## UNITED STATES v. IMPERIAL CHEMICAL INDUSTRIES, Limited, et al.

United States District Court
S. D. New York.

Sept. 28, 1951.

---

J. Howard McGrath, Atty. Gen., Leonard J. Emmerglick, Sp. Asst. to the Atty. Gen. (Ephraim Jacobs, Burton R. Thorman, Bert C. Dedman, Jr., and Samuel B. Prezis, all of Washington, D. C., of counsel), for plaintiff.

Covington, Burling, Rublee, O'Brian & Shorb, Washington, D. C. (John Lord O'Brian, Gerhard A. Gesell and Charles F. Barber, Washington, D. C., of counsel), and Root, Ballantine, Harlan Bushby & Palmer, New York City (John M. Harlan, Edward L. Friedman, Jr., and Charles E. Stewart, all of New York City, of counsel), for E. I. duPont deNemours & Co., Lammot duPont and Walter Samuel Carpenter, Jr.

Coudert Brothers, New York City (Mahlon B. Doing and Joseph A. McManus, New York City, of counsel), and Hughes, Hubbard & Ewing, New York City (L. Homer Surbeck, Richard W. Hogue, Jr. and Powell Pierpoint, all of New York City, of counsel), for Imperial Chemical Industries, Ltd. and Imperial Chemical Industries (New York), Ltd.

Donovan, Leisure, Newton, Lumbard & Irvine, New York City (J. Edward Lumbard, Jr., Phillips S. Trenbath, Robert J. Dunne and John F. Seiberling, Jr., all of New York City, of counsel), for Remington Arms Co. and Charles Krum Davis.

RYAN, District Judge.*

## * Abbreviations Used

ATLAS—Atlas Powder Company

BELGIAN COMPANIES—Poudreries Reunies de Belgique Poudreries Royales de Wetter-en-Coopal et cie.

BUNGE & BORN—Bunge & Born Limitada S. A. Commercial Financier y Industrial

CBC—Compania Brasileira de Cartuchos

CIL—Canadian Industries, Ltd.

COSWIG—Westfaelische Anhaltische Sprengstoff A. G.

CSAE—Compania Sud-Americana de Explosivos

CXL—Canadian Explosives, Ltd.

DAG—Dynamit Aktiengesellschaft

DUCILO—Ducilo S. A. Productora de Rayon

DUPERIAL-ARGENTINA—Industrias Quimicas Argentinas "Duperial", S. A.

DUPERIAL-BRAZIL—Industrias Chimicas Brasileiras "Duperial", S. A.

duPont—E. I. duPont deNemours & Company, Inc.

EIL—Explosives Industries, Ltd.

ELECTROCLOR—Electrocolor S. A. Argentina

EXL—Explosives Trades, Ltd.

HERCULES—Hercules Powder Company

ICI—Imperial Chemical Industries

ICI also NOBEL—Nobel industries, Ltd.

ICI(NY)—Imperial Chemical Industries (New York), Ltd.

I. G. Farben—I. G. Farbenindustrie, A. G.

This suit was instituted with the filing of the complaint of the United States of America on January 6, 1944, against nine defendants—four corporations and five individuals, officers of the corporate defendants. The action proceeded to trial on April 3, 1950; the trial was concluded on June 30, 1950. The issues were finally submitted to the court for determination in November, 1950.

## I. The Defendants

Defendant Imperial Chemical Industries, Ltd. (ICI) is a corporation organized under the laws of the United Kingdom with offices and principal place of business in London. It was formed in 1926 as the successor to Nobel Industries, Ltd., which in turn was known from 1919 to 1921 as Explosives Trades, Ltd., and from 1915 to 1919 as Nobel Explosives, Ltd., and prior to 1915 as Nobel Explosives Company, Ltd. of Glasgow. ICI was formed by the consolidation of British Dyestuffs Corporation, Ltd., a producer of dyestuffs; Nobel Industries, Ltd., a producer of explosives, nitrocellulose products and non-ferrous metals; and Brunner-Mond & Co., Ltd. and United Alkali Co., Ltd., producers of alkali products. We have used the letters ICI herein to designate the defendant Imperial Chemical Industries, Ltd. as well as Nobel Industries and its predecessors. ICI is one of the largest British manufacturers and sellers of a general line of chemical and related products; it is one of the principal companies of its kind in the world.

Defendant Imperial Chemical Industries (New York), Ltd. [ICI(NY)] is a corporation organized and existing under the laws of the State of New York, with offices and principal place of business in New York City.

Defendant E. I. duPont deNemours and Company, Inc. (duPont) is a corporation organized under the laws of the State of Delaware. DuPont was founded in 1802 as a partnership, known as E. I. duPont de Nemours & Co., to manufacture gunpowder and other explosives. In 1903, E. I. du Pont deNemours Powder Company was organized as a corporation under the laws of New Jersey to take over the business conducted by the partnership. In a decree of the United States Circuit Court for the Third Circuit (Delaware), entered on June 21, 1911, United States v. DuPont DeNemours & Co., 188 F. 127, it was adjudged that E. I. duPont deNemours Powder Company had acquired a monopoly of gunpowder and it was ordered that two new companies be formed. Pursuant to this direction, Hercules Powder Company and Atlas Powder Company were established and a portion of the duPont business sold to them. Thereafter, on or about September 4, 1915, defendant duPont was incorporated to take over and did take over the remainder of the explosive business. Since 1915, duPont has expanded its business; it now manufactures and sells many chemical products other than explosives. These products are sold and transported in commerce among the several states and between the United States and foreign nations. DuPont is a leading company in its field; it is one of the great chemical and industrial enterprises of the world.

Defendant Remington Arms Company, Inc. (Remington) is a corporation organized under the laws of the State of Delaware. It is a manufacturer of sporting arms and ammunition. The Remington trademark and the reputation of its products are favorably and internationally known. Its products are sold and transported in commerce among the several states and between the United States and foreign nations.

Defendants Lammot duPont and Walter S. Carpenter, Jr. are both residents of Wilmington, Delaware and long have been in the employ of and officers of duPont. They have actively participated in the management and direction of duPont and

LA CELULOSA—La Celulosa Argentina S. A.
LPL—Leathercloth Proprietary, Ltd.
NCF—Nobel Chemical Finishes, Ltd.
NOBEL also ICI—Nobel Industries, Ltd.
NORWEGIAN COMPANY—Norsk-Spraengsto-findustri A/S
ORBEA—Cartucheria Orbea Argentina S. A.

PRIMITIVA—Cia. Primitiva de Gas
REMINGTON—Remington Arms Company, Inc.
SOLVAY & BELGIAN COMPANY—Solvay et Cie.
WINCHESTER—Winchester Repeating Arms Company

have taken part for many years in the formulation and carrying out of the policies, agreements and undertakings of that company.

Defendant Charles Krum Davis is a resident of Fairfield, Connecticut and has been president and general manager of Remington since 1933.

Harry Duncan McGowan (now Lord McGowan), herein referred to as Sir Harry McGowan, and Henry Mond (Lord Melchett) are named as defendants but were not served with process. Sir Harry McGowan and Lord Melchett were at the time of the filing of the complaint residents and citizens of Great Britain. The former has been Chairman of the Board of Directors of ICI, since 1931 and for many years prior thereto had been one of the managing officials of Nobel Industries, Ltd. and of its predecessor companies. Lord Melchett was a director of ICI from 1928; he took an active part in the management of its affairs. He is now deceased.

The following foreign corporations, although not named defendants, are alleged to have been parties to the unlawful agreements set forth in the complaint:

Canadian Industries, Ltd. (CIL);

Explosives Industries, Ltd. (EIL);

Compania Sud-Americana de Explosivos (CSAE);

Industrias Quimicas Argentinas "Duperial," S. A. Industrial y Commercial (Duperial-Argentina);

Industrias Chimicas Brasileiras "Duperial," S. A. (Duperial-Brazil);

Bunge and Born Limitada, S. A. Commercial, Financiera y Industrial (Bunge & Born);

Dynamit Aktiengesellschaft (DAG). (DAG is controlled by I. G. Farbenindustries, A. G. as is Köln-Rottweil A. G. (Köln); DAG as used herein includes Köln, for whom DAG acted in making the various agreements.)

## II. The Pleadings

The complaint was filed under Section 4 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended 15 U.S.C.A. § 4—the Sherman Anti-Trust Act—to restrain and prevent alleged continuing violations of Section 1 of the Act.

In essence, the complaint charges a conspiracy among the defendants, having as its purpose a division of world markets and the elimination of competition among themselves and between them and third parties in the trade and commerce of chemical products, sporting arms and ammunition. The complaint alleges the achievement of this purpose by the execution of unlawful contracts, agreements, arrangements and understandings and the establishment and maintenance of jointly-owned foreign companies; and the continued existence and accomplishment of this conspiracy and its purposes despite various temporary arrangements necessitated by the war. By reason of this, it is alleged that judicial remedy is necessary to restore competition among the defendants and between them and third parties. The complaint prays that the combination and conspiracy and the practices alleged be decreed unlawful and that defendants be perpetually enjoined from continuing, reviving or renewing any of the said violations.

Generally, the several answers of the defendants consist of a denial that any of them violated the anti-trust laws.

Specifically, the answer of the duPont defendants after admitting many of the transactions alleged, avers: that these activities had not for their purpose nor have they effected an unreasonable restraint of trade; that duPont never controlled or dominated the chemical business nor did it ever have the power to do so; that to meet the ever increasing rivalry among manufacturers in this rapidly advancing field it has had to steadily expand its research activities; that the agreements with defendant ICI had for their purpose the expansion of duPont's manufacture and commerce in the chemical industry and the facilitation of technological progress by the acquisition and exchange of patents, inventions and licenses not otherwise available to it. The answer further alleges that the licenses which it granted under these agreements represented lawful exercise of its rights and that these agreements did

not have a restrictive effect on trade, but, on the contrary, opened to each party new manufacturing and commercial opportunities. It is also alleged that the agreements were bona fide and not a device to cloak and conceal a division of markets, that their terms stated the full intent and purpose of the parties to them, that the parties, at all times, operated pursuant to such explicit terms in order to carry out their manifest purpose, and that any exchange or grant of information was subject to adequate and justifiable compensation.

DuPont further alleges that it has consistently sought to expand its foreign commerce, that because of numerous economic, political and business factors, it had to join with other interests; but that, at no time, did it cease to act with a view to the fullest possible development of its trade.

DuPont alleges that the creation of the jointly-owned foreign companies was made necessary by economic conditions, and did not represent an effort to restrict or divide trade; that there was no collusion with defendant ICI in the establishment of the prices at which duPont and ICI products were sold to these companies, but that, on the contrary, prices were fixed independently and separately by each with regard to market conditions and the best interests of their customers. The effect of this, it is alleged, could not be injurious to trade, since the alternative would have forced duPont, because of factors beyond its control, to yield markets it had previously serviced.

As to duPont's relation with Remington in the conspiracy charged, duPont points out that it acquired a majority interest in that company, and therefore necessarily exercised some control over its policies and management. However, duPont denies that it ever agreed with ICI to limit Remington's trade, and asserts that any agreement entered into had for its sole purpose the expansion of that company's trade.

The answer of the ICI defendants raises substantially the same defenses; their repetition will serve no purpose. In addition, ICI urges that this court lacks jurisdiction over it, in that it is a foreign corporation, not doing business in the United States, and therefore not amenable to the process of this court. It does admit that defendant ICI(NY) is found here, and that it is beneficially owned and controlled by ICI, but denies that ICI(NY) is its agent for the transaction of business.

The answer of the Remington defendants; besides denying participation in any conspiracy, also denies that any unlawful understanding existed since 1932 (at which time it became affiliated with duPont) between the other defendants, or that Remington knew of any such combination between the other defendants prior to that time.

Answering the Government's claim that acquisition by duPont of stock in Remington had for its purpose or effected the elimination of competition between Remington and ICI in the sale of sporting arms and ammunition and the bringing of this industry within the existing over-all conspiracy, Remington alleges: that at no time has duPont controlled its management, policies or activities, other than as a right incidental to stock ownership, but that Remington has continued to act independently; that its affiliation with duPont was necessary if Remington was to preserve and improve its competitive position in this field— a policy from which it has never deviated. It is further alleged that as a result of economic conditions, acquisition by duPont of a majority interest in Remington was a logical solution to a serious economic problem confronting both companies, and that Remington has greatly benefited thereby.

With reference to its agreements with ICI, Remington alleges as their effect, not a curtailment, but an increase in its exports to and in its manufacture in the British Empire, as well as the improvement of its products, the addition and substitution of new ones and the saving of expense and time in research. Remington denies making any agreement whereby ICI was to or did curtail its exports to the United States, alleging that because of the extremely high tariffs in effect here, ICI could not, under any circumstances, have developed an extensive trade to this country.

The organization of the jointly-owned foreign companies by Remington with ICI, Remington alleges, was necessitated by po-

litical and economic factors (tariffs and national trade barriers) which were effectively closing markets to Remington. Establishment of foreign plants to manufacture and distribute locally and to act as Remington's exclusive selling agents, it avers, was the only means by which it could continue to sell in these markets. Remington further alleges that all these agreements and arrangements with ICI were independently arrived at, motivated not by any conspiracy, but prompted solely by independent assessment of commercial factors.

The action was tried by the Court upon the issues thus framed.

### III. Jurisdiction over ICI

█ By way of a separate and distinct defense in its answer, ICI has questioned the court's jurisdiction over it, asserting that it has not been properly served with process in this action. Service of process upon ICI was made, or attempted to be made, by service upon ICI(NY), a New York corporation wholly owned by ICI and having an office in the City of New York. The issue here presented is whether the relationship between ICI and ICI(NY), and the activities of the latter company in this district, are such that service upon ICI (NY) is effective to confer jurisdiction upon this court over the parent company.

This very question was raised by ICI in a prior litigation in which it was involved in this district. United States v. United States Alkali Export Ass'n, Inc. et al.,[1] S.D.N.Y.1946. The parties have stipulated herein that the jurisdictional issue should be determined on the basis of the record made in that case (hereinafter known as the Alkasso case), together with the evidence adduced herein. Moreover, ICI has rested its legal position on the arguments it advanced in its briefs in the prior litigation, which briefs it has resubmitted to the court.

We have carefully examined the factual evidence bearing on the jurisdictional issue submitted in the Alkasso case submitted herein, the briefs which have been submitted to the courts, and Judge Leibell's exhaustive opinion in the prior litigation. We are in complete agreement with Judge Leibell's determination that service of process upon ICI(NY) suffices to confer jurisdiction upon this court over ICI.

We find that the offices and staff maintained in this district by ICI(NY) were used solely for the purpose of carrying out the business of defendant ICI. The conclusion is inescapable that defendant ICI was doing business within this district through ICI(NY); and that the two were so inextricably associated that every move of the latter was directed by ICI. Consequently, we hold that service on ICI(NY) gave ICI notice of the institution of this suit. There is every "reasonable assurance that the notice will be actual." International Shoe Co. v. State of Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95.

It cannot be successfully contended that requiring ICI to defend here will work such an inconvenience as to result in a denial of due process. It is hard to conceive of a forum more convenient to plaintiff and to a defendant who has had such numerous, permanent contacts in this district—contacts so essential to the continued conduct of its affairs. ICI has taken advantage of the opportunities offered here for its corporate activities; it has received the benefit of the laws of the United States; it must expect to be required to answer for their breach. International Shoe Co. v. State of Washington, supra, 326 U.S. at page 317, 66 S.Ct. 154; Latimer v. S/A Industrias Reunidas F. Matarazzo, 2 Cir., 175 F.2d 184, 185.

### IV. Admissibility in Evidence of Certain Documents

Defendants duPont, Lammot duPont, and Walter S. Carpenter Jr. moved to strike certain of the plaintiff's exhibits on the ground that they are hearsay and not admissible under any exception to the hearsay rule. The moving defendants urge that even if it be assumed that a conspiracy has been shown, *prima facie,* by evidence *aliunde,* which they do not concede, the challenged documents are not in furtherance of the conspiracy, but are (1)

---

1. No opinion for publication.

512

mere narrative statements of past events, or (2) internal ICI statements recording gossip, speculation, or opinion, or (3) *ex parte* interpretations of draft or final agreements, or (4) anonymous and other miscellaneous hearsay statements.

■ There is no disagreement as to the applicable law. If a conspiracy has been shown *prima facie* by evidence *aliunde,* declarations of co-conspirators in furtherance of the conspiracy are admissible against all. Since we have found that a conspiracy has been so proven, the sole issue is whether the challenged documents are declarations in furtherance of the conspiracy. Because of the nature of the conspiracy, and of its participants, we conclude that they are.

■ Whether a declaration is in furtherance of a conspiracy must perforce turn upon scope and extent of the conspiracy. When the alleged conspirators are large corporations, doing a world-wide business, with seats of authority geographically distant one from another, numerous internal communications within each corporation are necessary in order to apprise large numbers of corporate officers and employees of the nature of the negotiations, the attitudes of the representatives of other co-conspirators, the decisions reached, their import and the understanding of the agents of the corporation of the decisions reached. Otherwise, such a conspiracy would be inoperative.

Moreover, in a conspiracy which continues over many years, which has been adapted to changed conditions, which has altered techniques and tactics from time to time, and where the individuals operating the affairs of corporate members of the conspiracy have changed with the passing of years, the keeping of records of past agreements and understandings, the preparation of summaries of past relationships between the parties and the making of reports are in aid of the over-all purpose, persisting throughout, which the parties to the agreement have been intent upon accomplishing.

In addition, a broad agreement to divide world-wide markets such as is shown in this case, existing from as early as 1897,

cannot be a static one, else it would find itself ineffective due to rapidly changing world conditions, and the new and frequent developments in technical fields. Revisions, alterations, adjustments, and expansion to new and attractive areas were necessarily part of the conspiracy here proven, and, indeed, at the very heart of its successful survival of altered external factors. Accordingly, the steps taken by each co-conspirator in suggesting alterations, preparing for conferences, reporting discussions among the representatives of the co-conspirators concerning proposed alterations, planning new means of effectuating the joint purpose, all are in furtherance of the conspiracy.

An agreement and conspiracy of the nature proven in this case is a vital, growing, adjustable enterprise, and this growth, vitality and adjustability further the purposes of the conspiracy, for without them, the conspiracy would become ineffectual and fail of its purposes.

All of the challenged documents are therefore held to be in furtherance of the conspiracy. The objections of the moving defendants go to the weight to be given particular parts of particular documents, and where a document contains conjecture or speculation as to the state of mind of individuals employed by a co-conspirator, or similar matter of slight probative value, little if any weight has been given to it.

The conclusion we have reached is in accord with the weight of authority. See United States v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746; Schine Chain Theatres v. United States, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L.Ed. 260; United States v. Hartford Empire Co., D.C.N.D.Ohio, 46 F.Supp. 541, affirmed 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; United States v. General Electric Co., D.C.N.J., 82 F.Supp. 753, 902–905.

■ In light of the conclusion here reached it is apparent that six exhibits offered into evidence by the plaintiff during the trial and excluded as to the defendant Remington (with the reservation that in light of later developments, the ruling might

be changed), should be admitted generally. Each appears to be in furtherance of the conspiracy. Exhibits 1278, 1279, 1280, and 1281 are therefore admitted.

Exhibits 1269 and 1309 likewise appear in furtherance of the conspiracy provided only their authenticity as declaration by agents of ICI is established. Neither is signed and there is no proof as to their authorship. Nevertheless, since there is sufficient circumstantial proof to establish that they are authentic records and declarations of an agent of ICI, they are received in evidence. Both are from the files of ICI (cf. VII Wigmore on Evidence 2160 (1940 ed.)); the subject matter of both is corroborated by other evidence, and both, the first document especially, give every indication of having been prepared by a responsible agent of ICI. Indeed, the only logical explanation of their appearance in the ICI files if they are not authentic, is that the documents are forgeries, or spurious. Such an explanation is rejected as entirely improbable.

However, the weight to be given the documents, particularly to the second, is necessarily decreased. While they bear every indication that they were prepared by persons in a position to know of the matters set down, their anonymity must go to the weight to be given them. With this caveat, the two documents will be received.

We come now to examine the stenographic record of the trial consisting of over 5200 pages, the 1436 exhibits introduced by the Government and printed in 13 volumes, and the 2264 exhibits introduced by the defendants and printed in 17 volumes. We are grateful to counsel for their cooperation in expediting the presentation and introduction of the evidence, but we have approached the examination and evaluation of the multitudinous exhibits with the reflection that of them there were too many and too much. Perhaps, with knowledge born of this experience, a similar trial in the future will see the introduction of fewer exhibits. However, we have here considered all exhibits and from them and the testimony we make the following findings.

## V. The Patents and Processes Agreements

### A. The "Explosives Agreements"

The several types of agreement into which the defendants entered present important problems peculiar to each type. Therefore, although the complaint alleges that all the agreements entered into between the defendants reflect a continuing overall conspiracy, the distinct types will be separately examined. We will separately consider the various patents and processes agreements; the agreements affecting the jointly owned companies; and what might be characterized as miscellaneous selling arrangements. Throughout it must be borne in mind that the Government alleges the interconnection of all these agreements.

While reaching the fullest efflorescence in the 1929 and 1939 agreements embracing large categories of products, the patents and processes agreements were first developed with respect to explosives. In ascertaining the intent underlying the patents and processes agreements, a separate study of the explosive arrangements may prove useful. Evaluation of the intent of the parties in making these agreements will be facilitated by first setting forth summarily the content of the major earlier agreements.

### 1. Content of These Agreements

In 1897, duPont and various other American companies entered into an explosives agreement with Vereinigte Köln-Rottweiler Pulverfabriken, of Cologne, and Nobel-Dynamite trust of London (predecessor of ICI), the latter companies being designated "the European factories." The spirit of the agreement was set forth in the preface: "Whereas, the parties hereto own or control a large number of companies and works engaged in the manufacture and trade of explosives, and whereas, it has been deemed advisable to make arrangements, so as to avoid anything being done which would affect injuriously the common interest" (Ex. 1410, pp. 11148 E, F).

The agreement provided substantially as follows: with respect to Black Powder and Smokeless Sporting Powder, "the

American Factories undertake not to erect factories in Europe, and the European factories undertake not to erect factories in the United States of America. Both parties, however, were to be free to import into the other party's territory" (Ex. 1410, p. 11148 G, H).

With respect to detonators it was provided that "the European Factories shall abstain from erecting detonator works in the United States of North America," and would discontinue works then in the process of construction (Ex. 1410, p. 11148G). In consideration of this undertaking the American Factories agreed to order at fixed prices a certain number of detonators per year. "With regard to Smokeless Military Powder it is hereby agreed that the European Factories undertake not to erect any factories in the United States of America, and that the American Factories undertake not to erect any factories in Europe. Whenever the American Factories receive an enquiry for any Government other than their own, either directly or indirectly, they are to communicate with the European Factories through the Chairmen appointed, as hereinafter set forth, and by that means to ascertain the price at which the European Factories are quoting or have fixed, and they shall be bound not to quote or sell at any lower figure than the price at which the European Factories are quoting or have fixed. Should the European Factories receive an enquiry from the Government of the United States of North America, or decide to quote for delivery for that Government, either directly or indirectly, they shall first in the like manner ascertain the price quoted or fixed by the American Factories and shall be bound not to quote or sell below that figure" (Ex. 1410, p. 11148 H).

The provisions of the 1897 agreement most pertinent to this suit are those involving high explosives, defined as "all explosives fired by means of detonators," as to which it was "agreed that the United States of North America, with their present or future territories, Possessions, Colonies, or Dependencies, the Republics of Mexico, Guatemala, Honduras, Nicaragua, and Costa Rica, as well as the Republics of the United States of Colombia and Venezuela, are to be deemed the exclusive territory of the American Factories, and are hereafter referred to as 'American Territory'. All the countries in South America not above mentioned, as well as British Honduras and the Islands in the Caribbean Sea, which are not Spanish possessions, are to be deemed common territory, hereinafter referred to as 'Syndicated Territory'; the rest of the world is to be the exclusive territory of the European Factories, hereinafter referred to as 'European Territory'. The Dominion of Canada and the Islands appertaining thereto, as well as the Spanish possessions in the Caribbean Sea, are to be a free market unaffected by this Agreement.

"The American Factories are to abstain from manufacturing, selling, or quoting, directly or indirectly, in or for consumption in any of the countries of the European Territory, and the Europeans are to abstain in like manner—in any of the countries in the American Territories. With regard to the Syndicated Territory neither party are to erect works there, except by a mutual understanding, and the trade there is to be carried on for joint account in the manner hereinafter defined" (Ex. 1410, pp. 11148–H–I).

It was further provided that the American and the European Factories were each to designate a Chairman, who were to agree upon and fix a basis price for each market in the Syndicated Territory, to include cost of manufacture, and all charges, as well as a stipulated "contribution towards the Common Fund." The Chairmen were empowered likewise to fix a selling price for each market, below which no sales were to be effected; the difference between the basis price and the selling price was to be deemed the "Syndicate" profit, and to be divided in equal shares by the American Factories and the European Factories (Ex. 1410 p. 11148 1 et seq.).

This 1897 Agreement was cancelled by the parties in 1906, one year before the filing of a government monopoly suit against duPont which resulted, inter alia, in its judicial condemnation. United States v.

E. I. DuPont DeNemours & Co., C.C., 188 F. 127.

In 1907, DuPont entered into the first of the patents and processes agreements (Ex. D. 1271). The other parties to the contract were Köln-Rottweiler and Nobel Dynamite Trust, Ltd. (the European factories). Many of the provisions of this first of the patents and processes agreements were adhered to in the later agreements.

In it the words "invention" or "inventions" were understood to include American inventions and European inventions. "Explosives" were defined "as including Black Powder and Nitrate mixtures in all their varieties; smokeless propellants, whether for military or sporting purposes; disruptive explosives of any kind, whether for industrial or warlike purposes; * * * and generally all devices for initial detonation or ignition, as also ammunition of every kind, as well as the ingredients and component parts of all the above insofar as they are applicable to explosives."

To the "Americans" were allocated the United States of America and their present and future territories, possessions, colonies, or dependencies, Mexico, Guatemala, Honduras, Nicaragua, Costa Rica, Panama, Colombia and Venezuela. To the "Europeans" were assigned all countries not allocated to the "Americans," except the balance of South America, British Honduras, Islands of the Caribbean, the Dominion of Canada and Newfoundland.

The agreement provided for the exchange of patented and secret processes; each granted to the other exclusive rights for the grantee's territory and non-exclusive rights in all other territories (Ex. D-1271, pp. 8213, 8214).

Each party further agreed that if it acquired during the term of the Contract any rights under any patents or secret processes relating to the manufacture of explosives in any territory in which it has not granted its "inventions" to the other, "such party shall co-operate and use its best endeavours to obtain such similar rights, licences, etc., for the other party as will enable the other party to use the same in territory in which rights have been granted to it hereunder, but neither party is under obligation to pur-chase or pay for any such rights for the benefit of the other" (Ex. D-1271, p. 8215).

It was also provided that "For the purpose of making effective the grants hereby made, each party shall disclose to the other immediately, or in any event within twelve months from the date of this Contract, full particulars in regard to all 'inventions' employed by such party, and shall furnish the other with copies of all patents owned or controlled by such party, and wherever necessary shall execute such assignments and licences under such patents as may be necessary to carry out the intent of this Agreement, and each party shall appoint one or more competent and trustworthy persons experienced in the business for the purpose of receiving information from the other party as to all secret processes now used by either party to this Contract, and shall notify the other of such appointment, and immediately after receipt of such notification, or in any event within twelve months thereafter, each party shall disclose to the appointees of the other party all such information concerning any secret process used, owned or controlled by such party as may be necessary to carry out the intent of this Agreement. Each party agrees from time to time during the continuance of this Agreement to transfer any 'invention' hereafter owned or controlled by it, and to disclose all such information in regard to any such 'invention' whenever the same may reasonably be required under the terms of this Agreement· Each party agrees to use its best endeavours to keep secret any disclosures made by the other party to it, but shall not be liable in damages for failure so to do. Each party will further supply such experienced chemists, engineers, foremen, and other experts as the other party may require to assist such other party in availing itself of any such 'invention' and practically applying it, all of which assistance, however, shall be at the expense of the party availing itself thereof, and such assistance shall be afforded by each party to the other from time to time as required" (Ex. D-1271, p. 8215).

Finally, of special significance in this 1907 Agreement was the provision for pay-

ment for the licenses granted, which read: "It being impossible to compute the detailed value to each of the parties of the 'inventions' hereby granted, the patents hereby conveyed not having been applied in the business of the grantees, and the secret processes being at present unknown to each grantee hereunder, a proper and fair compensation by each party to the other can most accurately be reached by basing the payment to be made by the parties to each other on the increase in their profits as compared with the profits earned in 1906, providing for the normal increase independent of the adoption of the 'inventions' hereby granted by allowing 6 per cent on all and any increase in the earnings capital, on the assumption that any increase in the normal profits must call for a corresponding increase in capital" (Ex. D–1271, pp. 8216, 8217).

We find that the purpose and effect of this agreement of 1907 was to eliminate competition in the various explosive markets of the world.

Early in the summer of 1913, duPont counsel "urged upon the Executive Committee the danger of the continuance of this agreement in view of the injunctive provisions of the decree in the government suit." Conferences were held and the 1907 agreement was cancelled (Ex. 39, p. 213). A new agreement was drawn, which was not executed due to the outbreak of World War I (Ex. 1); however, duPont and the British Nobel Company continued to cooperate during the war and accepted the unsigned draft as if in effect between them during the war. The 1914 draft followed the familiar pattern; it was in the form of an agreement to exchange present and future patents, processes and inventions relating to military and commercial explosives; the allotment of exclusive territories was identical to that made in the 1907 agreement (Ex. D–1271, p. 8213; Ex. 1).

The 1913 document was drawn in the light of the recognition "that previous agreements had been based on sound business considerations" and of duPont's position that "it is not good business to attempt an expansion in certain directions if such an act is bound to result as a boomerang of retaliation" (Ex. 37, p. 198). It was drafted to replace the 1907 agreement with a document which gave outward service to the law of the United States. The negotiations left Judge Laffey, duPont general counsel, who had participated in the conference which brought it forth, with the impression that, "* * * we were getting our house in order legally, abolishing all contract relations that might be construed in restraint of trade, but that, as a matter of voluntary policy, nothing would be done by either party that under the 1907 agreement would constitute a violation of the contract" (Ex. 39, p. 213).

It was also noted by Judge Laffey that, "It was well understood by both parties that there was no legal obligation under the Sherman Law to compete and that even natural competitors in the same territory might as a voluntary policy refrain from competition" (Ex. 39, p. 213).

The evil, however, lay in that here the competitors were by collateral understanding effectuating a purpose to refrain from competing with each other (Ex. 37, pp. 197–99; Ex. 39, p. 213; Ex. D–1275 to 1280–C).

In 1920, duPont entered into an agreement with Explosives Trades Ltd., successor to Nobel, which again repeated the pattern of the 1913 Agreement. It was provided that products other than explosives might be added if the parties so elect (Ex. 3, pp. 55–56). It was called by the parties the "General Explosives Agreement of 1920." The German companies were not made parties; World War I had intervened. This agreement Sir Harry McGowan of ICI referred to on September 19, 1923 as "a camouflage to cover all relationships between the two companies" (Ex. 43, p. 228).

2. The Intent of the Parties

These agreements represent the major Patents and Processes Agreements involving explosives. The claim of the Government with respect to this phase of the case simply stated is:

The 1897 Agreement was at least in part an open effort to divide markets. Recognizing its illegality under the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15

note, the parties sought to achieve the same purpose through a patents and processes agreement which it was hoped would give a color of legality to the unlawful operation. Through their lack of experience with this technique of evasion, however, they included provisions which exposed its unlawful purpose. When apprised of this by counsel, they eliminated the offending provisions, but did not, however, change the essential purpose of the arrangement or the suitability of the agreement to that purpose.

The position of the defendants may be stated as follows: the 1897 Agreement was an illegal one and for that reason was cancelled; the Patents and Processes Agreement of 1907 was not a continuation of that arrangement but a genuine effort to achieve the benefits of exchange of technology; its illegal aspects did not represent an effort to continue the 1897 Agreement, but resulted from inexperience with the legal requirements of such agreements; and in any event, if there had been any illegal purpose originally, it was abandoned in the subsequent Agreements.

A basic issue in the conflicting analyses is, of course, the role played by the Patents and Processes Agreement of 1907. A comprehension of this is facilitated by examination of a factor of central significance in the patents and processes phase of the alleged conspiracy; the utility of these Agreements as instruments of territorial division. This can be appreciated by observing the operation of the agreements with respect to patents and secret processes involving techniques or methods in the production or utilization of non-patented products. All may compete in the production or sale of such commodities. Under the agreements the granting or acceptance of a license to such a technique results directly in the elimination of competition. The accepting party is given the exclusive right to utilize the technique in producing a non-patented commodity in its allocated exclusive territory; but it may not utilize the technique in the territory reserved by the grantor. Similarly, the granting party may not utilize the technique in the territory reserved to the other. It is plain that, acting in strict accordance with the terms of the patents and processes agreements, parties so disposed could effectively eliminate competition between themselves.

We here assume that the patents and processes agreements are not invalid on their face. The burden thus devolves upon the Government to prove that the defendants entered into these agreements with an illegal purpose, or that they operated to achieve an illegal result.

It should be noted again that both agreements were cancelled by the parties on advice of counsel that it was illegal. The correctness of this opinion can scarcely be doubted, nor do we understand the defendants to dispute it now. The immediate question is whether the illegality of the 1907 Agreement reflected only innocent inexperience with the legal requirements or whether it also represented a deliberate effort to continue the purpose of the prior 1897 Agreement.

In this connection, several facts seem reasonably apparent. The 1897 Agreement was a palpable effort to eliminate competition among the contracting parties. In part, this was to be accomplished by a division of territories. It was cancelled because the parties recognized it to be illegal. A reading of the 1897 and 1907 Agreements convinces that the latter Agreement was worded and designed to effectuate the purpose of the former. Some of the incriminating similarities were well pointed out by counsel in urging the cancellation of the 1907 Agreement: "The parties to the Agreement of 1907 are substantially the same parties to the Agreement of 1897; the territorial division is the same in both Agreements; what was European territory under the old Agreement is European territory under the present Agreement; what was American territory under the old Agreement is American under the present Agreement; much of the phraseology of the old Agreement is found in the new Agreement" (Ex. D-1279, p. 8283).

The single most illuminating provision of the 1907 Agreement concerned payments for the mutual exchange of patents and

processes. This exchange of patent and process licenses, coupled with territorial limitations, can be considered legal only on the theory that it represents a legitimate exploitation of a legal monopoly. An essential element of such legitimate exploitation is that a bona fide effort be made to exact royalties proportioned to value. Thus, if a patent and process agreement of the kind involved here was to provide for exchanges of licenses with no remuneration at all, absent an exchange equal in value, its efficacy as an instrument to divide markets could scarcely be questioned. What the parties did do in the 1907 Agreement was hardly preferable. In substance, they provided that one-half of the increase of profits subsequent to the exchange of licenses would be attributed to the use of the licensed inventions, and paid to the licensing party. The effect of this provision was to eliminate all possible inducement between the parties to compete. The explanation that, absent experience as to the value of the licenses, these provisions represented a bona fide effort to assess value, does not merit consideration. Its destructive effect on competition is too plain to admit of doubt.

The inherent utility of the 1907 Patents and Processes Agreement as an instrument of trade division, the nature of the 1897 Agreement, the similarity between the two agreements, the special profit sharing provisions, and the historical recordings and writings lead us to conclude that the 1907 Agreement was designed to effectuate the purposes of the illegal 1897 Agreement.

▮ The weight to be accorded duPont's declarations, which recur throughout the relationships of the parties, that the agreement was to be considered on its face, and no subterraneous intent was to be imported therein will be considered later. It suffices to say that they do not successfully rebut the inference here drawn with respect to the 1907 Agreement. Nor is this conclusion rebutted by evidence purporting to indicate a genuine desire to achieve the advantages and exchange of technology. So long as a major purpose of the agreement was an illegal one, a complementary legitimate purpose does not immunize the parties

from Anti-Trust prosecution. See U. S. v. National Lead Co., D.C., 63 F.Supp. 513, 524.

Not only are the patents and processes agreements susceptible to being apt instruments of territorial divisions, but the very first such agreement was deliberately entered into with a view to effectuating that illegal purpose.

From the finding above that the 1907 Agreement was intended to achieve an illegal purpose it does not necessarily follow that all the subsequent patents and processes agreements were similarly motivated. It thus becomes necessary for us to determine whether or not the subsequent agreements are expressions of the same basic policy. In this inquiry two factors must be borne in mind: first, as we have noted, the 1913 and 1920 Agreements deleted those provisions which in the 1907 Agreement gave clear internal corroboration of the parties' unlawful intent; second, the potentiality of the patents and processes agreements for territorial allocation is inherent in the structure of the agreements, and is in no way dependent upon the omitted provisions. If a material consideration in inducing the agreement was to divide markets and restrain United States imports and exports the agreements were unlawful. We turn then to examine the circumstances surrounding these agreements and to inquire into the manner in which they were carried out.

DuPont points to vigorous statements by their executives to the effect that they would not agree to any effort to use the agreements as a tool of territorial division and repudiating any construction of these agreements as designed to achieve territorial allocation. Defendants urge these duPont statements as decisive on the question of intent; the Government asserts that they are purely record making statements, and merit no consideration whatsoever. The weight to be accorded these contemporaneous utterances may be most profitably considered in an examination of a dispute between the parties, concerning the proper interpretation of these agreements, which arose later in connection with its military explosives aspects.

However the following may be noted here. It is established in law that the agreements were unlawful if entered into with an unlawful intent and to accomplish an unlawful purpose. U. S. v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533. The evidence is that counsel fully advised defendants that the law so provided (Ex. D–1279, p. 8284). Under these circumstances it is reasonable to assume that if the parties had the unlawful intent ascribed to them, they would have sought to conceal that fact by statements of the kind here made. This does not mean, of course, that such statements are to be considered evidence of guilt (as the Government appears to urge), but it does mean that they must be weighed carefully in their context and measured against the course of events.

In connection with the 1913 and 1920 Agreements, the Government points to, as important evidence of duPont intent and purpose, a memorandum drawn up by Lammot duPont in 1919 setting forth a proposed duPont export policy. He embraced within the projected policy four categories of products: (1) explosives, accessories and ingredients; (2) artificial leather; (3) dye stuffs and intermediates; and (4) all other products. With respect to each of these categories three distinct trade areas were proposed, varying slightly with each of the categories of materials, and paralleling the areas set forth in the various patents and processes agreements. The three areas are designated: (1) Active Territory —"Territory where duPont or subsidiaries expect to and will endeavor to, become the leading source of supply"; (2) Representative Territory—"Territory where duPont company or subsidiaries expect to do business now or later, but do not expect to become the leading seller"; (3) Inactive Territory—"Territory where duPont company or subsidiaries do not expect to do any business and will not attempt to supply in any way. Inactive Territory includes all above in which we have given to other manufacturers, through Agreements, exclusive rights to our own Patents and Processes" (Ex. 2, p. 36).

The Government urges that this document establishes the "camouflage" nature of the patents and processes agreements; that this policy (which Lammot duPont asserted to be already in effect) represented fulfillment of the agreements. The position of duPont, apart from denial of the secret understanding underlying the patents and processes agreements and the claim that Lammot duPont misstated past policy, and that his recommendations were not accepted, is that the document, at worst, indicated a unilateral policy dictated by business considerations; which, if the fact, would admittedly not be within the purview of the Sherman Act. In support of this, duPont points out that the policy concerned commodities not within the scope of any agreement. Furthermore, duPont does not dispute that the agreements inevitably involved some territorial withdrawal, but urges that the surrendered territory was competitively difficult, and that the technological benefits outweighed the loss of markets. Thus, Lammot duPont's export policy might be explained as reflecting the same view of the competitive unremunerativeness of the "Inactive Territories," as was reflected in the patents and processes agreements themselves.

This ingenious interpretation becomes difficult to sustain, however, when considered with other language in the same document. Lammont duPont also wrote: "As far as placing an obligation upon the company is concerned it appears to me that we are practically obligated to this policy now, insofar as it limits our activities" (Ex. 2, p. 34). This language is subject to several possible interpretations. One is that the exchange of licenses under the patents and processes agreements had been so complete that under the terms of the agreements complete territorial division had already taken place. Nothing in the record indicates this to be the fact. But, if this be considered the fact, it would afford striking confirmation of the utility of the patents and processes agreements as a device for dividing territories, and its identification in the minds of the parties with that result· Another interpretation—and in our view

the more probably correct one—is that Mr. duPont understood that his company was under an obligation not to compete in the "Inactive Territory." Under the circumstances, such an over-all obligation must have involved an agreement with Nobel. Whether the obligation became effective irrespective of the granting of licenses, or whether it was intended to make it effective upon interchange of licenses intended to achieve that purpose, is not here important.

The claim that the memorandum misstated duPont policy and that its recommendations were never adopted, is a subject for further inquiry. What is presently significant is that an important duPont executive apparently understood, twelve years after the termination of the 1897 Agreement, and six years after the termination of the 1907 Agreement, that his company was committed to a policy of territorial division.

This conclusion, almost irresistible upon close study of the memorandum in the light of surrounding circumstances, casts a curious light on previous disavowals of such purpose by duPont executives, and indeed, on the weight to be accorded subsequent statements of similar import. It is particularly important in view of the fact (which will receive more detailed consideration), that ICI executives later persisted in the same understanding of the nature and effect of the patents and processes agreements.

Another feature of this memorandum deserving of note is the inquiry addressed by Lammot duPont as to whether anything in his memorandum "would be objectionable as a matter of record" (Ex. 2, p. 34), a statement which may well be taken as an indication of a policy of concealment by duPont.

In 1923, a controversy between duPont and ICI resulted from sales in Europe by duPont of I. M. R. powder (a new form of nitro-cellulose powder). Unfortunately, the factual background of this disagreement is not entirely presented by the evidence but it appears that duPont had offered licenses for the I. M. R. powder to ICI which they had declined. Military authorities had interposed objections to the licensing of some secret military inventions, but whether this objection extended to I. M. R. powders does not appear. DuPont had discontinued licenses in this area allegedly with a view to freeing itself to sell military products abroad; but what licenses these were, and to what products in Europe they related, and what the sales picture was with respect to those products remains obscure. Another element in the factual melange was the pressure to which duPont was subjected by American Army officers to sell abroad in order to keep works in operation, and skilled personnel on the job, in preparation for any emergency.

The controversy was initiated by ICI in a letter from Sir Harry McGowan (Ex. 33, pp. 186–7). Subsequently, ICI's position was fully stated in a memorandum in which they noted that: "Nobel have always interpreted the arrangement with duPont by reference to the sequence of agreements and arrangements dating back to 1897 and not merely on a strict reading or interpretation of the present Patents and Processes Agreements, * * *." (Ex. 36, p. 193).

In this connection, the language of Barksdale, duPont's counsel, describing the 1913 Agreement as an effort to maintain the spirit of the 1907 Agreement, was cited (Ex. 36); the memorandum continued:

"2. Nobel have no desire, nor do they see any necessity, to make any change in the existing arrangements which have worked all this time so satisfactorily, leading as they have done to a free and frank exchange of ideas on all sorts of subjects to the mutual benefit of both parties.

"3. If duPont consider that any altered conditions have arisen, which call for a change in the business policies of the parties and also possibly of the actual agreement, as it now exists, then it would appear to be a matter for duPont to put forward their proposals, in the promulgation of which it seems advisable to keep the following points in mind:—

"(a) According to Mr. Felix duPont, the reason for the development of the duPont ideas is based on a desire to keep their powder factories employed with orders from the European markets. It must be

borne in mind that our American friends are not alone in this, because many of the European manufacturers (apart altogether from Nobel) have unemployed capacity not only in military powders but also in other commercial products, which they are all equally anxious to fill.

"*Note* at this point if duPont seek business in European markets it will be no longer possible for Nobel to hold the European manufacturers off in the manner which we have been able to do so far.

"(b) From our knowledge of the European markets, which duPont are investigating, it seems that most if not all such countries have now or will have in the near future factories adequate for the production of normal needs, and that only in case of emergency or of special circumstances will orders be placed with outsiders. In such cases the Governments in question will be influenced entirely by the presence of stocks and will place the business with whichever supplier has the goods available. Spain, for instance, where duPont claim to have sold, only bought because of and at the time of the Moroccan troubles, and we have recently been assured that the factories existing in that country and owned by the Union Espanola and by the Government are adequate for all normal needs and that no business will be placed outside which can be filled from those sources.

"(c) Nobel have no desire to sustain an arrangement which will preclude duPont from supplying anything which they themselves or the local people are unable to supply, and some machinery might be devised dealing with emergencies or special demands, should duPont be approached, but Nobel hold strongly that the introduction of an active campaign in the European markets is a violation of the spirit of the understanding which must have far-reaching effects on the general business of both parties, and which cannot possibly lead to any regular trade, and certainly not to a volume of business sufficient to employ duPont plants economically or regularly" (Ex. 36, pp. 193-95).

Finally, it is observed, "* * * if the subject is to be governed by a strict reading of the existing agreement, Nobel has the right to take the I. M. R. manufacturing rights for European markets (subject to the Government Prohibition Clause), but it is felt by Nobel that the agreement should not be construed on its exact phraseology, but rather on the broad lines of interpretation which have always governed the dealings between the parties" (p. 195).

This memorandum was relayed by Crane, then in duPont's London office, to Haskell, vice-president of duPont. He prepared a response by letter to Crane. It is not entirely clear whether it was intended that the letter was to be shown by Crane or whether it was designed merely to guide Crane in conversations with Nobel officials (Ex. 36, p. 192).

Mr. Haskell commenced by repudiating the interpretation placed on Barksdale's language by ICI to the effect that the Patents and Processes Agreement referred back to the 1897 Agreement; but he acknowledged that the previous arrangements had been based on sound business considerations; that mutual benefits had come from friendly relations, and that expansion in certain directions might well result in harmful retaliation (Ex. 37, p. 198).

He takes issue with the Nobel "camouflage" view of the agreement which he states to be contrary to the fact, in that the 1907 Agreement was cancelled and its place taken by the 1913 Agreement which "was complete in itself and represented all that could be done legally, and was so accepted by the parties" (Ex. 37, p. 198).

Mr. Haskell then notes that the sale by duPont of military powders to Europe was at the base of the controversy. He recalls that on several previous occasions duPont had sold military powders to Europe without protest from Nobel. He considered the "present situation" to be an outgrowth of the First World War when duPont supplied European requirements which in turn developed new buyers who preferred duPont powder. He observed that while Nobels disclaim any desire to act the part of dog in the manger, they are really so acting, for they "'hold strongly' that we should not sell nitrocellulose powder—something they do not themselves manufac-

ture in Europe" (Ex. 37, p. 203). Furthermore, he points out:

"* * * the kind of powder required by European buyers is the same as that formerly produced by the Germans. It also happens that the territory in question is to a very large extent the same territory the Germans enjoyed before the war. Therefore, in introducing a campaign in Europe to sell nitrocellulose powder, we are really entering the countries formerly sold by the Germans in which Nobel powder (Cordite) was never in demand.

"Since we are supplying something the Nobels have not yet manufactured to countries formerly supplied by the Germans, it seems rather far-fetched to evoke the spirit of a contract which would have expired in 1921 and to which the Germans were previously a party but which was cancelled in 1913 and by the Germans never renewed, and use this as a basis for excluding duponts from the former German markets and preclude their selling nitrocellulose powder—something Nobels have never themselves manufactured" (p. 205).

Mr. Haskell points out the change in conditions over the years, and that "I.M.R. powder was unknown in those years and the present trade conditions resulting from the War were then undreamed of" (p. 207).

The divergence in interpretation of the 1920 Agreement, he attributes to Nobels' inability to understand the Sherman Act, and, finally, he summarized his conclusions as follows:

"1. The Patents and Processes Agreement signed in 1919 means what it says and not more or less.

"2. Experience has indicated that friendly cooperation between such concerns as duPonts and Nobels is preferable to antagonism. The word 'friendly' is used in its widest sense and embraces not only the give-and-take of every day life but also rivalry and competition having due regard for fair play and the ethics of the game. * * *

"3. It must be recognized that new conditions constantly arise and that in composing differences in point of view it is of first importance to have full information as to the facts and to clear away misconceptions of facts and then adjust differences in accordance with the principles set forth in the preceding paragraph, considering each case on its merits and with relation to the whole" (Ex. 37, pp. 208–09).

Haskell's letter was submitted to duPont counsel, Judge Laffey, before being transmitted to Crane. Judge Laffey confessed that he was unable to understand precisely what policy Haskell was advocating and that he was uncertain as to the policy he would advocate (Ex. 39, p. 211).

He emphatically stated that duPont was under no legal or contractual obligation to abstain from sale of explosives in Europe absent the granting of exclusive licenses, "* * * but I feel, as I think we all feel, that we must look at this matter from the moral or ethical standpoint. In the light of what has gone before and in view of the fact that the Nobels are partners not only in Canada and Chile but in the automobile field, we must look at it with a view, I should think, of avoiding what, for the want of a better name, are often called 'unfriendly acts'" (Ex. 39, p. 212).

Judge Laffey described as the "strongest point" in Haskell's letter the assertion that the territory interested in duPont powder was substantially that previously served by the Germans. He urged, "* * * it would be logical for us to contend that this territory should be treated as so-called neutral territory, or to put it another way as 'spoils' belonging to the British and ourselves as allies in the late war" (Ex. 39, p. 215). He then suggested that duPont should, "* * * either say to Nobels we will as a matter of voluntary policy do nothing in European territory that, under the 1907 agreement, would be contrary thereto, or we should do what I am inclined to think we can properly do, take the position that the dropping out of the German company should leave the territory supplied by the Germans neutral territory in which we have equal rights. That would leave us free to sell nitrocellulose powders wherever the Germans sold them" (Ex. 39, pp. 215–216). Finally, he suggested three alternative courses, but, again, indicated his preference that duPont adopt the posi-

tion that the territory supplied by the Germans during the existence of the 1907 Agreement should be neutral territory.

A meeting was held on April 29, 1924, minutes of which record that Irenee duPont stated, with respect to the interpretation of the 1920 Agreement, that it did not obligate the parties to abstain from sales to the other's exclusive territory where no license had been granted or accepted. It was also recorded that "the Nobel representatives accepted Mr. duPont's statements as being the proper interpretation of the understanding. * * *" (Ex. 48, p. 252).

The position of the duPont defendants concerning this episode is as follows: in the conviction that the 1920 Agreement did not obligate them to abstain, absent licenses, duPont sold, first I. M. R. powders, and then other military nitro-cellulose powders, to Europe. When Nobel objected to these sales and described the agreement as a camouflage, duPont unequivocally rejected that construction. Ultimately, duPont exacted from Nobel acquiescence in its construction of the agreement, as reflected in the minutes and confirmed by the undisputed fact that duPont continued to export military products to Europe. This sequence of events, duPont insists, completely refutes the Government charge of a continuing conspiracy to divide markets.

We hold that analysis of the evidence sustains an entirely different interpretation of the dispute.

The first major document was the note of September 19, 1923, sent by Sir Harry McGowan of ICI to Carpenter of duPont, which set forth the position that the 1920 Agreement was a "camouflage," intended to be interpreted with reference to prior agreements extending back to 1897 (Ex. 43, p. 228). It is to be noted that the Nobel interpretation succeeds various apparently unequivocal statements by duPont executives, preserved in the records, that the patent and processes agreements were just that and not a territorial agreement (e.g. Ex. D.–1280, p. 8288). These documents to which duPont points as probative of its innocence, were apparently regarded by their business associates of many years'

standing as mere record serving statements. That duPont had been unable to impress upon Nobel this understanding of the agreements, assuming them to be free of territorial implications, seems a remarkable circumstance. It is no answer to say that Nobel had difficulty in understanding the nature of the Sherman Act and the significance of duPonts' comments with respect to it. That fact and its possible dangers had been understood from the beginning and it is inconceivable that duPont did not state its position with that difficulty in mind.

The view expressed by Nobel as to the camouflage nature of the agreements should be compared with the understanding of the agreement indicated by Lammot duPont in the document previously discussed (Ex. 2), and also with the significant comment of Carpenter of duPont that "there is much right in McGowan's position" (Ex. 37). Haskell's letter to Crane and Judge Laffey's comment on it, must be read with recognition of the fact that duPont, at all times, realized that their agreements and dealings with Nobel contained the seeds of possible trouble as far as the anti-trust laws were concerned, and that records should be completely free of language which might give color or support to such an accusation. Confronted with a document like the Nobel note, it became essential for duPont, irrespective of their actual position, to state on the record dissent from the Nobel view, and, indeed to require Nobel to place on the record acceptance of the duPont construction. These observations are made, not to discount in advance all duPont's disavowals of guilt, but rather to emphasize the necessity for careful scrutiny of the correspondence and records.

Haskell first repudiated the Nobel "camouflage" theory but thereafter he intimated duPont's recognition of the desirability of cooperation. Repeating his repudiation of any territorial connotation, he emphasized the greatly changed conditions resulting from the war with respect to military explosives, the essential lack of competitiveness between the duPont military product and the Nobel product, the circumstance that the territory primarily interested in

the duPont military product was that formerly serviced by Germany and in which Nobel powder was never in demand.

If Haskell were flatly repudiating any theory of territorial abstention, the question arises as to why he should refer to cooperation and lay such heavy emphasis on other justifications for duPont sales of military powder to Europe. Perhaps, this might be explained in part by the fact that duPont did not wish to offend Nobel unnecessarily, but this explanation is not entirely satisfactory. The Nobel note indicated to Haskell that Nobel continued to regard the patents and processes agreement as a camouflage. Moreover, Nobel was aware that duPont considered itself under a necessity to keep out of its records language savoring of a territorial arrangement. Under these circumstances, the Haskell memorandum certainly involved the danger that Nobel would consider it an attempt to modify a territorial arrangement with respect to a particular type of product rather than a denial of the existence of any territorial arrangement. Why Haskell should have used language capable of such construction, when he could hardly have been unaware of such a possibility, is difficult to understand.

It is important to note, again, that Judge Laffey, general counsel to duPont and a man intimately familiar with the history of the duPont-Nobel dealings, to whom the Haskell letter was referred for consideration, confessed himself "in doubt as to just what you advocate should be the position of the duPont company." He himself believed that duPont was under no legal or contractual obligation to abstain, but from the "ethical" standpoint it was a different matter.

Nor may we fail to give weight to Judge Laffey's report of his understanding of the 1913 Agreement, that the parties were getting their house in order legally, but that, "as a matter of voluntary policy, nothing would be done by either party that under the 1907 agreement would constitute a violation of the contract." It must be recalled, too, that the defendants have insisted that the 1907 Agreement was not intended to continue to effectuate the purposes of the 1897 Agreement, but that it was cancelled and replaced by the 1913 Agreement only because certain provisions gave it an air of illegality. We are unable to discover in the 1907 Agreement a provision absent from the 1913 Agreement, such that a course of action might constitute a violation of the first agreement without constituting a violation of the second. The conclusion is inevitable, particularly in view of the context of Judge Laffey's letter, that he understood the 1907 Agreement to mask a territorial understanding, and that the 1913 Agreement was to be interpreted in accord with the earlier understanding. Any doubts on this score would seem to be dispelled by Judge Laffey's further statement that it was "well understood by both parties that there was no legal obligation under the Sherman Law to compete and that even natural competitors in the same territory might as a voluntary policy refrain from competition" (Ex. 39, p. 213). Under the circumstances, such a mutual understanding can be viewed only as a euphemistic description of an agreement not to compete.

There is no record of any reply to Judge Laffey's letter. Notwithstanding his comments, which made clear the basic ambiguity in duPont's position as set forth by Haskell, the Haskell letter was transmitted. Subsequent documents add little to the picture, looking forward to the resolution of the dispute after discussions held on the highest levels.

No record of these discussions was maintained other than the minute wherein Nobel suddenly appeared to acquiesce in the supposed duPont view. The matter was recognized to be of such fundamental importance that it could not be resolved either by correspondence or by discussion among subordinates (Ex. 42, p. 223). Its resolution was deferred pending the convenient assemblage of the higher officials of the two companies. It is inconceivable that the memorandum of agreement (Ex. 48, p. 251) had not been preceded by detailed discussions over the history and operation of the agreement. During their long association other discussions and negotiations were recorded with meticulous care. If duPont genuinely rejected the territorial theory,

and if it brought ICI over to its view, it is difficult to understand why no records of these particular discussions were preserved. This gap in the records becomes particularly important in the light of the fact that Nobel, after formally acquiescing in the duPont view, continued to regard the agreement as a camouflage (Ex. 179, p. 824).

We are unable to accept at face value the document in which Nobel apparently acquiesced in the duPont construction of the agreement (Ex. 48), nor do we regard duPont's continued sales of such military explosives as decisive of the non-existence of territorial restriction. The basic facts are at least equally consistent with another view, namely, that the real disagreement arose out of an effort by duPont to modify the territorial arrangement.

It should be noted that the disagreement involved solely military explosives. DuPont was under pressure from the government to maintain in operation their military facilities. Moreover, their military commodity was not in direct competition with the Nobel military product. The main European market for their product was one previously serviced by Germany, and where Nobel had made no sales of note. In urging duPont's right to sell, Judge Laffey certainly regarded these considerations as the decisive ones. Haskell was, at best, ambiguous as to the ultimate basis of his position under circumstances in which ambiguity can only be considered unfavorably to the defendants. The mere fact of duPont's continued sales of military products to Europe is as consistent with the existence of an underlying territorial arrangement as with its nonexistence. We are persuaded that the military explosives dispute, far from disclosing the abandonment of a territorial arrangement, serves only to confirm its continued vitality.

Any substantial doubt on this score would seem to be resolved by an arrangement into which the parties entered during November, 1925 (Ex. 51) and which they made public in 1926. This agreement was the first of four related to military explosives on the European continent. Here, we confine our interest to the first of these arrangements solely for the light it sheds on the Patents and Processes Agreement of 1920. In substance, the arrangement provided that "duPont was to have the priority on nitro-cellulose powder business, and that Nobel Industries would have the priority on T.N.T. and nitroglycerine powders" (Ex. 51, p. 259). Nobel was also to limit its sales of nitro-cellulose powder to three hundred tons a year.

Apparently, after duPont secured Nobel's consent to its sale of military powders in Europe, some competition had developed between the two. The nature of this competition is not detailed in the documents, but, at least, in part, it followed Nobel's apparent entrance into the nitro-cellulose field. It is not, however, a permissible inference from the fact of this competition that duPont had previously insisted on its right to sell military explosives to Europe irrespective of competition with Nobel. In fact, a key argument in the duPont position had been that at that time little or no competition would follow from its entry into the European military explosive field.

That the agreement here described was illegal, if within the jurisdiction of the Sherman Act, can scarcely be questioned. It is apparent that the parties then thought that the agreement was not within the jurisdiction of the Act, and that they were free to embody in writing their real understanding. This jurisdictional question does not presently concern us, for we are now interested in that agreement solely to the extent that it illuminates the preceding dispute.

The fundamental fact is that after a prolonged dispute involving military explosives, the parties entered into an agreement to divide the European market between themselves. Originally, Nobel had contended that duPont was foreclosed from the European market and duPont had claimed the contrary, but ultimately, both parties agreed upon a division of that market between themselves. This development adds still greater weight to the position that the earlier dispute in fact involved only a disagreement as to the nature of the territorial arrangement and not as to the fact of a territorial arrangement. It is contended by the defendants that this latest agreement, suc-

ceeding by a year and a half the "termination" of the previous dispute, was quite unrelated to it. But it is significant to note that at the very inception of the prior controversy, Carpenter, for duPont, had suggested as a possible and desirable solution that the nitro-cellulose business be reserved to duPont and the cordite to Nobel (Ex. 34, p. 189). In connection with this, note must be taken of a still later expression of the duPont view after the acceptance of special European arrangements for military explosives. A minute of a duPont Foreign Relations Committee conference, held February 7, 1928, reports as follows: "The above should not be taken to mean that Nobels are dissatisfied with the present arrangement; as they have done very well on their T.N.T. sales. They seem to have accepted our position of being in Europe; i. e., that the business we are enjoying formerly belonged to the Germans and that we have as much right to it as they have" (Ex. 60, p. 302).

The conclusion is difficult to avoid that the entire "controversy" indicated, not the non-existence of a territorial arrangement, but a dispute against the background of altered trade conditions as to an appropriate division of the European military explosives market.

3. Expansion of Conspiracy to Embrace DAG

During 1924–1926, various discussions took place between duPont, ICI and various German companies headed by DAG. In part these discussions concerned plans for the elimination of competition between the companies in South and Central America; this phase will be considered later. To the extent that they involved patents and processes agreements, consideration is presently appropriate. The result of these discussions were the following agreements entered into in 1926:

(1) A patents and processes agreement was drawn up between duPont and DAG, which followed the now familiar pattern, with DAG receiving as its exclusive license territory the following area carved out of the previous ICI exclusive license area: Germany, Holland, Poland, Austria, Denmark, and Bulgaria (Ex. 85, pp. 424–427). Due to objections from DAG, this agreement was never signed (Ex. 98; Ex. 634). The Government claims that it was nevertheless carried out; duPont denies this, and insists that whatever exchanges of licenses took place were worked out separate and apart from this agreement. We deem it unnecessary to decide this question.

(2) DuPont and ICI entered into a new patents and processes agreement replacing the earlier 1920 Agreement and embracing substantially the same products (Ex. 97, p. 499). Only two changes from the earlier agreement are of note. Military explosives were not included and the territory assigned to DAG under the separate agreement was excised from ICI territory. Otherwise the 1926 Agreement was substantially the same as the one in 1920.

(3) ICI and DAG entered into a patents and processes and trade abstention agreement (Ex. 96, p. 480). The exclusive license territories under the patents and processes agreement were identical with the territories set off for each other in the trade abstention part of the agreement. The territories set apart for the German company included those countries assigned as German exclusive territory under the duPont-DAG agreement (Ex. 85), and several others.

DuPont was well aware that ICI and DAG were interested in achieving agreement, and indeed did achieve agreement, dividing trade areas between themselves. More precisely duPont was aware that this division of territory pertained to the subject matter of its patents and processes agreement with ICI and that the territory in question was that assigned under its earlier agreement to ICI. Not only was duPont aware of this, but it entered into separate agreements with DAG and ICI in which the exclusive license territories assigned these companies dovetailed neatly with, and was obviously planned to dovetail with, the territorial division which the latter companies had entered upon between themselves. Together with these circumstances, it must be noted (and this will receive more ample comment later) that duPont joined with both companies in ar-

rangements looking forward to the elimination of competition in South and Central America—arrangements which involved only exports and were therefore probably believed by duPont to be outside the purview of the Sherman Act.

On the one hand, then, we find a network of agreements, into some of which duPont openly entered, looking forward to the elimination of competition. On the other hand, precisely at the point beyond which it was believed the jurisdiction of the Sherman Act extended, we have patents and processes agreements—which the parties now urge were solely concerned with the exchange of technology. And we find these latter agreements, allegedly motivated solely by technological considerations, fit with miraculous neatness into the general pattern of territorial arrangements. We are unable to accept the proposition that this happy harmony was the result of sheer coincidence. This pattern of arrangements furnishes proof that the patents and processes agreements represented, in major part, an effort to camouflage an illegal trading arrangement under an appearance of legality.

We have found that the agreements, heretofore examined, primarily involving explosives, reflect an underlying conspiracy between the defendants duPont and ICI to divide markets between them. The 1907 patents and processes agreement, the first real utilization of that device, was an attempt to effectuate the purposes of the illegal 1897 Agreement, under the color of legality provided by its patent features. The cancellation of that agreement, and its replacement by more carefully drawn patents and processes provisions, in no way altered the underlying motivations of the earlier agreements.

#### 4. The Addition of Products to the "Explosive Agreements"

DuPont and ICI, originally commenced as explosives companies, expanded the scope of their operations over a period of time, particularly during 1920–1929, until they became great chemical combines, producing large varieties of chemical products. Both the 1920 and 1926 agreements provided that new products might be added to the agreement by mutual consent. This was done with respect to a number of products (Ex. 37, pp. 205, 206). These additions simply relate to the number of products within the patents and processes agreement and do not help to define the nature of the agreements.

With respect to other products, also not within the scope of the original agreements, arrangements other than mere exchanges of licenses were undertaken. In accordance with its contention that the patents and processes agreements masked a territorial division, the Government insists that these other products were brought within the scope of the conspiracy to divide markets. In form these other arrangements, relating to the exclusive territories, were similar to the devices employed in the non-exclusive territories, and we shall consider them in connection with our discussion of the jointly-owned companies.

#### B. The 1929 and 1939 Agreements

With the growth of duPont and ICI the desirability of expanding their patents and processes arrangements to embrace the numerous new products became apparent. The agreements we are about to consider represent the fruits of this determination.

It must be remembered that the patents and processes agreements did, according to their terms, involve a division of territories; that is not disputed. It is the contention of the defendants, however, that this division of territories is a mere by-product of a legitimate exploitation of valid patent and secret invention monopolies. With respect to this, it is clear that the parties were not primarily interested in exploiting their monopolies in order to get royalties. As set forth in the 1929 Agreement, and amplified in argument, the defendants claim that they entered into these arrangements with the purpose of securing for themselves the benefits of an exchange of technology.

The query then, is whether the agreements were entered into with a view to dividing territories, or to securing the benefit of technology; or, if both motives were present, whether the unlawful motive

was a material consideration. The imposition of territorial division was not necessary to achieve the benefits of an exchange of technology. The same benefits could be equally well achieved without any territorial allocation.

It is argued in justification for the assignment of territories that the parties deemed exclusive license territories necessary so that they would not be faced with competition utilizing their own inventions. Let us see how this worked out under the terms of the patents and processes agreements. Until 1934, every licensing of a patent or invention had a dual aspect: the licensee could not utilize the invention in the territory of the licensor, and to that extent the contention has support; but, on the other hand, the licensor could not utilize his own invention in the licensee's territory. This territorial restriction, included in every patents and processes agreement until 1934, cannot be explained by the need to protect a party against the adverse use of its own technology. Unless this territorial restriction can be otherwise satisfactorily explained, it opens to the severest scrutiny the authenticity of the entire technological justification for these agreements.

Similarly, it may be noted that the patents and processes agreements provided for non-exclusive licenses in areas other than those set up as exclusive. In those areas the parties were willing to permit their technology to be used against themselves. Oddly enough, the non-exclusive areas, as the duPont documents themselves emphasize, were areas in which the conditions for effective competition between the parties existed to a far greater extent than in the exclusive territories, and in which licensed technologies could be more effectively used against the licensor. This apparent contradiction, duPont seeks to dispel by the argument that their exclusive market, though less vulnerable, was also more important to promote. While this might be considered satisfactory on the surface, we must observe that the situation it describes is equally susceptible to another interpretation, that pressed by the Government, namely the exclusive territories were considered

so important to the respective parties that they sought to protect them, not against adverse use of technology, but against competition.

Nor can we accept the defendant's explanation that by the territorial restriction in the patents and processes agreements until 1934 upon the licensor with respect to its own inventions in the licensee's exclusive territory, the parties restricted themselves because they determined that the best way to exploit their inventions was through royalties flowing from licenses, and that to compete with respect to that territory would simply reduce its royalties value. The decisive inquiry would appear to be whether or not the bulk of inventions licensed had, or were expected to have, any appreciable royalty value. The proof demonstrates that many of the inventions licensed did not have such value, but were nevertheless made the basis for a territorial allocation. The inference necessarily follows that the territorial division was the real purpose of the arrangement.

The discussions pertaining to extension of the duPont-Nobel relations to the newly formed ICI were initiated in July 1927 when duPont sent to Europe a delegation headed by Lammot duPont. The purpose behind the formation of ICI was to monopolize the British chemical industry; Sir Harry McGowan described it as the first step in a "scheme to rationalize chemical manufacture of the world" (Ex. 122, D-2235 to D-2238). Further steps were to be development of the existing intimate contact with duPont (Ex. D-2236, p. 11504) and arrangements with I. G. Farben and Allied Chemical and Dye Co. of the United States (Ex. 122, pp. 607-608; Ex. D-2236, p. 11504). Earlier in the year, ICI had commenced discussions with I. G. Farben looking forward to a "cooperative arrangement" involving the world's chemical industry. DuPont also separately engaged in conversations with I. G. Farben. While their discussions proceeded independently, ICI and duPont kept each other informed of the results. In December, 1927 both came to the conclusion that an agreement could not be reached with I. G. Farben for the time being, and that they

ought to proceed independently to expand their own patents and processes agreements, leaving I. G. Farben arrangements to the future (Ex. 124; Ex. 125).

The documents dealing with the discussions and negotiations preceding and following the duPont-ICI agreement of 1929 are extremely voluminous and varied. A large variety of products, presenting individual and difficult problems, are involved. A complete and exhaustive recital of all pertinent material would be impractical. We have made an effort to recite and synthesize what we regard as the most significant portions.

## 1. Negotiation of the 1929 Agreement

### a. The Internal duPont Discussions

Preparatory to entering negotiations both parties undertook to ascertain the views of those within their organizations directly familiar with the individual products. With duPont this took the form of meetings of its Foreign Relations Committee with representatives of the separate departments.

On February 6, 1928, a meeting of the Foreign Relations Committee was held (Ex. 179). The chief topic of discussion was ICI's proposed entrance into the plastic field, which duPont urged should be done through the purchase of the British Xylonite Company, if done at all. The duPont Viscoloid Company had dealings with the British Xylonite Company which consisted of "an exchange of technical information without any understanding on markets whatsoever." The disadvantages to duPont of the ICI purchase were pointed out; it was felt that "the ICI were not an aggressive research and development concern" and that "if they took over the Xylonite Co. it was likely that we (duPont) would receive less rather than more technical aid than under the present arrangement." It was also believed that "If an agreement were made with ICI, they would undoubtedly ask for a territorial arrangement" (Ex. 179, p. 823). The real interest of "Viscoloid" in the English market was that it was "the largest export market of the Italian subsidiary companies" and duPont opposition to withdrawal from England

was recorded because "such withdrawal would not be of benefit to the ICI as the business would be taken by the Germans" (Ex. 179, p. 823). The minutes then note that

"* * * In this connection the question of our withdrawing from English and European markets whenever we competed with I.C.I. was discussed, and the precedents of military powders and Fabrikoid were mentioned.

"The question as to DuPont's attitude if I.C.I. should put this subject on a broad basis, and ask for an exchange of information on all subjects was then discussed. Mr. Crane thought that the Brunner-Mond crowd wanted such an agreement but he thought that a Patents and Processes agreement had meant and still meant to Sir Harry McGowan and his associates a camouflage to cover a division of territory. Our attitude continues to be that such an agreement means exactly what it says. It was agreed that from the broad company standpoint it is desirable that we act as friendly advisors, but that if the Patents and Processes agreement were extended it should not carry any implication of limitation of territory on non-patented products" (Ex. 179, pp. 823, 824).

A further meeting of the committee was held the next day; the agenda included discussion of the extension of the patents and processes agreement, and the competitive situation existing in Great Britain between a duPont subsidiary, National Ammonia Company, and an ICI subsidiary, the Standard Anhydrous Ammonia Company.

It is reported that "Mr. Crane stated that * * * ICI has intimated that the National Ammonia Company should cease selling in England. The point of view of the latter company is that they should continue in competition to maintain a trading position, i. e., that they would be willing to withdraw on some such basis as money compensation or an understanding whereby Standard would agree not to compete with the National Company's Canadian subsidiary" (Ex. 180, p. 826).

Further, it was noted that the "real basis of discussion with ICI is the extension

of the Patents and Processes Agreement. If this is brought up, we can discuss withdrawing from selling anhydrous in England on terms; if it is not, then there is no basis for discussing the point of withdrawal at all" (Ex. 180, p. 827).

It is clear that ICI's interest in withdrawals was strictly to eliminate competition and that the officials of the subsidiaries were entirely willing to negotiate a territorial division; the subsequent reference to the patents and processes agreement as the only basis of withdrawal illuminates the way in which that agreement was viewed by both duPont and ICI. The significance of this is not altered by the statement that both parties might profit technologically, or that the future of the duPont Company in England was insecure.

On February 14, 1928, another meeting discussed the proposed extension of the patents and processes agreement with reference to paint, lacquer and chemical technology. A duPont official pointed out that through Nobel Chemical Finishes, Ltd. all products of the Paint, Varnish and Lead and Chemical products division were already covered.

Later it was recorded that "Mr. Crane asked why we withdrew from England on Fabrikoid without compensation. This was done because the President felt it was right from a broad company standpoint, and also it was found that we had been bad price cutters and were disturbing the market. All agreed that they should not be considered a precedent for future withdrawals" (Ex. 181, p. 830).

The insincerity of this duPont resolution to leave behind their evil ways is plain; there was never a firm purpose of amendment; these were but empty words and not the precursor of a new and different duPont-ICI era.

Of particular interest is the record of another meeting of the duPont Foreign Relations Committee called to discuss the extension of the patents and processes agreement to dyestuffs (Ex. 182); this, as well as other documents bearing on dyestuffs, must be read in the light of defendants' claim that acquisition of I. G. Farben technology was a major factor inducing duPont to enter into these arrangements.

It is recorded that

"As a background Mr. Harrington reviewed the situation with I. G. Farben. The ideal situation is to be let alone:

"1. The Germans to refrain from making any large investments in this country.

"2. Competition with the Germans in present export markets—We are perfectly willing not to open any new offices.

"3. Germans to cease an attempt to break down our tariff.

"4. Patents and Processes Agreement with I.G. would be very advantageous. This is of little interest to the Germans as they are seeking a market for their product, and not for their processes. An alternative but less desirable arrangement would be the formation of an American partnership with the I.G., although any consideration of this must be on the basis of complete control by duPont Company" (Ex. 182, pp. 832, 833).

DuPont's primary concern with respect to I. G. Farben and dyestuffs was to eliminate their competition. The entire program was in elaboration of the statement of "the ideal situation," which was "to be let alone." Three of the points involve restriction on competition, two of them in American markets, and one of them in export markets. While a patents and processes arrangement would be desirable, it was apparently precluded by I. G.'s refusal to abstain from American markets. The possibility of acquiring I. G.'s eminently desirable technology without imposing territorial abstention did not even occur to duPont!

The alternative to the first program—an American partnership with I. G.—was obviously set forth as a device to eliminate competition in the American market.

The minutes then report consideration of an arrangement with ICI and note the following stumbling blocks:

"1. Any real international understanding must include the I.G. and we should not make commitments with the ICI that might preclude future conversation leading to an understanding with them. * * *

"2. Territorial Limitations: if such an understanding becomes impossible and it becomes necessary for us to fight the I.G. in their export markets due to an increase in their aggressiveness in this country, we must have a free hand. The ICI would undoubtedly ask for the British Empire, possibly recognizing our market in Canada. It is extremely doubtful whether we should sacrifice our rights to sell in India, this being one of I.G.'s most important markets" (Ex. 182, p. 833).

This still further demonstrates the complete trade psychology which dominated duPont's view of the I.G. dyestuff problem. Continuation and intensification of the duPont dyestuffs business in India was viewed solely as a technique to force I.G. to a territorial arrangement. But if that was duPont's controlling consideration with respect to I.G. concerning dyestuffs—what then can we think about their understanding of the ICI relationship? (See Ex. 184.)

Another meeting was held February 18, 1928 to discuss matters to be taken up with ICI (Ex. 185). It was noted at this meeting held in Lammot duPont's office on February 18, 1928, that "Any extension would probably be based on N.A. (excluding Canada) as exclusive territory for duPont, as against British Empire as exclusive territory for ICI. Mr. Lammot duPont questioned the eventual fairness of this decision, suggesting that S.A. should also be included in duPont territory. It was recognized, however, that ICI could fairly point to a large number of industries in which the United States was half the world's market (Ex. 185, pp. 851, 852).

This last comment is of considerable significance. Both parts of the defendants' explanation for the use of exclusive territories—self-protection against adverse use of technology and the superiority of licensing where competitive possibilities are limited—hinge upon the concept that there were territories in which one party had strong competitive advantages and other territories where the other party enjoyed such advantages. These quoted paragraphs indicate that a significant factor in determining exclusive territories was to divide trade evenly between the parties. The vitality of such a consideration is inconsistent with the claims asserted, and lends further support to the view that they regarded the patents and processes agreement as a camouflage for a territorial division.

■■■ Immediately following this revealing quotation, the minutes of the meeting of February 18, 1928 continued: "The implications of a Patents and Processes agreement should be included in the Minutes. It means exactly what it says and is not a camouflage for a sales arrangement" (Ex. 185, p. 852).

The weight to be accorded such declarations has been previously discussed. To us, it reads as an expression of a consciousness of guilt of wrongdoing, a protestation of innocence in the absence of an accusation, an attempt to create an explanation or defense prior to detection.

Preliminary meetings were then held at Wilmington in March, 1928, attended by duPont executives and an ICI delegation headed by Sir Harry McGowan. With respect to the extension of the patents and processes agreement certain complicating factors were pointed out: the I. G. situation; ICI's stock interest in Allied Chemical and desire to maintain friendly relations with them in various world markets; ICI's relation with Newport Chemical Company, which "would of necessity cause duPont's information to be passed along to Newport." In response to a query by Sir Harry McGowan as to the possibility of getting together to form a tri-partite agreement with Allied Chemical, duPont was of the opinion that "any agreement between A.C.D. and duPont would cause so much hostile criticism as to preclude the subject from consideration" (Ex. 186, p. 861).

b. The Internal ICI Discussions

Like duPont, ICI also held preparatory internal discussions. Letters were sent to the various ICI product groups (Ex. 194). It was pointed out that: "The existing agreement in effect gave (1) North America (excluding Canada) to duPonts; (2) British Empire to Nobels, and (3) The remainder of the world is common" (Ex. 194, p. 896).

The new agreement was to be explored preliminarily on the basis of the same general demarcation. To get a clear picture, answers were sought to the following questions:

"(1) What agreements have ICI or the subsidiaries with concerns in U.S.A. or elsewhere which might cut across any extended arrangement with duPonts?

"(2) What in effect are the provisions of such arrangements?

"(3) Where, if at all, are duPonts competing with us in the British Empire?

"(4) Is any such competition serious? In other words, can a view be taken on the probability of duPont's agreeing readily to withdraw from any such British markets?

"(5) In what countries under (3) i.e., 'the remainder of the world' can ICI claim to have all, or a large share of the market? In other words, to which countries do ICI attach importance?

"(6) Can a view be taken of the countries in (3) to which duPonts are likely to attach importance?

"Replies to these queries are only desired in general terms. If the relatively simple markets can be eliminated, it may be necessary to go into specific situations in detail.

"It is only proposed at this stage to ask one question affecting the technical situation, viz:—

"In what technical fields can ICI claim to be ahead of duPonts? In other words, where are we likely to have more to give than to get?" (Ex. 194, pp. 897–98).

These letters initiating ICI preparation for the negotiations with duPont placed primary emphasis on the commercial situation. It is possible that this arose from a belief in the importance of such considerations in working out an effective, legitimate patents and processes agreement, but the whole approach of the letter suggests the contrary. The evidence substantially confirms the territorial view as representing ICI's dominant attitude.

The responses to this ICI letter from their department heads reflect the belief of ICI that it had considerable information of great value to give duPont. To that extent, they rebut the Government's contention that ICI's technology was so far behind that duPont could not possibly have been genuinely interested in its acquisition. Note should be taken, however, of various comments in the answering letters which disclose an interesting pattern.

In the response of the British Leather Cloth Manufacturing Co., Ltd. (The British Pluvium Co. Limited), it is reported that duPont is competing in South America, but that the competition is not serious, and it is not "desirable that duPonts should withdraw from this market at this stage." A list of countries in which ICI has a large share of the trade is appended and it is indicated that duPont would attach importance to the trade in five countries, all of which are on the ICI list (Ex. 195). Another letter disclosed that ICI's leathercloth business in the United States, "* * * is comparatively small and that any question of ICI withdrawing from that market would not be one of major importance. You will appreciate, of course, that nothing will be given away without some quid pro quo, although in comparatively minor issues the quid pro quo might be obtained in some general sense or affecting another industry in ICI" (Ex. 196, p. 903).

It was pointed out in an ICI memorandum of February 8, 1929, that,

"* * * in actual trading there are many modifications to the general statement that the remainder of the world is common.

"We have in mind such arrangements as apply in the case of China and Japan, whereby the Americans quote considerable higher prices than ours, if called upon to do so, thereby in effect giving us protection in these markets also. We merely cite this as an example but our point is that the Patent and Processes Agreement is generally looked upon as a guide in the matter of trading and that in any revision of the agreement care should be taken to safeguard the position from a trading point of view. This may even have to be done in a manner verbally but it is necessary to keep it in mind. A general statement to

the effect that the position applying at present in regard to high explosives would also apply in the future ought to be sufficient as our American friends do not like to put things too concretely in writing in view of the Anti-trust regulation in the States" (Ex. 201, pp. 917–18).

c. The Joint duPont—ICI Discussions

It was finally determined in October, 1928, at a meeting of the duPont Foreign Relations Committee that duPont should approve of extending its agreement with ICI to cover products other than explosives, "provided suitable territorial arrangements can be made" (Ex. 190, p. 888). Dr. Fin Sparre, with Mr. John K. Jenney as his secretary, was designated the duPont negotiator; ICI named Messrs. George W. White and Francis Walker (Ex. 191; Ex. 192). Later, at a duPont meeting, it was resolved that the existing Explosives Patents and Processes Agreement between duPont and ICI should be suggested to the negotiating committee as a form for the new agreement, "it probably being the only legal method of effecting the purpose of the two companies" (Ex. 205, p. 927).

With this background, the patents and processes negotiations took place in two sections: first, preliminary conferences in New York, and then later conferences in London. It is our purpose here to determine what light these discussions cast upon the intent of the parties.

At the first meeting held at Wilmington on March 4, 1929 of the "sub-committee" appointed by duPont and ICI to consider the extension of the patents and processes agreements, a dispute arose concerning the basic territorial allotments. It was recorded that:

"I.C.I. raised the broad principle that its logical markets were its export markets, while duPont's logical market was the United States. They therefore suggested that duPont's exclusive territory be North America (except Canada), that South America be non-exclusive, and the rest of the world exclusive territory for I.C.I.

"Dr. Sparre replied that duPonts could never accept this principle. It was his contention that the size and competitive situation in the United States market could not be considered as an argument against duPont's equity in other markets. He also pointed out that duPont had an international position which had cost considerable time and expense to build up, and that duPont would never accept the principle that it must confine itself to the American hemisphere" (Ex. 205, p. 932).

Finally, it was " * * * decided to carry on discussions from the standpoint of recognizing United States as duPont's exclusive territory (duPont representatives entered the reservation that they considered North America exclusive of Canada as being the proper division), against the British Empire (exclusive of Canada) as exclusive I.C.I. territory, the rest of the world to be non-exclusive. It is recognized that on individual products, exclusive territories will not be necessarily confined to these territories" (Ex. 205, p. 932).

Dr. Sparre's statement that duPont would not confine itself to the American hemisphere is interesting in its revelation of a fact made clear throughout the record, namely, that the parties recognized that the assignment of a territory as exclusive to one party meant the elimination of the other party from that territory.

The minutes further record that "The British Empire being I.C.I. territory, duPont would expect to withdraw when I.C.I. is prepared to take over its business. Proper compensation will be arranged by the Heads of Industries concerned" (Ex. 205, p. 933).

The reference to withdrawal, unqualified by any allusion to the granting of licenses, in terms seems to disclose a territorial understanding. The defendants insist, however, that patents and processes licenses were an unstated but generally accepted qualification of such language. Since substantially similar language was used in the London Draft of the Agreement, and the same difference of interpretation there arises, this question can be best examined in that context.

Two observations, however, may be presently made: (1) even if licenses were in the minds of the parties, it is clear that

they understood the agreement to entail withdrawal from present business in the other's exclusive territory, and to preclude future or potential business therein; and (2) it seems plain that by arrangement for proper compensation, the parties had in mind payment for withdrawal from business rather than payment for the value of patents. If in fact consideration was to be paid for the value of surrendered business, independently of payment for the value of technology, the inference is strong that the primary concern of the parties was to divide territories, and not to exchange patent technology.

At a second meeting of the Committee held the following day, "It was decided to proceed in discussions along the lines of attempting to reduce neutral territory to a minimum. A list of the interests and commitments of both parties in this connection as far as the members of the subcommittee had knowledge, was submitted" (Ex. 206, p. 934).

At this meeting, the first of a series of discussions concerning provisions for particular products was held.

With respect to coated textiles, it was reported that: "DuPont has a certain export business in the British Empire * * *, from which it might withdraw, at such time as ICI could supply, for suitable territorial compensation elsewhere" (Ex. 206, p. 935).

Assuming that the withdrawal was envisaged as occurring only upon licensing of inventions, it is difficult to relate the projected transaction to any legitimate patents and processes agreement purpose. The business in question must be assumed to have been profitable, else there would seem no reason why withdrawal should be conditioned upon territorial compensation. Thus, the parties here, as elsewhere throughout their relationship, contemplated the direct elimination of competition between themselves; and that fact has significance independent of the actual intent of the parties. But, in addition, the proposed exchange cannot fit into the defendants' rationale for assigning exclusive territories.

That rationale assumes that there were territories wherein one party had natural economic advantages and that these territories should be assigned to the preferred party as exclusive license territories for the reasons: (1) that party should not be required to permit its technology to be used adversely in their main markets; and (2) the parties preferred to forego their individual right to exploit their own invention where the competitive possibilities were limited in exchange for the right to exploit the other party's technology in its own territories. Assuming that the British Empire was properly deemed the exclusive territory of ICI, and so deemed even with respect to products made the basis for a profitable business therein by duPont, the question arises how the surrendered business can be made the basis for assignment of additional territories to duPont. The assignment of territory as exclusive to one party simply to compensate it for a prospective loss of business is difficult to reconcile with the needs of a legitimate technological agreement. Such a territorial assignment, however, does fit into the pattern of a commercial understanding. The approach here disclosed, echoed throughout the record of negotiations, strongly supports the conclusion that at least one major objective of the patents and processes agreement was to eliminate competition.

A major topic of discussion throughout the negotiations, and one to be read in the context of the preceding consideration, was also alluded to in the following language: "DuPont would agree to withdraw from India when ICI was in a position to supply duPont trade there and upon suitable compensation" (Ex. 206, p. 937).

Note should also be taken of the immediately following comment.

"It was agreed that it would not be desirable for either party to withdraw from China or Japan, but that the two parties could gain material advantages by close collaboration. Mr. White suggested the feasibility of DuPonts considering the I.C.I. Trading Companies in those countries for their agents" (Ex. 206, p. 937).

A territorial agreement was reached with respect to exclusive and non-exclusive areas. The dominant consideration underlying the assignment of exclusive areas was stated as follows: " * * * it is recognized that for most efficient operations, licenses and rights under this agreement should be exclusive in areas having close relationships with the home country of each company" (Ex. 208, p. 949).

With respect to non-exclusive areas, the following was tentatively agreed upon: "(5) For the same existing operations in which both companies are engaged, non-exclusive licenses will be granted by one company to the other for all other countries not in exclusive territory, but it shall be the duty of the heads of each industry of each company to endeavor to formulate mutually acceptable plans for either joint operations or further extension of exclusive rights under patents and processes to the end that the maximum value of such patents and processes be realized" (Ex. 208, p. 950).

The reference to joint operations is omitted from the final agreement; whether or not the jointly owned companies subsequently effectuated the above understanding remains open for later inquiry.

Certain it is that the parties were not happy to have much of the world embraced in the non-exclusive license area.

"It is recognized that the granting of non-exclusive licenses to each other in large and important countries must lead to some conflicting developments and lessen the efficiency in operation and value of processes. * * * It is therefore necessary to devise means whereby to reduce to comparative unimportance conflicts or inefficiency caused by mutual non-exclusive licenses. Therefore, * * * it is further agreed to extend the countries of exclusive licenses as follows:

"(A) Explosives—this industry to follow the present explosives patents and processes agreement.

"(B) All other products and industries to be examined in detail in order to propose extensions of the exclusive license countries so that the exclusive territory of each company will comprise countries in addition to those designated in Section 4" (Ex. 208, pp. 951, 952).

A subsequent duPont letter indicates that discussion of the proposed extensions could not be entered into during the early part of the negotiations because ICI did not have the commercial information necessary for its discussion at that time (Ex. 209, p. 956).

We find of considerable interest a letter written at this time to Dr. Sparre, duPont's Chief negotiator, by E. G. Robinson, Ass't General Manager of the duPont Dyestuff's department. The opinion is there expressed that "As far as dyes and intermediates are concerned, we are very definitely of the opinion that the information which we could furnish them would be of very much greater value than that which we could expect to receive" (Ex. 210, p. 962).

This statement is particularly interesting in light of duPont's claim that a primary objective of the agreement was the acquisition of dyestuffs technology. However, defendants point out that the ICI dyestuff's people had expressed the contrary view (Ex. 200, p. 916), and suggest that the Robinson statement was in the nature of puffing. Moreover, Robinson himself goes on to indicate that a pooling of technology would be of benefit.

The most interesting comment in the Robinson letter is the following: "In the case of the original Patents and Processes Agreement applying to the explosives Department, it is our belief that the arrangement was attractive and continues to be attractive because of the extent to which an allocation of territory between duPont and ICI, can be made effective, due to the absence of other important competitors. In the case of dyes and intermediates, because of the great importance of the Germans in this field, any agreement which can be reached between I.C.I. and ourselves as to allocation of world territory, is of much less significance" (Ex. 210, p. 962).

The presence or absence of important competitors would seem quite clearly to be immaterial if the objective of the agreement was to secure to the parties the benefit of each other's technology. Patents and processes received under the agreement do not lose their technological utility because

of the existence of a competitor. The existence of outside competition was relevant to the patents and processes agreement only if a principal purpose of that agreement was to eliminate competition between the parties. In that event, the presence of a competitor not subject to the agreement would, of course, reduce to the parties the benefits of eliminating competition *inter se*. It is plain that Robinson considered the then existing agreements to be motivated by an effort to eliminate competition, and was objecting to any attempted application of that principle to dyes and intermediates.

On April 18, 1929, a preliminary draft agreement was drawn up (Ex. 212, p. 976); many of its provisions embrace points previously considered, but a few of the provisions merit mention.

It was set forth that: "4. Such granting of exclusive licenses should be made as each company may become in a position to undertake business in new territory inasmuch as otherwise, one company might lose business which the other company might not be able to secure" (Ex. 212, p. 979).

Putting to one side any question of an underlying purpose to divide markets, it is made perfectly clear by this statement, as well as by numerous others in the record, that an effect of the proposed agreement was expected to be the elimination of existing competition between the parties.

The draft agreement also declared that in at least two instances duPont was assigned additional exclusive territory in part as compensation for business which was to be surrendered to ICI (Ex. 212, p. 982).

During the London conferences, Dr. Sparre sent to Lammot duPont, who was fully informed of the course of the negotiations, a letter on the progress of the conferences which contained a reference of interest: "Salt Cake has bothered me quite a little bit. Approximately 75,000 tons annually are exported to the U. S. jointly by German and English manufacturers under a pooling arrangement. All the Salt Cake exported to the U. S. is of German manufacture and export, although I.C.I. share in the profit and place their quota in other markets. I think that when it comes to drafting the agreement, good care should be given to this point, but no doubt Mr. Mudge will consider this is a difficult situation to handle, and I do not have a suitable solution to propose at this time" (Ex. 218, p. 1052).

Dr. Sparre was concerned with the salt cake situation because it involved competition with duPont in the American market, and he was desirous of eliminating that competition. The objective could not be achieved because the product was of German manufacture and export; although the profits were shared by ICI, the patents and processes agreement could not be utilized to effect this purpose. This statement from duPont's chief negotiator is further proof that the parties considered the patents and processes agreement an instrument for elimination of competition.

A consolidated minute was prepared for meetings occurring May 6, to May 11, 1929. At the outset of the meetings, "Dr. Sparre outlined the legal situation relative to agreements between companies in the United States of America. It was agreed that the agreement must conform to the laws of the United States and for this reason the agreement must take the form of an agreement to purchase and sell exclusive and non-exclusive licenses to patents and secret processes and for that reason the phraseology of the agreement would be left to the duPont Legal Department" (Ex. 219, p. 1059).

The words "the agreement must take the form of" necessarily implies that the parties were seeking to achieve an objective other than that implicit in an exchange of technology. The facts and circumstances of the arrangements make it plain that the other objective was a division of territory.

This is followed by: "It is understood that references in these Minutes to 'territories' refer to territories in which licenses to patents and secret processes are to be granted by one party to the other and that such terms as 'existing business', 'trade', 'exports', etc. refer only to such products as are covered by patents or secret processes owned by one party or the other" (Ex. 219, p. 1059).

Further on it is recorded with respect to coated textiles that duPont will receive Germany, France and Italy for exclusive territory. However, it was provided that ICI could continue certain business in those countries which it was conducting through agents until such time as duPont could take over the business. This presents still another instance in which one of the parties was to withdraw from a business which it was competitively able to sustain. That this is so is indicated by the further statement that ICI volunteered to give duPont "such detailed information on customers, qualities and prices as would give duPont an opportunity to go after this business" (Ex. 219, p. 1063).

Similar provisions were made with respect to paints and varnishes.

The same minutes also record a continuation of the discussion concerning duPont's dyestuff business in India: "In view of duPont's desire to maintain an aggressive sale policy in all important markets as a tactical weapon against the I.G. it was agreed that duPont should continue its existing business in India. DuPonts conceded that India, as part of the British Empire, should be exclusive I.C.I. territory but requested that they be given a non-exclusive trading license until such time as the I.G. situation might be settled, at which time they would withdraw for adequate compensation in money and/or territory" (Ex. 219, p. 1067).

It, thus, is evident that duPont continued to regard its Indian dyestuff business as a tactical trading weapon to be used against I. G. Farben and in the light of previous duPont discussions it is apparent that the weapon was intended to force I.G. to a territorial arrangement. DuPont's contemplated withdrawal was to be compensated for, not on the basis of the value of the patents given, but rather on the basis of the value of the business to be surrendered. Indeed, the projected withdrawal is no way conditioned upon, or discussed in terms of licenses. Assuming licenses to be implicit in the discussion, it seems perfectly obvious that where business withdrawal is theoretically conditioned upon the granting of exclusive licenses but compensation in fact is based upon the value of the surrendered business the licenses simply constitute a subterfuge for a territorial understanding. Certainly, with respect to the duPonts' Indian dyestuff business, the underlying arrangement was an illegal territorial one.

A very similar arrangement was noted with respect to rubber chemicals: "Mr. Walker stated duPont should be free to take steps to expand this business until the situation vis-a-vis prior commitments should be cleared up. DuPonts should bear in mind the eventual inclusion of these products under the general agreement, at which time they should expect to withdraw from the British Empire for proper compensation" (Ex. 219, p. 1070).

At the end of the negotiations, the representatives of the two parties drew up a draft agreement, known as the "London Draft" which was to be submitted for final approval and rephrasing to the executives of the two companies (Ex. 221). Considerable controversy arose at the trial with respect to this draft and in particular Section 3(a), which reads:

"While British Possessions in North and Central America and the West Indies as coming within the British Empire is exclusive I.C.I. territory, except Canada, duPont may be in a favorable position to export certain products to these British possessions, and for this purpose, wherever it may be mutually agreed that duPont can advantageously handle such trade it will be free to continue its activities in this British territory. However, such concession to duPonts may be terminated on reasonable notice by I.C.I., whenever the latter is in a position to assume such trade.

"It is recognized that in certain cases exports to the exclusive territory of one company can be handled more advantageously by the other company and may be so permitted by mutual consent for such purpose only, until such permission may be terminated (upon reasonable notice if an established business) by the company having such exclusive right, whenever it may be in a position to assume such business" (Ex. 221, p. 1080).

When granting exclusive licenses the grantee may not be able for some period

of time to take over the business of the grantor; in such event the grantor will continue its established business until the grantee is in a position to assume the business. However, it was provided that, "In no case under this subsection is there any change intended in territorial rights, but each company will enjoy the results of its operations whenever established and permitted under this agreement" (Ex. 221, p. 1081).

In the ultimate agreement prepared by the duPont legal department this provision was re-worded so that territorial withdrawal was conditional upon the granting of exclusive licenses. However, the record makes it clear that both parties regarded the re-wording as working no material alteration in the original arrangement.

The Government explains this on the theory that the London Draft set forth the real understanding between the parties, that this understanding was an illegal territorial one, and that the ultimate agreement, acknowledge by duPont officials to work no real alteration, was merely a camouflage. The defendants position is that the London Draft was a rough understanding in which limitation of withdrawal to licenses was tacitly understood, and that the ultimate arrangement simply made it explicit.

█ On the facts of the entire record of negotiations between the parties, with its numerous allusions to territorial arrangements inconsistent with the legitimate requirements of a patents and processes agreement, we are convinced that subsection (3) of the London Draft in fact disclosed the essence of the arrangements between the parties, and that these arrangements were and are illegal.

That the London Draft was in terms illegal and that it was necessary to reword the language carefully was appreciated by the duPont officials. The whole tenor of comment by these officials reveals that the revised phraseology of the final agreement worked no substantial change in the business arrangement embodied in the London Draft (Exs. 222, p. 1093; 223, p. 1095; 224, p. 1101; 225, p. 1102; 231, pp. 1127-8).

There appears only one intimation that the final agreement was to differ substantially from the London Draft (Ex. 228, p. 1120), and that is contradicted by the bulk of comments (Ex. 231, pp. 1127-8; Ex. 232, p. 1149) and was palpably designed for record purposes only. Indeed, duPont regarded itself as "morally bound by the London Draft" (Ex. 232, p. 1149).

The basic theory of the understanding was clearly intimated in a letter from J. K. Jenney, of duPont. Discussing the withdrawal sections of the London Draft, and stating that they would not be embodied in the final agreement, he went on to point out: "It is obvious that when one company has given the other licenses in that company's exclusive territory that it becomes more and more difficult for the granting company to carry on business in the territory of the grantee, as the granting company gradually loses its rights to use the various improvements which keep its product abreast of the times. It also follows that it would not be good business practice to maintain agents in these territories who would only be free to sell products not covered by patents or processes. There is no obligation to get out of any territory, although it is obviously necessary from a common sense view point to gradually withdraw from the exclusive territories of the other party" (Ex. 227, p. 1107).

The object of this statement was to make it plain that the final agreement, which would condition withdrawal upon licensing, was in effect the same as the London Draft, which imposed no such limitation. Thus, it was anticipated that the patents and processes agreement would eliminate competition between the parties, not only as to products concerning which licenses had been granted but as to other products as well; in short, that the patents and processes agreement would result in a general withdrawal by the parties from each other's exclusive territory.

2. The Provisions of the 1929 Agreement

Working with the London Draft as a basis, the new patents and processes agree-

ment was drawn. It was prepared by the duPont legal department and had its "fullest endorsement" (Ex. 232, p. 1148). When forwarding a copy to the duPont London office on August 7, 1929, Dr. Sparre pointed out that "we have had a great deal of difficulty in preparing this paper in such a *form* that it would be legally correct" and that "some of the paragraphs have been prepared with the utmost care." He wrote of one comparatively brief paragraph (Art. 3A of the London Draft), "namely II (e) required several days' discussion and study before it was prepared in its present form." He urged that "no changes should be proposed even if it is only a word or two unless there is a strong reason for such proposal" for "every sentence and practically every word have been carefully selected in order to produce a legally acceptable document" (Ex. 232, pp. 1150–1151).

Dupont and ICI signed the 1929 agreement, effective July 1, 1929 (Ex. 1 of Complaint). By its terms it was to last for 10 years (Art. XIII). With a few specified exceptions, principally rayon, cellophane and products of the general alkali industry, the agreement covered substantially all of the chemical products made by the two companies. Prior contractual arrangements by either of the two companies were responsible for the exceptions (duPont & ICI Ans. par. 83). Military explosives were also excepted because duPont and ICI had made separate arrangements with respect to such explosives (duPont & ICI Ans. par. 95).

The following products were included in the 1929 Agreement (Art. III):

a. Explosives other than military powders.

b. Compounds of cellulose and its derivatives, including nitrocellulose compounds such as plastics and films, but excluding rayon, cellophane, nitrocellulose explosives, and coated textiles made from cellulose compounds.

c. Coated textile products, including components of those covered under (b).

d. Paints, varnishes, and lacquers, including the cellulose finishes known as "Duco" and "Delco" and similar chemical finishes, and exclusive of synthetic resins and colloiding agents, for use in paints, varnishes and lacquers, and plastics derived from cellulose.

e. Pigments, lakes and colors.

f. Acids, both organic and inorganic, for both the heavy chemical industry and special industries.

g. Chemicals of the general heavy chemical industry, excluding products of the general alkali industry.

h. Dyestuffs, their intermediates, and other organic chemicals, including rubber chemicals.

i. Synthetic ammonia, synthetic alcohol and other products and by-products of the fixed nitrogen industry.

j. Fertilizers.

k. Synthetic products from the hydrogenation of coal and oil.

1. Insecticides, fungicides and disinfectants.

m. Alcohols manufactured by either synthetic or fermentation processes other than synthetic alcohol as covered in subparagraph "1" above.

The 1929 Agreement assigned to duPont for its exclusive license territory North America and Central America, exclusive of Canada, Newfoundland, and British possessions. It assigned to ICI for its exclusive trading territory the British Empire, exclusive of Canada and Newfoundland (Art. II). The agreement provided that each party would, upon request, grant to the other an exclusive license to make use and employ within their respective exclusive territories all patented and secret inventions relating to agreement products, "now or hereinafter during the life of the agreement, owned or controlled by the parties," and to sell within the respective territories all products containing such invention (Art. II).

The agreement provided that the remainder of the world outside of the exclusively licensed territories would be considered non-exclusive territory, as to which ICI and duPont would exchange non-exclusive licenses.

540

DuPont and ICI were not free to grant licenses or any other interest in or under patents or secret inventions relating to agreement products to persons in the non-exclusive territories without first advising the other party of its intention to make such a grant (Art. V).

Although sub-licenses might be granted to subsidiary corporations by either party subject to the terms of the grant of the license so sub-licensed, no other sub-licenses could be granted without consent in writing first obtained from the original licensor (Art. IX). As Dr. Sparre later, on March 13, 1931, pointed out this clause was intended "to make sure that patents and secret processes of either company are not made available to parties beyond control of duPont or ICI and who may use the information for purposes outside of the du-Pont-ICI agreement, or to the detriment of duPont or ICI" (Ex. 313, p. 1369).

As was indicated previously, in connection with the London Draft, the agreement also provided that where either of the parties "may have established," with respect to certain products, internal trade in or export trade to a country within the exclusive territory of the other party, and the other party was not in a position to utilize the licenses granted to it in any such country for the time being, the licensor might continue its operation therein until given reasonable notice to withdraw from such territory (Art. II(e)).

To assist duPont in its negotiations with I. G. Farben, the agreement provided that although India came within ICI's exclusive territory, duPont could continue to export dyestuffs to India as a temporary measure (Art. 3(h) I).

It was recognized in the 1929 agreement that each party had existing relationships with third parties which might be in conflict with the agreement. Each party agreed that in negotiating for the renewal of any existing relationships it would endeavor to harmonize as fully as possible these relationships with the provisions of the 1929 agreement (Art. X, Exs. 357–362).

It should be noted that the 1929 agreement did not in itself license patents; it defined the territorial limits within which each party might acquire from the other licenses to patents and secret inventions for the designated products and industries (Art. II).

3. The 1934 Amendment to the 1929 Agreement

In 1934 duPont and ICI adopted an amendment to the 1929 Agreement (Ex. 609). Among other things it provided for the cancellation of the 1926 Agreement concerning industrial explosives and the integration of the subject matter of that agreement into the 1929 Agreement. The amendment also modified the 1929 Agreement by providing that licenses under the patents and processes agreement were not to prohibit the licensor from exploiting its own inventions in the exclusive territory of the other.

Unquestionably, this feature of the 1934 Amendment was motivated by legal considerations. In a letter written subsequent to the adoption of the Amendment, L. J. Greenwood of ICI, on June 18, 1938, quoted from a duPont memorandum on this change to the following effect: "The courts of this country have expressed the view that cross license agreements between two or more of the dominating members of an industry violate the anti-trust laws where any licensor accepts restrictions upon the sale of products embodying or produced by means of his own inventions" (Ex. 613, p. 2284).

That the amendment was not intended to work any material change in the relationship of duPont and ICI is apparent from the way in which it was broached to Sir Harry McGowan in a letter dated November 9, 1934 from Lammot duPont. The latter described the change as being rather difficult to explain. He stated that

" * * * we have given very careful consideration to this matter and feel that it is very important from our point of view that these modifications should be put into effect promptly; but we, of course, have no intention of urging the modifications on you if, for any reason, you feel that the modifications would be detrimental to our heretofore very satisfactory relations.

"Please do not trouble to give the matter any thought or study until Mr. Pickard arrives, as I feel quite sure his explanation will make the matter entirely clear" (Ex. 607, p. 2269).

Writing several years later, L. J. Greenwood described the change effected by this amendment as "more of a theoretical than a practical one" (Ex. 613, p. 2285). There is not a scintilla of evidence in the record which discloses the slightest practical change in the affairs of ICI and duPont.

## 4. The 1939 Agreement

DuPont and ICI executed a new agreement effective June 30, 1939 (Ex. 2, attached to complaint), the date of termination of the 1929 Agreement. The 1939 Agreement substantially incorporated the provisions of the 1929 Agreement, with a few alterations introduced principally for anti-trust reasons (Ex. 628, p. 2329; Ex. 629, p. 2339; Ex. 633; Ex. 1371, p. 10984). In addition, it omitted the provisions of Article II (e) of the 1929 Agreement, which were no longer deemed necessary, since by that time each party had transferred to the other substantially all the business it previously had in the other's territory.

Another change introduced in the 1939 Agreement merits more detailed consideration. Under the 1926 Agreement relating to commercial explosives, which had been incorporated by the 1934 Amendment into the 1929 Agreement, ICI was allotted considerably more extensive exclusive territory than was allotted it for other products under the 1929 Agreement. DuPont proposed that this territorial arrangement should be conformed to that prescribed for the other products.

To secure ICI's acquiescence in the change, "Dr. Sparre assured Lord Melchett that the deletions in question would not in any way affect the commercial arrangements in regard to Explosives which have governed the relations of the two Companies on these matters over the past 35 years. He confirmed that the deletion in question merely referred to the exchange of patents and processes" (Ex. 632, p. 2348).

In a subsequent ICI memorandum Dr. Sparre is recorded as having emphasized that " * * * with or without the Patents and Processes Agreement it was open to duPonts as and when they cared to depart from the territorial marketing understandings. He most categorically, however, stated that there was no intention to-day on the part of Mr. Yancey and his sales section to depart from existing practice" (Ex. 634, p. 2351).

A minute of a joint duPont-ICI meeting of June 6, 1939 sets forth the understanding of the parties on this score with admirable clarity: "Lord Melchett informed Dr. Finn Sparre that this matter had been discussed very fully with the Group and Committees concerned, and that we had reached the conclusion that, on the clear understanding that the alteration of territory would not affect the commercial policy of the duPont Explosives Division, we agreed that we had no justifiable reason for resisting this amendment, and that we accepted it. Dr. Finn Sparre assured Lord Melchett that there was at present no intention on the part of duPonts of changing their commercial policy in regard to explosives, and if any such question ever arose it would be considered as a matter of high policy by Mr. Lammot duPont and the higher Executive officials" (Ex. 637, p. 2368).

It would be difficult to conceive a more explicit acknowledgment of the existence of a commercial understanding between duPont and ICI than that embodied in these declarations by Dr. Sparre, who was duPont's chief negotiator of the 1929 Patents and Processes Agreements. His statements expose as a complete travesty duPont's reiterated denials of the existence of any commercial understanding, as well as their assurances of the bona fide purposes of the patents and processes agreements. They explain the understanding of ICI officials, persisting through the years, that the patents and processes arrangements masked a territorial understanding—an interpretation which resisted numerous formal duPont disavowals.

It is significant that these damaging utterances—explicit and unqualified reports

of statements by a responsible duPont official—are to be found only in the files of ICI. We now appreciate why duPont should have so impressed upon ICI officials the high importance of avoiding in writing anything damaging from an anti-trust point of view that Mr. Mitchell of ICI felt compelled to write: "Subject to human frailty, everything that can be done to guard the position is being done" (Ex. 428, p. 1790).

Perhaps ICI had thought that "concealment" had been the watchword as a result of the instructions sent on October 20, 1937 to its Central Administration Committee which called attention to "* * * the importance of taking care that all correspondence and cables despatched to the United States and Canada are so phrased that they do not imply a restrictive agreement or understanding with a North American Company such as contravenes the American or Canadian Anti-Trust Laws" (Ex. 429, p. 1792).

Perhaps, too, ICI felt that members of the Committee had, as requested, not only taken "an early opportunity of reminding their staffs of the necessity of careful phraseology in this connection when cabling to or corresponding with any company in North America" (Ex. 429, pp. 1792–1793); but that this had been extended to include internal reports, writings and memoranda. In this, however, they were mistaken.

That duPont files should contain no explicit references to an understanding which Dr. Sparre describes as having lasted for 35 years is testimony to the vigor of duPont's efforts at concealment.

5. Operations under the 1929 and 1939 Agreements

a. Elimination of Competition

After the 1929 Agreement was executed, and in accordance with its provisions, both duPont and ICI commenced to make available to each other their individual technologies. Exclusive licenses for inventions relating to the whole area of embraced products were exchanged.

As the terms of the agreement implied, and as both duPont and ICI plainly contemplated, the effect of these licenses was to eliminate competition between the parties in their respective exclusive areas with respect to the included products.

DuPont and ICI have, except for limited exceptions, adhered to the allocation of exclusive markets for the manufacture and sale of chemical products as provided for in their understanding and the agreement of 1929. DuPont turned over to ICI its existing export trade of chemical products to ICI's exclusive territory when requested to do so by ICI, and thereafter refrained from exporting such chemical products to ICI's exclusive territory without ICI's consent (Exs. 292–296, 303–306; Ex. 537, pp. 2014–2015; Exs. 308–311, 314–316, 322–324, 368–370, 441–445, 456–466, 467–514, 1352–1354, 1356). ICI did likewise for duPont's exclusive territory (Ex. 317; Exs. 515–523; Ex. 524; Ex. 525, p. 1983; Exs. 526–534; Exs. 1341, 1355). ICI recognized that it was under an obligation not to expand in duPont's territory (Ex. 594, pp. 2217–2218).

Where one party had an established business in the territory of the other, in accordance with Article II(e), that business was permitted to continue until such time as the party whose exclusive territory it was, could take over the business. But the effect everywhere was the same, elimination of competition between the parties through the exchange of exclusive licenses.

It is unnecessary to set forth those transactions in full. Characteristic is the following in a report by a duPont official.

"At the same time, our formerly important business in Great Britain is diminishing; and this we believe is at least partly in consequence of the perfectly natural positive policy on the part of I. C. I. to crowd us out of that market as promptly as they may be able to replace our products with their own" (Ex. 310, pp. 1360, 1361).

As the patents and processes agreement resulted in diminishing existing competition, a fortiori, it put an end to possibilities of future competition.

That there did exist genuine potentialities for business expansion in the exclusive territory of the opposite party cannot be successfully disputed. On at least two occasions ICI was desirous of entering into col-

laboration with companies intent on serving the American market but because of complications arising out of obligations to license duPont exclusively, the projects were eventually dropped (Exs. 331–339; Exs. 348–356).

In a document substantially devoted to a candid examination of the restrictions imposed by the patents and processes agreement on third party dealing, the duPont Foreign Relations Department reached the following conclusion: "The DuPont-I.C.I. Agreement imposes obligations on DuPont which unquestionably restrict its present and future activities in the British Empire. If these restrictions are considered to be an impediment to DuPont's progress and not to be counterbalanced by similar restrictions which the Agreement imposes on I.C.I.'s activities in North America (exclusive of Canada and Newfoundland), then it is recommended that the matter be taken up with I.C.I. with a view to changing the Agreement to coincide with our wishes" (Ex. 363, p. 1558).

During the 1929 negotiations, duPont demanded and ICI acceded to a special provision permitting duPont to continue their activities in India "until such time as may be mutually agreed upon by the Chairman of the Boards of Directors of the two companies, from which time duPont's rights in India will be terminated, compensation to be paid to duPont acceptable to both parties" (Ex. 221, p. 1085). The original motivation for this insistence was duPont's desire to use this Indian trade as a weapon to force I. G. Farben to a commercial understanding.

By May 18, 1931, Dr. Sparre of du-Pont concluded that "the reason for making duPont's dyestuffs business in India an exception to the general terms of the ICI-duPont agreement no longer" existed and that duPont was "obligated to turn this business over to ICI" (Ex. 596, p. 2228). At the same time it was arranged that ICI would withdraw from the selling of dyestuffs in the United States and that ICI would transfer to duPont ownership of Dyestuffs Corporation of America which had been operated as ICI's selling company for dyestuffs in the United States. This was done by agreement between ICI and duPont dated September 15, 1931 (Ex. 598). Payment of compensation was provided in the agreement for both these transfers.

It should be noted in connection with this agreement that duPont promised to continue to supply to ICI, at prices to be mutually agreed upon, "such of duPont's special types of dyestuffs and related products as have been heretofore sold by du-Pont in the Empire of India," and ICI made a similar pledge with respect to its sales to the Dyestuffs Corporation (Ex. 598, p. 2235). Thus, ICI and duPont were surrendering business in each other's exclusive license territory which the other party was in no position to take over. It should be noted also that this transaction was in no way dependent upon the existence of exclusive licenses.

In the Patents and Processes Agreement of 1929, duPont's projected withdrawal from India was, in part, made contingent upon the assignment to ICI of exclusive licenses (Art. III(h) (1)). DuPont's actual withdrawal, obviously regarded as pursuant to the 1929 Agreement (Ex. 596, p. 2228; Ex. 599, p. 2244), had nothing whatever to do with exclusive licenses. It follows, therefore, that the surrender by duPont of its Indian dyestuffs export business to ICI and duPont's acquisition of the Dyestuff's Corporation of America, can be explained only as part of an overall plan to divide world markets. These surrenders occurred solely because there existed a basic arrangement under which the British Empire was ICI's exclusive trading territory, and the United States was part of duPont's exclusive territory.

We later will consider the effect of the 1929 Agreement on the duPont investments in NCF and LPL.

b. The Evaluations.

During the negotiations for the 1929 Agreement, ICI had objected to, and duPont had insisted upon, the inclusion of a provision for compensation for the licenses exchanged (Art. II(g)). The respective positions of the two parties were aptly pointed out in a letter to Lammot

duPont from J. K. Jenney, Secretary of the duPont Foreign Relations Committee, as follows:

"You reported that Sir Harry McGowan had stated that ICI objected to the clauses of the proposed Patents & Processes Agreement which provide that patents and secret processes should be sold by one party to the other for compensation because it had been agreed that the contributions of the two parties should be roughly equal over a period of years, and that the idea of compensation would prevent Department Heads from full cooperation, particularly in the early stages of the development of an invention because they would desire to hold back until the development had taken such shape that it could be offered for sale.

"Mr. Mudge stated that while an agreement involving a full and free interchange of all secret processes and patents and also providing for exclusive territories might not be illegal, if the agreement should ever be scrutinized by the Courts the presumption would be that the agreement was for a division of markets leaving the burden of proving the contrary on our side. In its present form the agreement, in Mr. Mudge's opinion, is legal and leaves the burden of proof on the Government" (Ex. 565, pp. 2130, 2131).

The opinion of Sir Harry McGowan, quoted above, conforms, of course, to the persistently held ICI view that the patents and processes agreement was a camouflage for a territorial understanding. Regarding the projected exchange of licenses simply as an instrument to mask a territorial division, ICI could see little justification for payment of compensation based on the value of licenses exchanged.

DuPont, it will be noted, defended the provision for compensation solely on the ground of legal necessity. Whole technologies were to be made available to one another by two great chemical combines, with an almost mathematical certainty that there must be some disparity in value; yet, duPont insisted upon a compensation provision solely to safeguard its legal position.

Certain it is that ICI received the distinct impression that, with the exception of patents and processes "of outstanding merit," the provision for compensation was largely a legal formality (Ex. 568, p. 2136).

It was recorded by ICI in an internal communication marked "Private and Confidential" on November 5, 1929 that "At a meeting held at Wilmington on 27th September, at which the President and Colonel Pollitt were present, it was agreed that both Companies would table all patents and secret processes as were considered to be of outstanding merit. An effort would then be made to evaluate the processes and settle compensation with a view to clearing the way for fullest possible technical cooperation thereafter without payment" (Ex. 568, p. 2136).

DuPont, it is true, did prepare for a more inclusive evaluation (Ex. 570, p. 2141); but that this preparation represented anything more than an elaborate pretense is rendered highly doubtful by the actual evaluation negotiations.

Both duPont and ICI had formally determined that the "contemplated evaluation" discussed in the Fall of 1929 involved "processes of outstanding merit only." Within the dyestuffs department, the duPont men felt "they were not able to take any official attitude on the suggested method for a general evaluation of dyestuffs processes." On this a duPont technician "gave voice to his personal feeling that there were no processes that could be described as coming under the definition 'of outstanding merit' * * *." But the decision as to this division was left to be dealt with by the astute duPont negotiator, Dr. Sparre, who already expressed the thought to ICI that a settlement could be rapidly reached (Ex. 570, pp. 2140, 2141).

A tabulation of patents and processes exchanged by duPont was prepared; when it reached ICI on June 19, 1930, ICI note was made that "Bearing in mind that this is a Patents and Processes Agreement, and also taking into account the anti-trust laws of the States, it will no doubt be deemed desirable by our American friends to formally effect some interchange of patents and

processes, and I should imagine it is not their intention to push for payment against all the items mentioned on the attached list" (Ex. 575, p. 2152).

The first evaluation conference was held during 1930. The documents make it clear that ICI entered the conference with the view that a 50/50 settlement was desirable. Thus Walker, ICI's chief negotiator for the 1929 Agreement, writes: "Mr. Akers and myself have got rather accustomed to the frame of mind that this whole question of evaluation presents so many difficulties that it will probably have to be settled on a 50/50 basis" (Ex. 576, p. 2154).

Moreover, and again even before the conference began, ICI anticipated the legal necessity for a token payment. Thus A. G. Major of the ICI Foreign Department in a note wrote: "In the evaluation of the pre-Agreement Patents and Processes with duPonts, it has been our understanding that we should endeavor to arrive at a solution which would involve acceptance of the principle of approximate parity of value of processes offered by both sides, the actual document embodying this to be adjusted to the legal requirements of American law. This would involve payment by one side to the other of a sum of money, probably 6000 pounds or 7000 pounds" (Ex. 577, p. 2156; see also Ex. 578, p. 2157).

Minutes of the meetings do disclose that a number of patents and processes were canvassed, and views as to their usefulness were exchanged (Ex. 579, 580, 581; pp. 2158-2177). The day following the last recorded meeting F. Walker of ICI reported by letter, also marked "Private and Confidential," as follows:

"In effect, the stage we have now reached is that 50/50 for patent and process evaluation has been agreed. However, owing to American legal conditions, it is desirable that a considerable differential should be created and be paid for by one side or the other. I have taken the line that I do not care what we hang this differential on to, but if it happens that payment is to be made by ICI to duPont, I must naturally be clearly satisfied that we are getting something for the money.

"Briefly, the line taken by Finn Sparre regarding the Neozones was that duPonts have a considerable trade in our territory and under the terms of the Agreement are entitled to compensation as and when they give up this trade.

* * * * * *

"We are now trying to find a thoroughly equitable reason for passing money from one side to the other. The Neozones are only one of several means suggested" (Ex. 582, pp. 2178-2179).

A memorandum from Dr. Sparre to Walker makes it crystal clear that duPont was insisting upon a differential in its favor, not on the basis of any comparative appraisal of the value of the two technologies, but solely to compensate duPont for its loss of business in the British Empire. In that memorandum Dr. Sparre alludes to Neozones and several other products wherein the patents and processes agreement cause duPont commercial loss, and goes on to point out:

"I have mentioned a figure of $125,000. I do not think it will require more than a profit of $25,000 per annum to justify a settlement on the basis of $125,000 once and for all.

"I believe you will agree that under the duPont-ICI Agreement the duPont Company has taken an annual reduction in profits from export business which exceeds by much more than $25,000 per annum any possible loss which your company can be shown to have suffered under the agreement.

"Please also keep in mind that under the duPont-ICI agreement we are selling you trademarks, patents and processes which have resulted in par already, and which will further result, in the discontinuance of a comparatively large export business to the British Empire, the method of handling which is shown in the duPont-ICI Agreement, and for which we must have a reason which is sound and proper from a business and legal standpoint" (Ex. 583, p. 2182).

The situation is aptly summarized in an ICI document as follows: "It was realized that the meetings with Dr. Finn Sparre

were arranged with the definite object of arriving at the differential, if any, due by one company to the other on the value of patents and processes at the time of the signing of that agreement (1st July, 1929). However, it had been agreed that for various reasons the exchange of information had balanced out, consequently no payment was due either way. This decision, although satisfactory to both companies, was not in Dr. Finn Sparre's opinion a satisfactory settlement from the point of view of the U. S. Anti-Trust Law, and he wished a difference, one way or the other, to be arrived at. To do this he suggested taking clauses of the Agreement and deciding a balance of existing trade of the companies in the other's territory which would have to be given up at the request of the other Company and for which the Agreement provided that compensation was due" (Ex. 584, p. 2184).

This same ICI memorandum finally concluded with the statement that "It was agreed that Mr. Walker would see Dr. Finn Sparre and endeavor to reach a final decision. It was also agreed that Mr. Walker should endeavor to establish a 50/50 basis, but if Dr. Sparre insisted on a differential, then D.C.A. would be suggested as that differential" (Ex. 584, p. 2186).

This was followed by a further ICI memorandum, dated November 20, 1930, ten days later, in which it was recorded that

"It was agreed with Dr. Finn Sparre to settle the matter of exchange of patents and processes on the basis of parity of values.

"It was not, however, quite so easy to deal with the trade still being done by each party in the other's territory. Finally the President agreed in conversation with Dr. Sparre to wrap up the settlement of this phase of the matter round the purchase by ICI of duPont's business in Neozones and other rubber agers in this country for the sum of $125,000, provided duPont's take from us, at a figure to be agreed, the Dyestuffs Corporation of America" (Ex. 585, p. 2187).

Ultimately, the figure of $125,000.00 was agreed upon. In a report to the Presidents of the two companies signed by the negotiators the following significant comment is made:

"It finally being evident that no agreement could be arrived at as to certain patents and processes, the Committee determined to report the result of its conference as follows:

\* \* \* \* \* \*

"2. That the total value of the patents and secret processes under which ICI desires to acquire licenses from duPont exceeds the value of the patents and processes under which duPont desires to acquire licenses from ICI and in consequence ICI should pay to duPont such sum of money for the licenses it desires to secure as will compensate duPont for such difference.

"3. That the undersigned representative of duPont on said Committee suggests that the sum of $125,000 fairly represents such difference in value, and is prepared to recommend the acceptance by duPont of such sum as a compromise, and the undersigned representative of ICI on said Committee, believing it to be for the best interests of the parties that the differences be so compromised, will recommend the payment of said sum by ICI to duPont" (Ex. 590, p. 2203).

Of this report, F. Walker, the ICI negotiator, wrote:

"I have signed the report in question, as I appreciate it is worded in relation to the American Anti-Trust Laws.

"Paragraph '2,' page 4, is not admitted by us, but for the purpose of this particular report we cannot take exception to the paragraph, as we have actually agreed to pay them the sum of $125,000 provided they buy from us the Dyestuffs Corporation of America. Of necessity, however, the second transaction must not be involved with the settlement of the evaluation of the patents and processes, and must not be referred to in that connection" (Ex. 589, p. 2197).

It was arbitrarily decided to attribute the differential to duPont's loss of export business on Neozones. The settlement of the evaluation on this basis was reached in 1930, even though duPont at that time had not yet obtained the right from Goodyear Tire and Rubber Company to sub-license

ICI under the principal Neozone patents which duPont had obtained from Goodyear (Ex. D–1788; Ex. D–1791).

The statement in the report that the sum of $125,000.00 was believed to represent a fair appraisal of the excess of value of du-Pont's inventions over those of ICI was, of course, untrue, and was known by the authors to be untrue when made. No such agreement had in fact been reached. The differential arrived at had nothing whatsoever to do with the value of inventions; it was based solely on trading conditions; it was designed to establish the existence of a good faith evaluation which had not in fact transpired. The entire record of negotiations between the parties bears all the indicia of an elaborate pretense designed to cover their operations with an aura of legality. That duPont and ICI would go so far as to have high executives and trusted negotiators like Mr. Walker and Dr. Sparre flatly misstate the results of their prolonged negotiations provides a significant insight into their keen awareness of the legal dangers implicit in their operations and into the sincerity of their protestations of innocence.

The defendants have insisted on this trial that whatever conclusions may be drawn as to the first evaluation, the subsequent evaluations were genuine, bona fide affairs, and they have submitted numerous documents in support of this contention (Ex. D–1454; Ex. 1554).

These documents do disclose that in the subsequent evaluations the negotiators exhaustively tabulated their respective inventions, evolved a formula to ascertain value, and made some outward effort to appraise the inventions. Nevertheless, we are persuaded that the pattern of the first evaluation was not altered in substance and that the primary intention of the parties remained the same: to create an artificial and insubstantial differential while going through the motions of an evaluation.

The second evaluation took place during March and April of 1936 and purported to cover the licenses granted from July 1st, 1929 to June 30, 1934 (Ex. 1493). In a report to Lammot duPont by the chief nego-tiators, the guiding principle of the evaluation was stated to be as follows: " * * * one years earnings or savings equivalent to a 20% royalty over a 5 year period of an established business should be taken as a fair consideration" (Ex. D–1493, p. 8956). It is noted in the report that 720 subjects were received for consideration, some of the subjects including "several inventions or even whole fields of development." Many of these subjects, however, were carried over to the next review and only 420 subjects were covered in the second evaluation. The report notes that "It was found possible to agree on only a general consideration of numerous comparatively minor or indefinite patents and processes but a detailed examination was made of a very considerable number of valuable and novel patents and processes" (Ex. D–1493, p. 8956). How many inventions were in fact specifically evaluated is not set forth in the report.

The balance arrived at in the second evaluation was $111,925.00 to be paid du-Pont by ICI. The total differential at this point in the relationships of the parties was $209,656.00 (monetary devaluation having reduced the first payment to $97,731.00).

The licenses exchanged from 1934 to 1939 were made the subject of evaluation during October, 1945 (Ex. D–1513, p. 9052). The delay was attributed to the outbreak of the war, which was also responsible for delay in compiling information for the subsequent period to 1944, with exceptions which will be noted. 868 subjects were covered in this report of the third evaluation. Of this number, however, only 23 subjects were specifically evaluated (14 to ICI and 9 to duPont) resulting in a balance to duPont of $32,235.00 (Ex. D–1532, p. 9160).

Simultaneously, 28 subjects from the 1939–1944 period were evaluated as 3 groups, resulting in a balance to ICI of $223,040.00. The net sum paid ICI as a result of the third evaluation was then $190,805.00. At the end of the third evaluation, all inventions exchanged between the parties for a period of 10 years having been covered, the total overall balance was $18,-851.00 in favor of duPont.

The fourth evaluation, covering the period from June 30, 1939 to July 1st, 1944, took place during May, 1946 (Ex. D–1533, p. 9162). 590 subjects were embraced, but of these only 50 (29 to ICI; 21 to duPont) were specifically evaluated. For this entire period from 1939–1944 a balance was found due to duPont of $6,182.00 (Ex. D–1532, p. 9160). Added to the previous differential established after the first three evaluations, we find the total balance in favor of duPont at the end of the fourth evaluation to be $25,033.00.

It is unnecessary to consider the evaluation accompanying the cancellation of the patents and processes arrangements. This occurred subsequent to the filing of this suit wherein the complaint specifically attacked the genuineness of the evaluations; even so it does not alter the pattern.

The situation presented is an extraordinary one. For 15 years, two great chemical and industrial organizations exclusively licensed to one another hundreds upon hundreds of inventions for exploitation in vast commercial territories. We are asked to believe that as a result of a bona fide effort to ascertain the differential in value between these two vast bodies of inventions, that differential was found to be $25,033.00. We do not accept this extravagant proposition.

The truth concerning the evaluations is not difficult to perceive. The provision for compensation was inserted only to preserve the appearance of a bona fide patent licensing scheme (Ex. 565, p. 2130). The very language of the compensation provision made it plain that payments were to be governed by broad policy considerations rather than by individual license values (Art. II(g)). Both parties understood that the principle of approximate parity of values was to govern (Ex. 384, pp. 1647, 1648; Ex. 389, p. 1668; Ex. 565, p. 2130; Ex. 577; Ex. 578; Ex. 634, p. 2354). In the small percentage of inventions which were specifically assessed the technique for achieving their goal was readily available (Ex. 1532, p. 9160; Ex. D–1551, p. 9305). The overall result of the evaluations can be understood reasonably only as the execution of that understanding. Any lingering doubts are dispelled by the demonstration in the first evaluation of the readiness of both duPont and ICI to misstate the facts of their dealings in an effort to buttress their legal position. This history of the evaluations presents still additional evidence that the patents and processes structure was merely a camouflage for an underlying agreement to divide territories and markets.

One other aspect of these evaluations merits our attention. It was noted above that out of 868 subjects considered in the 1934–1939 evaluation, only 23 were specifically evaluated; and out of 590 subjects embraced in the 1939–1944 evaluation only 50 were specifically evaluated. In the evaluation for 1944–1948, accompanying the cancellation of the patents and processes arrangements, a total of 1067 subjects were considered. Of these, only 94 contributions (43 by duPont and 51 by ICI) were deemed "capable of financial assessment" (Ex. D–1551, p. 9305).

The pattern presented by these figures is striking. We discussed earlier how the granting of exclusive licenses under the patents and processes agreements could work, by the very nature of the exclusive grant, an elimination of competition between the parties, and that such an effect could be achieved by an exchange of inventions of utterly minor value. The figures presented here show that of the great mass of inventions exchanged, each one of which could contribute to a territorial withdrawal, only a small proportion were considered by the parties to have sufficient economic value to be the subject of specific monetary assessment.

In connection with this, it seems important to note how small a proportion of patents were actually used by the recipients. Of all the patents duPont obtained from ICI it made use of only about 7.7 per cent (Ex. 1406–A). ICI utilized only about 15% of the patents it obtained from duPont (Ex. 1409).

These two sets of figures—the small percentage of licenses which were deemed to have commercial value, and the small percentage which were actually utilized by the parties—provides still additional confirma-

tion that the patents and processes structure masked an illegal trading agreement.

**c. The Addition of Products**

The evidence is decisive that duPont and ICI arranged to extend their cooperation to products outside the scope of the written agreement. Thus, as early as 1930, Mr. Mitchell of ICI had instructed the ICI organization to offer everything to duPont "before approaching others" (Ex. 325, p. 1400).

In 1937, Sir William Coates visited Wilmington to discuss with duPont "the spirit of the arrangement." It was recorded by ICI that "It appeared desirable to try and focus in more precise words the meaning to be attached to the phrase 'the spirit of the Agreement' and an attempt was therefore made to put down on paper the joint views of the two companies on those points which had recently come prominently to notice" (Ex 431, p. 1798).

After discussions with duPont officials, Sir William Coates prepared a memorandum which he designated, "as a note of my personal impressions of duPont's views" (Ex. 431, p. 1799), which was read to a joint conference of duPont and ICI officials (Ex. 431, p. 1798). (We consider this memorandum later when discussing neoprene, polythene and nylon.) After discussion, the Coates memorandum was amended, and, as amended, it contained the following section: "5. Where a non-resident party has originated any process, use or product lying outside of the scope of the agreement and is free in regard to its exploitation or use in the territory of the resident party, that exploitation shall be carried on in consultation with the resident party as to the means, manner and time of exploitation, which will be conducted in the best interests of the originating party, subject always to the prior interest of the resident party, in his exclusive territory. For this purpose the resident party will provide any necessary assistance in personnel or otherwise" (Ex. 431, p. 1801).

Even before this memorandum was prepared, there is evidence that the parties were offering to each other inventions not within the strict wording of the agreement. Thus, it is reported that although

methacrylic acid esters do not fall within the wording of the agreement, "both duPont and ICI have, for a considerable period, assumed that their agreement included methacrylic acid esters and have acted accordingly" (Ex. 423, p. 1765).

Considerable evidence bearing on this question appears in the negotiations surrounding the 1939 Agreement. In that year, but prior to the execution of the agreement, ICI's "duPont Committee" resolved that "it be put to duPont that ICI/duPont agree in general that offer should be made of all inventions irrespective of whether they are agreement products or not—subject to prior commitments—and that if agreed this be embodied by a clause in the agreement or, in preference, a letter signed by both parties covering such understanding" (Ex. 631, p. 2345). After discussion had been held and accord reached on the principal terms of the new agreement, Lord Melchett reported: "With a view to widening the scope of the agreement, it was agreed that it would be a good thing if there was to be an exchange of letters between the two parties stating that outside the products covered by the agreement they would each offer to the other first refusal for their exclusive territory, rights in any inventions whatsoever, subject, of course, to prior commitments. It was to be made clear, however, that such a letter would not deprive the inventor of disposing of his invention at his sole discretion, but is to be purely an expression of general policy" (Ex. 641, p. 2386).

A letter pursuant to this arrangement was addressed to Lammot duPont by Lord McGowan on July 4, 1939, and embodied the further declaration that the indicated policy was a "reiteration of policy which I think each of our companies follow already" (Ex. 643, p. 2392). The letter was returned to ICI by Dr. Sparre, who instructed duPont London representative, Caesar Graselli, to hand it to Lord Melchett personally and state to Lord Melchett that he (Sparre) would explain orally why it was returned to him (Ex. 643, p. 2393). This mode of furtively handling a letter from the directing head of ICI to Lammot

duPont—a letter merely carrying out a decision which, an ICI document makes clear, had already been arrived at—is an extraordinary example of duPont's efforts at concealment. It is significant that a subsequent memorandum by L. J. Greenwood of ICI states unequivocally that the parties did in fact carry out their understanding (Ex. 740, p. 2799).

### d. Neoprene, Polythene and Nylon

When the 1929 Patents and Processes Agreement was drawn, a differentiation between products manufactured on July 1, 1929 and those subsequently developed was made in Article II of the agreement (Ex. 1 of complaint, Art. II–(c), p. 98). It was later pointed out by the Foreign Relations Department of duPont that "In sub-paragraphs (a) and (b) it is specified that one party shall grant to the other within its exclusive license territory exclusive licenses on inventions 'relating to the products specified.' The obligation to grant licenses in non-exclusive territory is confined to inventions 'relating to such of the products hereinafter specified as are now manufactured by both parties.' There is no definition or interpretation as to just what is meant by a new product" (Ex. 647, p. 2403).

But all licenses were subject to the provision in the 1929 Agreement that "adequate and justifiable compensation to be agreed upon by separate negotiations" would be paid (Ex. 1 of complaint; Art. II (g) p. 99). There developed a practice between duPont and ICI of earmarking for special attention inventions which were considered to be of outstanding importance. "The term 'major invention' was coined to apply to developments of outstanding importance which either company wished to exclude from the general terms of the agreement as applying to compensation and to earmark as having special value" (Ex. 652, p. 2418).

By agreement of the parties, three such "major inventions" were made the subject of separate evaluations, designed to fix their "special value." These covered neoprene, a new duPont synthetic rubber (Ex. 664); polythene, a new ICI plastic sub-stance (Ex. 679; Ex. D–1195); and nylon, a new duPont synthetic fiber (Ex. D–1153; Ex. D–1163). It is these three "major inventions" and the negotiations and agreements concerning them we now consider.

*Neoprene* is covered by broad process and products patents; duPont acquired rights to these patents in 1928 and 1932 under a royalty licensing agreement. Thereafter duPont developed and improved the product through its own research. In 1931 duPont advised ICI of the work duPont had been doing on the development of a new synthetic "rubber"; Lammot duPont then wrote that "we consider this work as the most outstanding scientific achievement which we have made in the past decade" (Ex. 654, p. 2427).

ICI did not immediately request a license under duPont's British neoprene patents. ICI informed duPont that it had difficulty "in gauging the ultimate potentialities of neoprene" in the British markets (Ex. 655, p. 2429). From 1935 to January, 1941, when a formal licensing agreement (Ex. 664) was signed by duPont and ICI, neoprene was sold in the British Empire by ICI as duPont's agent; but during this period duPont fully realized its obligation to ICI to license it on this process (Ex. 656, p. 2431; Ex. 655, p. 2429). DuPont, too, during this same time, recognized "the very earnest effort of ICI" made to introduce neoprene on the British market, and to find practical applications for its use. Increasing quantities of neoprene were being imported to Great Britain; this, duPont felt, indicated "that the product might have more and more interest in the British market" (Ex. 656, p. 2431). ICI delayed its decision to take the license and to commence manufacture in a British plant of its own. DuPont awaited ICI's decision and delayed the full development in the British Empire of this "most outstanding scientific achievement" for six years. It was noted by the General Manager of the duPont Organic Chemicals Department, in September, 1938, that "the duPont company of course is quite willing to keep this contract at the disposal of ICI for a reasonable length of time" (Ex. 656, p. 2432).

DuPont did so for far more than "a reasonable length of time," and this, although not bound to such action by any contractual obligation. The entire neoprene negotiations, once again, give mute evidence of the broad understanding between duPont and ICI.

The neoprene licensing agreement (Ex. 664), although dated "1941," apparently was drawn but not signed in 1939; by its wording it was obviously intended as an appendage to the 1939 Patents and Processes agreement. It is not disputed that neoprene was one of the products within the Patents and Processes Agreement of 1939.

The vital importance of neoprene is a matter of common knowledge. During World War II, the United States Government build a neoprene plant in Louisville, Kentucky. It had been designed and was later operated by duPont. After the war, duPont purchased the plant but not until the objections of the Government had been met by the cancellation of the 1941 duPont-ICI Neoprene Agreement. ICI acquiesced in this cancellation which was accomplished in 1946 (Exs. D-1696-1699). But we may not ascribe to this joint action by duPont and ICI a purpose to abandon their understanding in which the neoprene negotiations were but a small part, for ICI had never manufactured neoprene, and had abandoned any intention it might ever have had of doing so.

Imagination does not have to wander unrestrained to see the purpose either of duPont in constantly urging upon the reluctant ICI the licensing agreement, and patiently awaiting ICI's decision to accept it, or of ICI in delaying the negotiations and finally accepting the license in 1941, only to surrender it in 1946, never having exercised the right to manufacture under it. These neoprene dealings put the spirit of cooperation to a severe test, but it survived.

*Polythene* is the subject of basic process and product patents. The first United States patent on polythene was issued to ICI in April, 1939. Lord Melchett of ICI wrote to Jasper E. Crane of duPont concerning polythene on March 16th, 1939, that research was "being continued on the preparation and properties of polythene, its possible applications and into its chemical modification." He then added. " * * * the work as you know is original, an extremely strong series of patents has been taken out and we are of the opinion that our work will have important exploitable value in the commercial markets of the world.

"We have not yet defined satisfactorily 'a major invention' but I think that a novel chemical process which produces a product with unique properties and potential commercial worth, together with a very strong patent position justifies the claim for polythene as a major invention. In effect this means that we retain the right to the final decision on the granting of licenses and the selection of licensees" (Ex. 668, p. 2495).

The qualification, which Lord Melchett then added, reads—"You will appreciate that the foregoing is a formal statement and does not in any way indicate a change in the course of action which duPonts and ourselves have followed to date" (Ex. 668, pp. 2494, 2495).

When it is noted that at the date of this letter (March 16, 1939) the two other "major inventions" nylon and neoprene, for which separate evaluations agreements were made, had already been the subject of special negotiations, it appears that duPont and ICI had each felt obligated to offer to the other licenses in the exclusive license territory which had been assigned to it (Ex. 668, pp. 2496-2499), on all new products of major importance. The purpose in giving notice of the special significance of these new products was not to take them out of the scope of the Patents and Processes Agreement of 1929, for they were specifically provided for in Article III(a) (b) and (c) (as they were later in the 1939 agreement by Article III(T)). The reason which prompted this notice was that basis might be laid for the claim for "special case" treatment by separate agreement providing for arrangements as to compensation.

Polythene was found to have special dielectric characteristics which were urgently required in connection with the production of radar equipment for wartime aircraft detection work (Ex. D-1193). Du-

Pont in September 1942 undertook the manufacture of polythene "entirely at the request of the United States Government and solely for war purposes," but it recognized at the time that "polythene, if cheaply produced, has a promising future but commercial exploitation must be deferred until a later time" because of wartime restrictions on the use of materials and on plant construction for commercial manufacture (Ex. 673, p. 2545). DuPont agreed that polythene was to be "treated as an exceptional case" under the patents and processes agreements and accepted ICI royalty proposals. It has not been disputed by duPont or ICI that polythene like neoprene is within the patents and processes agreements (R–1003–1006; 1033; Ex. 1408). ICI waived royalties for any production or use of polythene for war purposes (Ex. 675; Ex. D–1197) but later in January, 1946, duPont obligated itself by separate agreement to pay royalties to ICI on all polythene manufactured and sold by duPont for commercial purposes (Ex. D–2157; Ex. D–1195). This agreement was made two years after the filing of the instant suit; it was filed by duPont with both the Department of Justice and the Department of State before execution but it was acted upon by neither of these departments. The agreement is still operative (Ex. D–2219).

We find that the polythene negotiations were conducted under the patents and processes agreements with the purpose of carrying out the licensing plant which duPont and ICI had to allocate territories and to restrain and limit competition between themselves and others. The intent and purpose of these polythene arrangements from their inception was to carry out this general understanding between duPont and ICI.

Nylon is a new product, discovered and developed by duPont. Its development required more than ten years; at its peak the research employed the services of some 250 expert and trained chemists. The result was a scientific achievement of the first magnitude. DuPont invested many millions of its capital; it required great courage and vision to undertake and persevere in this work. The risk was enormous; the prospect of profit and gain was uncertain. That the resulting product, if any developed, would be commercially useful or marketable could not be foretold. Nylon development has brought large but well-earned rewards to duPont.

Nylon was wholly a duPont development from beginning to end. ICI made no contribution, directly or indirectly, to the discovery of nylon or to any phase of its development. Nylon is protected by product and process patents in the United States and throughout the world.

It was by letter of January 14, 1937 that Lammot duPont, then President of the duPont Company, first wrote of nylon to H. J. Mitchell, then President of ICI (Ex. 683), as follows:

"During the last several years we have been doing a very considerable amount of experimental work on a most promising development of new chemical compounds from which can be made, among other things, a new type of synthetic fiber useful for textile purposes and possibly other purposes. This work has been conducted as a particularly confidential subject because, knowing the considerable amount of work here and in other countries on the same general subject, we wanted to carry on our work with as little information as possible leaking out until we felt that we had a satisfactory patent position with the minimum of possible interferences.

"This will explain to you why your company has not been furnished with information in regard to this particular experimental work and it is also the reason why I am writing to you about this matter instead of having information passed along to your departments in the usual manner. However, not only has our experimental work progressed until we now see the possibility of commercial value but the patent situation seems also to be satisfactory, and in fact some patents have already been published in different countries. I therefore feel that the proper time has come to apprise you of this development, although I would ask that the subject should still be considered not only confidential in the usual manner, but also a subject that, for the time being, should be handled between you and myself

until other arrangement is made" (Ex. 683, pp. 2601–2602).

In this same letter, he also wrote that "We have given some thought to the question whether this development should be considered as coming under the duPont-ICI Agreement or whether it should be submitted to you for your consideration as a subject coming outside of the Agreement. It is quite possible that the material or some of the operations might be useful in the chemical industry outside of the new fiber development and unquestionably to such extent the patents and processes will be offered to your company for such purposes as coming under the Agreement. However, to the extent that the various patents and processes are required in the manufacture of the new type of fibers, such rights must be considered together as parts of a new industry.

· "As I see this situation at this time, we have here a development of possibly outstanding future importance and which we are glad to call to your attention for your consideration as to whether, in your opinion, your company could successfully undertake the commercial exploitation in your territory. In this connection, I do not think it is of any importance to discuss whether we should consider this subject as coming under the Patents and Processes Agreement inasmuch as we will be glad to submit it to you as a subject outside of the Agreement if that is the proper interpretation but, in any event, it is a subject of such importance that it should be subject to separate negotiations" (Ex. 683, pp. 2602, 2603).

Here, then, we have a recognition by duPont of its obligation to disclose to ICI the nylon development and to offer to ICI a license for nylon manufacture. The letter, too, is an acknowledgment by duPont that at least "the material or some of the operations" came within the patents and processes agreement. And the letter was a reaffirmation of the old "spirit of cooperation" and of a purpose to adhere to and carry out the general understanding between duPont and ICI by declaring that whether nylon might or might not be within the patents and processes agreement was

not of any importance, as it was duPont's intention to submit nylon to ICI in any event for "commercial exploitation" in ICI assigned territory.

Mr. Mitchell replied by letter of February 5, 1937: "I quite understand your reasons for not passing on information on this subject at once, and appreciate your offer to discuss the development of textile fibres from proteins with us before you approach anyone else" (Ex. D–1134, p. 7746).

And concerning Lammot duPont's observation that, with respect to nylon, "Furthermore, we have to consider the application for patents in the British Empire which, in our opinion, should be prosecuted by ourselves and not by your legal Department until we arrive at any understanding of your possible interest in the subject" (Ex. 683, p. 2603).

Mr. Mitchell noted the same views on the part of ICI with regard to "Ardil," a fibre with which ICI was then experimenting (Ex. D–1134, p. 7747).

DuPont has urged on trial that although neoprene and polythene were within the scope of the patents and processes agreements, nylon was not. DuPont's position is that the nylon negotiations and agreements were separate and apart from all other undertakings.

The Government has contended that the nylon agreement was offered to ICI pursuant to the terms of the Patents and Processes Agreements of 1929 and 1939 and that nylon was an invention and product within the scope of those agreements. In this respect, it is urged that nylon was treated as a "major invention" and dealt with in the same manner as were neoprene and polythene. Apart from this contractual obligation created by the patents and processes agreements, the Government has claimed that the nylon negotiations and agreements were had in further accomplishment of the continued purpose of duPont and ICI to restrain competition between themselves and others.

We have already determined the unlawful purpose of the patents and processes agreements, and we have found the unlawful understanding between duPont and ICI. The nylon agreements were had in the

achievement of that understanding and this independently of any construction which might have been given to the patents and processes agreements.

The 1929 Patents and Processes Agreement was by its terms to continue in effect for a period of ten years from its date, July 1, 1929 (Ex. 1 of complaint, Article XIII). DuPont licensed ICI under its nylon patents by agreement dated March 30, 1939. The 1939 Patents and Processes Agreement was dated June 30, 1939 (Ex. 2 of complaint). Both the nylon licensing agreement and the renewal 1939 Patents and Processes Agreement were negotiated and discussed during the same period. And at or about the same time duPont also licensed I. G. Farben (Ex. 1414), French Rhodiaceta (Ex. 1412) and Italian Rhodiaceta (Ex. 1413) under its nylon patents. These agreements were all similar in character. Each allocated exclusive manufacturing and trading territories to the licensees and reserved exclusive territory for duPont. The territorial allocation was agreed upon after discussions with all the parties (R. 2805-2807).

It is important to note that nylon, like neoprene and polythene, was handled as a "special case" or "major invention" under the 1929 Agreement. The exclusive territory granted to ICI in the nylon agreement (Ex. D-1153, pp. 7801-7802) included the exclusive territory granted to ICI under the 1929 Patents and Processes Agreement (Ex. 1 of complaint, Art. II(b)). DuPont, too, as it was permitted to do under the 1929 Agreement, granted exclusive licenses to third parties in ICI's normally non-exclusive territories; provision was also made for special compensation.

When the 1939 patents and processes agreement was signed three months later in June, 1939, nylon, neoprene and polythene were designated in Article III(T) as products within the agreement. Article III (T) conforms in purpose to Article III(A) (B) and (C) of the 1929 Agreement. Neoprene was not made the subject of a separate written agreement until January 22, 1941 (Ex. 664, p. 2451); polythene not until January 17, 1946 (Ex. D-1195, p. 7933); therefore the nylon agreements could alone

be listed under Schedule "A" of the 1939 Agreement as a prior commitment under Article III of the agreement. This listing of the four nylon licenses which had only recently been granted by duPont to ICI, French Rhodiaceta, Italian Rhodiaceta and I. G. Farben was to preserve the right of duPont to claim special compensation from ICI and to serve as an acknowledgment by ICI of the existence of the nylon agreements duPont had entered into with other parties. This was in accord with Article XI of the 1939 Agreement which provided for subordination of the provisions of the 1939 Agreement to prior commitments so scheduled; under Article XI both ICI and duPont upon renewal of these prior commitments were obligated to attempt to harmonize them with the terms of the 1939 Agreement.

It is interesting to note in connection with consideration of the question whether nylon was or was not within the patents and processes agreements the discussions which were had in November, 1937 between duPont and ICI officials. At that time it was recorded that "It appeared desirable to try and focus in more precise words the meaning to be attached to the phrase 'the spirit of the Agreement' and an attempt was therefore made to put down on paper the joint views of the two companies on those points which had recently come prominently to notice" (Ex. 431, p. 1798).

It was then formally stated that "3. It is the spirit of the agreement that where there is any doubt as to whether a process or product is within or without the agreement, the inclination should be to treat it as if it were in the agreement. Each party will accordingly not look on the agreement in any restrictive manner but as one directed to promoting the best interests of both" (Ex. 431, p. 1800).

And concerning this formal statement of policy, the following duPont comment was noted "Paragraph (3): duPont were strongly against any chiselling from the present Agreement; they desired that it should be widened rather than narrowed. In this connection I might add that at a later interview with Dr. Fin Sparre he informed me that on occasions duPont would find it

necessary, by reason of the legal position in the United States, to say that such-and-such a product or process must be regarded as outside the Agreement but that such a statement must not be understood to mean that I. C. I. would be treated in any other manner than if a product or process had been regarded as falling within the Agreement" (Ex. 431, p. 1803).

Of all of these statements—which were set forth in the memorandum, it was noted that it was not "a formal document," and that "Mr. Lammot duPont emphasized this aspect of the matter stating clearly that it must not be understood to be in any sense an agreement; that it had no force in itself; and that while it might represent duPont's views at that moment, it would not necessarily represent them at any later date" (Ex. 431, p. 1799).

But the memorandum was far more than "a formal document," it was later referred to as "an historical record of the conversations which took place that day" (Ex. D–1267, p. 8191). A week later on December 1, 1937, when internal inquiry was made among ICI officials as to "what, if any, inference there might be in Mr. L. duPont's remarks—' * * * While it might represent duPont's views at that moment, it would not necessarily represent them at any later date,' " the very brief and cryptic notation was made "answer-Sherman Act" (Ex. 433, pp. 1820, 1821).

It was an old custom of duPont to refrain from expressing understandings had with ICI in formal documents (see Ex. 19, p. 123; Ex. 778, pp. 2899, 2900).

We are left with no doubt that duPont within their own organization always considered the nylon licensing agreement with ICI as within the patents and processes agreements. On July 21, 1944, Walter S. Carpenter, at the time duPont president, recorded some of his "Observations regarding sublicensing under ICI-duPont agreement" (Ex. 752). He was considering the disposition of royalties from sublicensing nylon patents *under* the ICI-duPont agreement "in a way which harmonized with the fundamental philosophy embodied in the broad agreement" (Ex. 752, p. 2824). He then observed that "Recently this question has ap-

peared, in at least two cases of considerable importance, which now warrant a careful examination of principles. The first case was that of the licensing of the nylon patents" (Ex. 752, p. 2824).

Mr. Carpenter, following these observations, wrote Lord McGowan on September 24, 1942 that "ICI and duPont believe in 'the liberal exchange of information between the personnel of the respective research establishments,' as it is expressed in the Patents and Processes Agreement," and further that "It was agreed between us that outstanding developments might be considered 'exceptional cases,' and reference to such cases was made in the latest agreement which was executed in 1939. Such a case is made the subject of a special licensing contract with detailed provisions dealing with royalties, patents rights, definition of field, and other appropriate matters" (Ex. 672, pp. 2535, 2536).

The full effect of these records appears when we recall that the nylon agreement and the 1939 Patents and Processes Agreement were simultaneously discussed and negotiated.

In connection with a duPont "study" of the disposition of royalties from sublicenses, a duPont memorandum, dated August 3, 1944, notes that "In the case of neoprene, Notre Dame University had an interest, so that a formal agreement appeared desirable. Nylon was offered to ICI 'whether or not it was in the field of the ICI-duPont agreement' " (Ex. 1426, p. 11287).

The memorandum makes it clear that duPont regarded the nylon agreement as a special case within the patents and processes agreements.

When weighed against the very wording of the patents and processes agreements, and these records, the contention of duPont that the nylon agreements were separate and apart from all other duPont-ICI undertakings is found wanting.

During World War II the duPont-ICI nylon agreement was operative. Technical information and patent rights were furnished by duPont to ICI. ICI produced substantial quantities of nylon for military purposes; duPont, at the request of the United States Government, sold nylon poly-

mer to ICI for the production by ICI of nylon yarn pending the completion of the ICI raw materials plant. But in January, 1946, the duPont-ICI nylon licensing agreement (Ex. D–1153) was cancelled and duPont's British Empire nylon patents were assigned to ICI (Ex. D–1163). By the terms of this cancellation agreement, all obligations of duPont and ICI to grant licenses to each other under future nylon patents were terminated (Ex. D–1163, Art. I). ICI was granted the unrestricted and territorially unlimited right to use technical information relating to nylon which had been licensed to ICI under the 1939 nylon agreement. The circumstances surrounding this transaction are interesting.

We find in ICI records, under date of August 22, 1946, a memorandum concerning the "nylon agreement" that

"Mr. Wardenburg of the duPont London Office informs me he has heard from Mr. Swint that during the forthcoming visit to London of the duPont delegation they will wish to discuss with I.C.I. the possible revision of the I.C.I./duPont Nylon Agreement in the light of the pending Anti-Trust Suit.

"I believe that Dr. Cronshaw brought back a message to this effect on his return from his recent visit to the United States, but thought that you would appreciate receiving this additional advice" (Ex. 705, p. 2674).

Dr. Cronshaw was called as witness on the trial by ICI but neither explained or testified concerning this.

This was followed by a further memorandum from the ICI Legal Department dated October 3, 1946. This reads that

"On Monday, the 30th September, 1946, Mr. Swint outlined his proposals for a modification of the duPont/I.C.I. Nylon License Agreement.

He stated that certain of the features of the existing Nylon Agreement were probably vulnerable in view of the recent Sherman Act cases, and that if duPont were to continue the flow of technical information and patent licenses to I C I under the Agreement, it might involve duPont selling Nylon into I. C. I.'s license territory.

"DuPont did not want to be put into such a position which we might well regard as a breach of faith and they had therefore come to the conclusion that there must be a modification of the existing Nylon License.

"They proposed that there should be a 'cut-off' date for the existing Nylon Agreement for which they tentatively suggested January 1, 1947. Subsequent to that date, there would be no continuing exchange of technical information on Nylon developments, and licenses under patents taken out subsequent to that date would not continue to flow to I.C.I. automatically under the Agreement" (Ex. 706, pp. 2675–2676).

We find that duPont, desiring to minimize the possibility of nylon being included in any decree that might be entered in this suit because of the questionable legality of some provisions of the earlier nylon agreement under the anti-trust laws of the United States, sought and secured from ICI a new nylon agreement.

That ICI was fully informed of duPont's motives is plain from a reading of a report by E. A. Bingen, ICI's solicitor, to his Board under date of November 4, 1946, reading in part " * * * The new duPont-ICI Nylon License Agreement has been completed, sealed and sent to duPont, inasmuch as duPont were anxious that their house should be put in order before any discussions started with the Department of Justice, * * *" (Ex. 1427, p. 11295).

And at the same time duPont executed new nylon agreements with French Rhodiaceta (Ex. D–2189) and Italian Rhodiaceta (Ex. D–2192).

We find that the Nylon Agreement of 1939 stands condemned as within the patents and processes agreements. We find that the Nylon Agreement of 1939 was illegal because it was part of a licensing scheme, accomplished by concerted action of duPont and ICI for allocation of territories and pooling of patents embracing the whole of the nylon manufacturing industry and the whole of the nylon technology.

VI. The Jointly-owned Companies

The agreement of 1897 provided for a division of world territory for the manufac-

ture or sale of commercial or military explosives. DuPont undertook not to engage in the manufacture or sale of commercial or military explosives in Europe, Asia, Africa and Australia; and Nobel agreed to abstain with respect to the United States, Mexico, Central America, Colombia and Venezuela. Designed and intended to eliminate competition on a world-wide basis, the 1897 Agreement did not accomplish its full purpose. The agreement did allocate and assign to each, named continents and countries, as exclusive territories, but it left unassigned other territories and countries, the commercial stature of which was not then developed to the point where it was deemed necessary to provide for them.

This division of territories was implemented by a further undertaking with respect to patents. Both agreed not to assert against the other existing patents which they might hold for the other parties' territory, unless compelled to do so by an agreement with the inventor; in such event every effort would be made to settle the matter amicably. They further undertook that they would not purchase patents for each other's territory except after having given the other the privilege of preemption on the same terms as those under which the patent was offered to them. These patent provisions also left uncovered the unassigned territories.

The operations even under this earliest agreement soon made manifest at least two major problems. The first arose not only from a recognition of the illegality of the 1897 Agreement, which was aided by the suit filed by the Government against duPont in 1907, but also from a desire to provide for a further pooling of patents and processes. The solution to this, it was thought, lay in masking the territorial division in further agreements and cloaking the illegality of the understandings with such sanctity as might flow from patents and processes agreements. The second problem concerned the conflicts between duPont and Nobel in the unassigned or non-exclusive territories. It was found that something more than a "spirit of cooperation" was desirable to regulate competition in these non-exclusive areas. The answer, it was believed, was to be found in action in two expedients: (1) to reduce the non-exclusive territories by increasing the exclusive territories and (2) to set up jointly owned companies in the remaining non-exclusive territories. It is this latter phase we now consider; the reduction of non-exclusive territories was provided for in the agreements we have discussed.

 It is settled that joint manufacturing ventures, even in domestic markets, are not made unlawful *per se* by the Sherman Act, but become unlawful only if their purpose or their effect is to restrain trade or to monopolize. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. It is also clear that absent this wrongful purpose or harmful effect there is nothing *per se* unlawful in the association or combination of a single American enterprise with a single local concern of a foreign country in a jointly owned manufacturing or commercial company to develop a foreign local market. But the proof here shows an American concern, already established in a foreign local market, and a British concern, which has a foothold in the same foreign local market, combining to form a jointly owned company to the end that the same foreign market may be developed for their mutual benefit and profits divided on an agreed basis. To this, and as an incident to the formation of the foreign company, we find added by agreement not only joint contribution of capital investment but a pooling of patents and processes owned by the parent companies. That a foreign company created under such conditions by concerted action of actual or potential competitors meets the tests of *per se* legality is open to serious question. But, with a dubious nod, we assume that it does; we find, however, that the very purpose with which the foreign companies here involved were conceived and the circumstances under which they were born place them under the bar.

It was in 1911 that the first joint company, Canadian Explosives Ltd. (CXL) was organized (Ex. 28). Thereafter, an agreement was made, "between CXL and duPont, and another between CXL and Nobel, whereby patent rights were exchanged with

regard to certain territories," and it referred "particularly to explosives, ingredients and by-products thereof" (Ex. 15). Nobel did not limit the agreement with CXL to the field of the products named. When CXL "requested information in regard to products other than those covered," CXL "always received such information from Nobel" (Ex. 15, p. 117). CXL, however, met with refusal from duPont, and "in one particular case duPont Company refused to give CXL information in regard to pyroxylin solutions, on the ground that such information had no bearing on the explosives industry, and was therefore not within the duPont-CXL agreement" (Ex. 15, p. 117). But following this and on June 30, 1919, Lammot duPont recorded: "It is the feeling of a number of the Directors of the duPont Company that activities in Canada of interest to the duPont Company should be conducted through, and by, Canadian Explosives, Ltd." (Ex. 15, p. 117).

He then recommended that, "* * *' the duPont Company should undertake to give CXL the rights to all patents and secret processes and all technical and other information at hand in regard to the manufacturing processes for their use in Canada only, not making this right exclusive, however" (Ex. 15, p. 117).

This he did, however, "with the understanding that the Nobel Company take similar action" (Ex. 15). And, within a few weeks, on July 23, 1919, the officers of duPont were authorized "to effect an arrangement under which the Explosives Trade Limited and the duPont Company will be equal partners in the common stock of Canadian Explosives, Ltd. provided the duPont Company is willing to transfer to Canadian Explosives, Ltd. at a price to be agreed upon, our pyralin, fabrikoid and paint and varnish business in Canada, including Canadian plants for the manufacture thereof" (Ex. 16, p. 119).

Following this on July 31, 1919, CXL wrote Irenée duPont, then President of duPont:

"We have in our possession a letter from Explosives Trade Limited on this subject, which we quote as. follows:

" 'In future, in the case of our entering into businesses in Canada, this letter serves to record that we shall offer them to Canadian Explosives, Limited.'

"We shall be obliged if you will write us a similar letter" (Ex. 17, p. 120).

With caution, born of the antitrust suit of 1907–11, duPont's president caused reply to CXL to be made by a vice-president under date of August 25, 1919. It reads in part: "However, we do not feel that we should address to CXL a *formal letter* stating that 'before we enter into any new lines of business in Canada, opportunity would be offered to the CXL to take up this business.' " and further "Our intentions are certainly the same as those expressed in the letter from the Explosives Trades, Ltd. but, as stated above, we do not feel that we should formally state that this would hold good in everything" (Ex. 19, p. 123).

It was thus by the concerted action of duPont and Nobel that CXL became "the vehicle of industrial effort of ICI and duPont in Canada" (Ex. 836, 20, 174, 868, 870). The role played by CXL was continued by the successor company CIL.

A pattern of co-operation designed to eliminate competition and to effect a division of trade covering non-exclusive territories was found in the establishment of CXL. It proved practical and was followed by other jointly owned companies.

Compania Sud-Americana de Explosivos, (CSAE) was organized by duPont and ICI in 1921 for the joint manufacture and sale of explosives in Chile.

Explosives Industries, Ltd. (EIL) was formed in 1925 by duPont, ICI and DAG as the vehicle through which they agreed to conduct their exports in explosives to South America, outside of Chile and Bolivia, except for direct sales made in their home territory for export to the territory assigned to EIL.

Nobel Chemical Finishes, Ltd. (NCF), was created in 1926 by duPont and ICI for the manufacture and marketing of the duPont cellulose type of finish, trademarked "Duco," in the British Empire excluding Canada and Newfoundland.

Nobel Chemical Finishes, Ltd. (Australasia)—the company name was later changed to Leathercloth Proprietary, Ltd. (LPL)—was formed in 1927 by duPont and ICI to engage in the manufacture and sale of fabrikoid rubber cloth and related products in Australia.

Industrias Quimicas Argentinas "Duperial," S.A. Industrial y Commercial (Duperial-Argentina) was established in 1934 by duPont and ICI for trade in Argentina, Paraguay and Uruguay.

 Industrias Chimicas Brasileiras "Duperial" S.A. (Duperial-Brazil) was organized in 1938 for trade in Brazil.

The history of each of these companies demonstrates the unlawful purpose with which they were organized, and demonstrates that they were used as instruments by which territories and countries were divided and assigned for trade and commerce. It also reveals that these companies were intended to and did effect a restraint of American foreign trade and regulation and suppression of competition between ICI, duPont and other American concerns in the non-exclusive territories.

A. Canadian Explosives, Ltd. (CXL), later called Canadian Industries, Ltd. (CIL)

We turn first to an examination of the joint operation of CXL and consider the extent to which CXL was utilized to accomplish this purpose and effect these results.

On January 1, 1920, the same day on which duPont and EXL executed the General Explosives Agreement, a separate contract was made by them with CXL (Ex. 21, p. 126). The purpose of this tripartite agreement is recorded in a memorandum of a meeting of the directing heads of duPont and ICI, whereat it was agreed that, "It is understood that the ownership of CXL Company, shall be practically fifty-fifty; that the policy of the two companies controlling the CXL is to utilize the CXL Company as a medium through which to enter any businesses in Canada; that it is not the intention for CXL to do an export business, but to devote their energies to developing Canada;

that the Tri-Party agreement, which is being drawn between the duPont, CXL, and Explosives Trades Limited is intended to furnish information to the CXL on all items of manufacture in which the CXL have already entered" (Ex. 20, p. 124).

It was the purpose of duPont, by this bilateral undertaking with ICI, to foreclose itself from the full development of its trade in Canada. It was sought to conceal this purpose by verbiage which purported to provide only for the exchange of manufacturing information and the granting to CXL of a non-exclusive license. It granted to CXL a non-exclusive license to use "any and all patented and secret inventions and processes now or hereafter, during the life of this agreement, owned or controlled by them, in and in connection with the manufacture, sale and use in Canada, N.A., and Newfoundland, N.A. of products now manufactured" by either duPont or ICI. It is to be noted that although the grant is "during the life of this agreement" no termination date is specified. Apparently, ICI and duPont desired the arrangement to continue only as long as it served their purpose. A reading of the agreement discloses no reference to any particular patent or field of patents but relates to a whole body of technology covering a vast number of products. There was embodied a grant of future, as well as existing patents; it provided also for a cross-licensing by CXL to duPont and ICI. The grant from duPont to CXL related to explosives and certain specified classes of chemicals; the ICI grant covered explosives and a more limited class of chemicals. Listed among the products covered, it is important to note "black sporting powder," a product used by Remington Arms Company (Ex. 21, p. 127).

On January 1, 1925, the tripartite agreement of 1920 with CXL was modified so as to make the licensing grants of both duPont and ICI "exclusive." The agreement ran for 15 years with the proviso that upon termination these licensed rights were to continue "in the case of patented inventions, for the remaining life of the

patent; and in case of secret inventions, perpetually" (Ex. 24, p. 159).

Both ICI and duPont were well satisfied with the operations of CXL; it "had made them fast friends"; "the quotas fixed through stock ownership" were offering promise of good returns (Ex. 80, p. 403). ICI and duPont by 1926 had greatly extended the scope of their cooperation through the use of CXL.

On January 1, 1926, still another tripartite agreement was made by ICI, duPont and CXL. The grant of exclusive licenses to CXL was extended and provision was made for the bringing of other products under the terms of the agreement by mutual consent. All agreed that " * * * it will be the policy of the parties hereto that in exploiting any new products not covered by this agreement which" ICI or duPont "may hereafter develop, they will, so far as they can, consistent with their own interests, prefer" CXL "as the means of exploiting such new inventions or products in the Dominion of Canada, N. A. and Newfoundland, N. A." (Ex. 170, p. 774).

CXL met with competition in explosives from companies owned or controlled by Atlas Powder Company, an American concern. Atlas owned all the stock of the Giant Powder Company of Canada and certain of the stock of the Northern Explosives Limited, of Canada. "It was proposed in 1922 that CXL and Atlas Powder Company will consolidate their explosive interests in Canada"; "that CXL will buy, and Atlas Powder Company will sell, their interests in the Giant Company of Canada and in Northern Explosives, Limited"; "the Atlas Powder Company will then receive * * * CXL preferred and common stock," and "arrangements will be made to give Atlas Powder Company representation on the Board of CXL" (Ex. 22, p. 132). This proposed arrangement involved more than a deal affecting only Canadian trade and commerce; there was coupled with it a direct restraint upon American trade. As part and parcel of the transaction it was understood that at the time of consummation "the Atlas Powder Company and Canadian Explosives Limited will enter into an agreement by which the Atlas Powder Company will not do business in Canada in lines in which Canadian Explosives Limited is now engaged" (Ex. 22, p. 138). To remove any possible doubt as to the extent and scope of this understanding, there is appended a list of explosive and chemical products.

Atlas had an investment in excess of $1,500,000.00 in Giant Powder and Northern Explosives. The transaction was finally closed in 1926; Giant and Northern had by then been merged into one company—Northern-Giant Explosives, Ltd.; ICI and duPont received about 91% of the stock of the new company, and Atlas Powder the balance. Atlas received in addition from ICI and duPont 3983 preferred and 8749 common shares of CXL (Ex. 23; Ex. 25; Ex. 26). Thus, Atlas became a partner of duPont and ICI in Canada and joint owner with them in both CXL and Northern-Giant Explosives, Ltd.

With the entry of CXL into the field of new products, the company name was changed in 1927 to Canadian Industries, Ltd. (CIL).

In late 1928, ICI and duPont again extended their policy with regard to CIL relative to new products. A meeting was held in Wilmington on October 12, 1928; ICI, duPont and CIL participated. Matters not only affecting Canadian trade but the worldwide operation of ICI and duPont were discussed. Their policy with regard to CIL was formally restated as follows:

"It was agreed in principle that ICI and duPont desire to cooperate to the maximum degree in so far as practicable in any venture involving the manufacture and or sale of a product in which either or both principals are interested in so far as such venture wholly involves Canada and in so far as the products manufactured and or sold are destined for Canadian consumption, and recognize Canadian Industries, Ltd. as the proper vehicle for such cooperation" (Ex. 174, p. 791).

"Sir Harry McGowan stated that ICI had decided to allow CIL to take over the Canadian business of ICI in heavy chemicals and fertilizers. Mr. Lammot duPont agreed that the duPont Company would

turn over its Canadian heavy chemical business" (Ex. 174, p. 792).

This was accomplished; duPont in 1928 sold two of its Canadian subsidiaries—Canadian Ammonia Co., Ltd. and the Grasselli Chemical Co., Ltd. to CIL; ICI in 1929 transferred its Canadian subsidiary, Cassel Cyanide Company of Canada, Ltd. to CIL.

At this same meeting the Canadian dyestuffs business was on the agenda. "It was decided in principle that it would be desirable for both companies to handle their Canadian dyestuffs business through Canadian Industries, Ltd. if a practical means can be found" (Ex. 174, p. 793). The subject was left for further exploration, but not before it was agreed, that, in the event a satisfactory plan could not be worked out, "it would not be desirable for Canadian Industries, Ltd. to handle the British Dyestuffs Corporation business, as it is now contemplated, as such a step would put Canadian Industries, Ltd. in competition with duPont" (Ex. 174, p. 793).

Having agreed in principle, once again the "spirit of cooperation" and "of mutual cooperation" soon prevailed. DuPont enjoyed a much greater share of the Canadian dyestuffs business than ICI; nevertheless, they both agreed in 1929 to transfer to CIL all of their dyestuffs business in the Canadian and Newfoundland market. All undertook, too, to work towards a "50/50" division of CIL dyestuffs purchases between duPont and ICI (Ex. 790; Exs. 794–797 and Ex. 800). Efforts to accomplish this division were continued until as late as 1942 (Ex. 905); in practice, it was found difficult to carry this division out (Ex. D–793); in operation, the use of CIL to sell the dyestuffs of duPont and ICI actually resulted in ICI obtaining a larger share of the market than duPont Ex. 885).

On December 1, 1936, another tripartite agreement was made by duPont, ICI and CIL (Ex. 868). It superseded the contracts of 1925 and 1926; it expressly included explosives among the products covered; it provided for the grant by duPont and ICI to CIL of patents, inventions and processes (for Canada and Newfoundland) which they owned or which they might thereafter

acquire during the term of the agreement and a grant back from CIL to duPont and ICI of similar licenses for use in the rest of the world, excluding Canada and Newfoundland, such grants to conform to the territorial divisions set up in the Patents and Processes Agreement of 1929 and all amendments to it. The "spirit of the agreement" was stated to be that "the exploitation" in Canada and Newfoundland of the products of ICI and duPont should be conducted through CIL (Ex. 868, p. 3299).

It was provided that nothing in the agreement should deprive any grantor of the right to sell within the grantees' territory products not embodying inventions obtained by such grantor from the other parties (Ex. 868, p. 3301). But this 1936 contract was regarded by ICI as "more of a working memorandum than a cast-iron legal agreement" (Ex. 906, p. 3489) and that "the exigencies of the Sherman Anti-trust laws necessitate for duPont a legally drawn document as distinct from a codified memorandum or minute" (Ex. 850, p. 3192). "Interpretation" and "elucidation" were employed with reference to this clause of the 1936 agreement, to insure that this clause "which apparently stultifies the whole document * * * insofar as it permits all parties to export to each other's territories and therefore contradicts the rest of the provisions" was disregarded and rendered innocuous (Ex. 850, p. 3194).

The 1936 contract by its terms was to end on December 31, 1940, but by a letter agreement, dated December 16, 1940, it was extended indefinitely on a year to year basis, with provision for termination by any party on 90 day notice.

That the arrangement for CIL to purchase dyestuffs on a fifty-fifty ratio from duPont and ICI worked to effect a restraint of American trade appears clear. In 1929, an ICI official observed that at that time "DuPont's share is about three times that of ICI's share" (Ex. 795, p. 2957). Ten years later, in 1939, a duPont official recorded that "The Organic Chemicals Department feel that the arrangement has worked to the disadvantage of their department in that they could have sold a larger volume of duPont's dyestuffs at a

greater profit if they had continued to operate independently * * *" (Ex. 885, p. 3409).

Nevertheless, in 1942 CIL reported that "The fundamental of dyestuffs purchases between ICI and duPont is still based on a fifty-fifty ratio" (Ex. 905, p. 3486).

This equal division of purchases by CIL from duPont and ICI was not confined to dyestuffs; from 1929, CIL endeavored to purchase all products exported by duPont and ICI to Canada in equal proportions. The records show that from 1932 to the outbreak of World War II in 1939, the total annual purchases by CIL from duPont and ICI were substantially equal in amount (Ex. D-793, p. 6782).

A pricing formula was adopted by du-Pont and ICI in their sales to CIL (Ex. 824); it was intended to and did avoid price competition between duPont and ICI, and eliminated competition in Canada from others, including American manufacturers who exported to Canada, by placing CIL in a position to sell at low prices if necessary. Dyestuffs were sold to CIL on a commission basis. Other products, it was agreed, CIL would buy from duPont and ICI at the producer's mill cost plus 10 percent, or the best price allowed by either manufacturer to any domestic customer, whichever was lower (Ex. D-774; Ex. 832). This pricing formula was first adopted unilaterally by duPont; ICI followed in 1930 (Ex. 1382, p. 11038).

In some instances, duPont and ICI permitted CIL to purchase from other companies products also manufactured by du-Pont or ICI. This was permitted only where duPont or ICI were unable to supply, or where it was sought to prevent a third party from selling in Canada in competition with CIL (Ex. 801; Ex. 830; Ex. 832; Ex. 816; Ex. 1418).

The United States afforded a substantial market for the sale of products of the Canadian chemical industry (Ex. 1420), but up to 1946 CIL did not export chemical products to the United States because of exporting restraints placed upon it by du-Pont and ICI (Ex. 818; Ex. 819; Ex. 1380). A typical example of this restraint concerned a process which the Dominion Cartridge Company, a CIL subsidiary, had developed for waterproofing sporting ammunition. In 1928 CIL desired to exploit this process in the United States. When American manufacturers declined to take licenses on CIL's terms, CIL threatened to manufacture cartridges in the United States using its process. DuPont objected; CIL abandoned its plans; within a year, duPont acquired the license and itself licensed the process to all American cartridge manufacturers.

For many years CIL was prevented from exporting its manufactured products, particularly to the West Indies (Ex. 801; Ex. 816). The outbreak of hostilities in Europe in 1939 saw increased demand for CIL products. The matter was discussed by the duPont Executive Committee and a resolution adopted declaring: "that CIL has no right to export any products embodying shareholders inventions except that during the present emergency CIL may be permitted to supply ICI such goods for sale in the British Empire at prices returning a satisfactory profit to CIL" (Ex. 891, p. 3433).

CIL did expand its business during the war. These sales were, however, only in the British Empire. The sales were required to be made for ICI's account, since the products were shipped to the territory allocated to ICI under the arrangements then existing between duPont and ICI (Ex. 888; Ex. 892). The postwar period brought a prompt return to the established policy of restricting CIL's foreign activities. A letter from W. F. Lutyens, a director of ICI, dated April 11, 1944, is not only informative on this subject but reflects some light on the world-wide commercial relationship of duPont and ICI. It reads in part " * * * Secondly, you suggest that CIL should take a share in future developments and manufacture in countries where 'it can be done in such a way as not to conflict with ICI and duPont overseas trade.' I find it difficult to think of any country where these conditions can exist, as it seems to me that at present ICI and duPont between them have business in

every country in the world" (Ex. 908, p. 3492).

And, indeed, the evidence shows that between them they did.

DuPont in 1930 directed CIL not to sell Duco type finishes to a Toronto concern when it was learned that the purchase was destined for shipment to Peru (Ex. 791; Ex. 792). In 1932 and again in 1934 du-Pont refused to permit CIL shipments of "pontan", a coated textile, save for account of duPont and under an arrangement whereby CIL paid to duPont the profit in excess of cost plus ten percent. Likewise, in 1933, duPont prohibited the export to Australia of pyralin toilet articles, which CIL manufactured in Canada (Ex. 825; Ex. 826).

We have seen that the elimination of competition in Canada from the Atlas Powder Company with respect to products which CIL was producing was accomplished in 1922 by the purchase of the Atlas controlling interest in its two Canadian subsidiaries; for this Atlas received in part a stock interest in CIL. These Atlas holdings were a topic for discussion between duPont, ICI and CIL executives at the meeting of October 12, 1928. It was then agreed "not to purchase this stock due to the high price asked", and further "that it is desirable from the broad policy standpoint to have Atlas continue as a shareholder in CIL." Exactly, what "the broad policy standpoint" was is not recorded in these minutes, but we find suggestive the minutes of a duPont meeting held in Lammot duPont's office on October 6, 1928. It was apparently then determined, at least insofar as duPont was concerned, that "It is of advantage to both ICI and duPont to have Atlas continue as a shareholder in CIL as tending to further Atlas cooperation with the broad ICI-duPont foreign policy" (Ex. 190, p. 885) and that "If the ICI desire the Atlas holding acquired in order to take control out of American hands, we should meet their position and take steps to adjust American v. British Empire holdings on a 50-50 basis" (Ex. 190, p. 885).

That ICI wanted this accomplished is quite evident from the minutes of a London meeting of March 15, 1928 between Lammot duPont, Irenée duPont, Sir Harry McGowan and others (Ex. 187).

But Atlas "was not at all anxious to sell" at the time (Ex. 189). A few months brought a change of mind; what induced it does not appear and we may not speculate. It was arranged that Christiana-Securities Company, a closely held duPont corporation, should buy the Atlas holdings of CIL stock and record was made "of the fact that they were purchasing for duPont and ICI joint-account" (Ex. 775). As part of the purchase Atlas offered "to keep out of Canada on those products in the Canadian development of which" CIL was then engaged (Ex. 776); the transaction was negotiated by Lammot duPont and Sir Harry McCowan (Ex. 777; Ex. 778). CIL urged that this offer of Atlas, which was accepted, be set forth in a long term agreement. Atlas had asked and received a high price for its stock; this was justified by Atlas on the ground "that Atlas would be out of Canada permanently" (Ex. 778). That the Atlas offer to abstain from Canadian trade was a weighty factor in the closing is the only rational conclusion one can reach, but the offer and acceptance "was not included in the minutes because it was not considered pertinent" (Ex. 778, p. 2899). Of this, the secretary of the duPont Foreign Relations Committee wrote to the president of CIL: "Even if Atlas had actually entered into a formal agreement to keep out of Canada it hardly seems as though any useful purpose would be served by recording the fact in the ICI-duPont minutes. Moreover, while I doubt whether such an arrangement would come under the Sherman and Clayton Anti-Trust acts, it is nevertheless highly undesirable for an American corporation to enter into any agreement which has even the faintest odor of restraint of trade about it" (Ex. 778, p. 2899).

Empty words, which were immediately followed by "For this reason, our people did not consider it desirable to ask Atlas to make any formal promises of this nature" (Ex. 778, p. 2900).

Informal promises were deemed sufficient; the confidence and trust duPont and

ICI had in each other was extended to include Atlas.

That CIL was entirely and completely dominated and controlled by duPont and ICI has been abundantly established. It was their purpose to prevent other manufacturers, including American companies, from exporting chemical products to, and from manufacturing such products in Canada. DuPont and ICI felt that such competition would impair the territorial allocation they had made. They caused CIL to enter into numerous agreements and understandings with other chemical manufacturers to restrict the activities of these latter companies in Canada (Ex. 804; Exs. 820–823; Ex. 853; Ex. 857; Exs. 872–881; Exs. 886–887; Ex. 901). The operation of CIL effected its purpose; it was a division of foreign trade participated in by duPont; it was a restraint of American trade and commerce accomplished by the concerted action of duPont and ICI.

While Canada was thus being jointly "developed," South America was not neglected.

## B. Compania Sud-Americana de Explosivos (CSAE)

The "Understanding of 1920," which effected a division of the sale of explosives in all the markets of the world, left South America, Canada and Newfoundland as unassigned and non-exclusive territories. But before this and in 1918, (Nobel) ICI had proposed jointly owned and jointly operated factories for the manufacture of commercial explosives in Chile and Bolivia. DuPont was not too enthusiastic about the idea and Lammot duPont expressed his views in a letter of August 12, 1918 to Sir Harry McGowan as follows: "Personally, I believe that investments of expediency such as this promises to be are unworthy of attention, and if made, generally defeat their own purposes. On the other hand we, as you know, are earnest promoters of the cooperative idea and we believe it better to assist with this investment un-economical as it is, rather than to add to an unsound situation the future disadvantage of lack of cooperation between our interests. No doubt the solution of the difficulties in Chile and

Brazil will be determined eventually and the solution of this difficulty will be to the credit of the American interests as well as of the British; it therefore seems proper that the burden should be assumed jointly" (Ex. 4, p. 57).

That the proposed venture appeared to duPont economically unsound offered no barrier to duPont's consent. The spirit of cooperation and of partnership prevailed and Mr. duPont closed his letter to Sir Harry McGowan voicing the hope that ICI would consider duPont "as being in the position of helpful partners."

Thereafter, in July, 1919, the duPont Executive Committee resolved that it "should cooperate with Explosive Trade Limited in the construction and operation of a dynamite plant in Chile" and "bring about the organization of a joint company" "with the installation and operation of a dynamite plant in the northern part of Chile of a capacity of approximately 5,000,000 pounds of dynamite per annum" (Ex. 5, pp. 59, 60). The Committee further resolved "that no other individuals or corporations be allowed to acquire an interest in said operating company in the beginning unless the same should appear highly expedient in which case the Executive Committee would reconsider this phase" (Ex. 5, p. 60).

The object of Nobel and duPont in forming this Chilean Company was recorded as being "to preserve their combined share in the South American market from further inroads due either to friendly or unfriendly competition as far as is consistent with avoiding a dangerously selfish outlook vis-a-vis outside competitors" (Ex. 9, p. 78). It was also noted that "in recent years there has been a distinct tendency for new competitors to enter the South American markets" (Ex. 9, p. 81), and that "as regards Atlas and Hercules competition, it should be noted that this was very serious in 1919, and conceivably may become so again" (Ex. 9, p. 82). It was this that persuaded the duPont company by November, 1921, to re-examine their former position and to decide "that it is good policy to recognize the Atlas Company's inroads by allowing them to share as stockholders in the local plant" (Ex. 9, p. 82).

Compania de Explosivos de Chile, the company name was changed to Compania Sud-Americana de Explosivos (CSAE) in 1923, was organized by duPont and ICI in 1921. Atlas Powder Company was allotted 15% of the capital stock and the balance was divided equally between duPont and ICI.

Atlas urged that "all the Chile and Bolivia import business of the stockholders be handed over to the new company in addition to the trade that company can reach from its factory" (Ex. 11, p. 103); in this ICI finally joined with Atlas in exerting "pressure" on duPont to accept this view; duPont did. The Chilean and also the Bolivian import business in commercial explosives of the two American concerns—Atlas and duPont—and of ICI were turned over to CSAE in 1923 (Ex. 12, p. 111).

It was first agreed that the purchases of raw materials by CSAE were to be handled by duPont (Ex. 12, p. 111). This led to some conflict in the purchase of goods common to each shareholder but in 1930 this was all adjusted. It was then agreed that with reference to goods not common to each shareholder "DuPont Company shall act as agents for goods originating in North America; and ICI for materials originating in Great Britain and Europe" (Ex. 13, p. 115). and with reference to goods common to each shareholder that "The shareholding companies shall quote either competitively or an agreed upon figure according to what in their judgment is in the best interests of all concerned, but in no case shall the price be higher than that to the most favored customer" (Ex. 13, p. 115).

Again, by concerted action and by concerted abstention, restraint was placed upon American foreign trade.

Atlas continued as a shareholder of CSAE until 1942, when duPont purchased its interest (Ex. D–1314). Atlas had retained its interest in CSAE since the organization of the company in 1921. It is, indeed, strange that duPont after the lapse of 20 years gave to ICI as its reason for this purchase "that the joint ownership by two U. S. concerns in a company producing one of their major products was contrary to the Sherman Anti-Trust Law" (Ex. 1221, p. 4466). When duPont arrived at this conclusion of illegality is not clear, although it does appear that markedly similar motives were ascribed by duPont to themselves at the time of the purchase of Atlas' holdings in CIL and this occurred in November, 1928 (Ex. 778). Whether this purchase entailed, too, on Atlas' part an obligation to abstain from trade in Chile and Bolivia, as it did in Canada, is not revealed; perhaps, this was because the report on negotiations with Atlas Powder Company was made to the duPont Executive Committee *orally* (Ex. D–1314). The competition of Atlas and Hercules was restricted and eliminated in other South American territories by agreement which we shall consider later.

## C. Explosives Industries Limited (EIL)

In 1920, while negotiations were pending which resulted in the formation of CSAE, duPont and ICI agreed to share equally the net profits from their separate sales of explosives and blasting supplies for shipment to the countries of South America, other than Chile. They also agreed to acquaint each other with all inquiries for military explosives received from South American governments (Ex. 7; Ex. 8). This arrangement was known as the "South American Pooling Arrangement." It provided that "beginning on the 1st day of January, 1920 and continuing for the duration of the agreement, the contracting parties will share equally the net profits from their separate sales of explosives and blasting supplies sold for shipment to the countries of South America, excluding profits from the sale of military smokeless powder and explosives used for military propellants and bursting charges" (Ex. 7). That duPont executives had doubt as to the legality of the arrangement is manifest from the fact that it was submitted to counsel, who rendered the reassuring opinion "that any agreement entered into between this Company (duPont) and Explosives Trades to divide equally (or otherwise) the profits on the sale of explosives by both Companies in South America would not be within the purview of the Anti-Trust Laws of the U. S. A." (Ex. 7; Ex. D–1282).

The markets of Chile and Bolivia were specially provided for by the formation of CSAE in 1921. Trade in the remaining South American territories remained subject to the pooling arrangement. Then, by 1924, new competitors were entering the field.

The Germans (DAG), while forbidden by the Versailles Treaty from exporting military explosives, were exporting commercial explosives. By 1925, the Norwegian Company—(Norsk-Spraengstofindustri A/S)—had also entered the trade.

DuPont in January, 1925, noted that, "As a result of the activities of the German and Norwegian companies in invading South America and Mexico through quite a vigorous sales and price-cutting policy, these companies have taken quite a good deal of trade away from the older established sellers, principally Nobels, duPont, Atlas and Hercules. * * *" (Ex. 77, p. 382).

The "established sellers" did not meet the German and Norwegian competition by "inaugurating a first-class price war," and the latter were able to build up a substantial trade which they were anxious to consolidate before they met with "more aggressive competitive conditions" (Ex. 77, p. 382).

Sir Harry McGowan in October 1925, met at the Hague with representatives of DAG and the Norwegians. From the ICI notes of the conversations had at this meeting, it appears that, "At a very early stage in the proceedings it was evident that the chief concern of the Germans was as to the extent to which any arrangements which might be come to could be made to embrace the American companies * * *" (Ex. 71, p. 349); and Sir Harry McGowan stated that, "Although active competition existed, there was a friendly intercourse which in his judgment would enable the United States manufacturers to come to an understanding in regard to extra-United States questions, and further that the existing laws in the States did not in themselves preclude the possibility of such an understanding. He further intimated that from his conversations with the duPont Company he had ascertained that they were not adverse to associating in an agreement governing the South American continent, but that at this stage he was not able to speak with any authority on behalf of duPonts, and still less could he say how the matter would be approached by the other American manufacturers mentioned" (Ex. 71, p. 349).

At this same meeting, " * * * the Nobel representatives advised the Germans of the existence, in conjunction with the duPont Company, of the South American Pool, and suggested that they give consideration to the extension of that pool to cover all interested in the South American trade with the necessary variation of percentage interests * * *" (Ex. 71, p. 353).

The meeting "concluded with a suggestion that Sir Harry should invite the American representatives to a meeting" (Ex. 71, p. 357). This was done in a letter to Irenee duPont (Ex. 72) advising that the Germans "were anxious to arrive at some arrangement whereby the present insensate competition—particularly in South America— might be stopped and selling prices put on a more remunerative level."

At the next meeting held in London in November, 1924, duPont was represented. The business of the Westfaelische Anhaltische Sprengstoff, A. G. (Coswig), a German concern, was discussed. The minutes record that, "The question of duPont purchasing an interest in or control of the Coswig and/or the D.A.G. group was discussed it being pointed out previously that Nobel was not willing to consider at this time any investments in Germany: furthermore, that the German government would probably look with disfavor or prohibit any arrangements which would tend to curtail exports,—and Sir Harry McGowan took the very definite position that any purchase of an European explosives company by duPont would seriously cut into the atmosphere between duPont and Nobel, being looked upon by Nobel as an unfriendly act. It was his opinion that such a step would be similar to the purchase by Nobel of one of the American companies, and that no such step should be taken by either duPont or Nobel except at the invitation of the other party" (Ex. 76, p. 370).

"Concern was also expressed by the Germans as to the activities of the Trojan company," an American concern (Ex. 75, p. 367). The Germans "insisted upon a quota in Mexico based on their 1924 sales" (Ex. 75, p. 368). "DuPont representatives stated that they could not agree to any quota arrangement in Mexico; and that so far as they were concerned the Mexican situation would have to remain open until the meeting in the spring of 1925" (Ex. 75, p. 373). DuPont felt that DAG "had gone into Mexico because the Australian trade, which before the war gave them close to 1000 tons, has been completely closed to them." This, duPont felt, meant that ICI had gained at duPont expense, "the German loss to Nobel in Australia being taken from the American companies in Mexico" (Ex. 75, p. 374).

Later, on November 24, 1924, when informed of these discussions, the duPont Executive Committee authorized the sending of the following cablegram to the du-Pont representatives then abroad negotiating with ICI and DAG:

"Our Idea Of Buying Coswig Not To Increase DuPont Sphere But For Joint Benefit Of Getting Better Deal With German Nobels And Later Consolidation With Them (Stop) In View Of Nobels Attitude We Withdraw Suggestion (Stop) On The Other Hand We View Trojan Competition In South America As A Temporary And Minor Factor To Be Eliminated By Sae Company Through Suitable Competing Explosives (Stop) Our Ideas Regarding Mexico Have Not Changed" (Ex. 76, p. 377).

When the duPont representatives returned to the United States they made a lengthy report (Ex. 77) in which they noted that the German interests wanted only a straight commercial trade arrangement and that they "had no wish at this time to renew anything like former relationships such as the interchange of technical information, patents, etc." (Ex. 77, p. 381). They further reported that the German interests "had already declined to acquire some of the Chile Company's stock which the Nobels offered them, preferring to have their share of the business directly instead of through ownership in the local enterprise. One reason for this is that the German factories need production badly" (Ex. 77, p. 385). It was further noted that some trade in the Chilean territory was "remote and expensive to reach from the local factory and can almost as well be served from abroad" (Ex. 77, p. 385). Concerning the Mexican trade, the duPont representatives rejected the German suggestion made "rather earnestly that in the meantime some price convention should be maintained, particularly in Mexico, * * * as this would be tantamount to recognizing their right to a quota in that country * * *." (Ex. 77, pp. 388–9). The foreign trade policy of duPont was clearly set forth in this report as follows: "It was pointed out by us that whatever the reasons might be for changed conditions elsewhere, the policy so far as Americans are concerned remains the same, to wit—that it is sound business procedure to restrict ourselves to a certain degree to those markets in which we have advantage over foreign competitors so long as those competitors restrict themselves to other markets in which they have economic advantages, and that we considered Mexico one of our natural markets for the reason that many of the users of explosives there are Americans, and also that we can reach the consumer economically" (Ex. 77, pp. 386–7).

Subsequent meetings were held in New York and in Wilmington in April, 1925, between ICI, duPont and DAG; a decision for "cooperation instead of antagonism" was reached (Ex. 78, p. 397). Mr. Haskell of duPont "outlined the experience with CXL and told how the forming of a Canadian corporation had ironed out all difficulties between Nobel and duPont and had made them fast friends and how such an association with quotas fixed through stock ownership could not help but make money for all concerned in the long run." * * * (Ex. 80, p. 403).

At these meetings it was agreed "to grant to DAG a 25% quota of the high explosives business done in Chile and Bolivia by the two interests, viz: CSAE and DAG" (Ex. 89, p. 440; Ex. 81, p. 406), and that ICI, duPont and DAG would organize a "selling company" to operate in

South American continental markets other than Chile and Bolivia, and to handle in those markets the sales of commercial explosives of the parties on a quota basis, the quotas to be fixed by stock ownership" (Ex. 82). The respective shareholdings in the company were fixed at: duPont—37.5%; ICI (Nobel-London)—37.5%; DAG (Nobel-Hamburg)—25%.

Thus, Explosives Industries, Ltd. (EIL) was organized in 1925, under the laws of the United Kingdom (Ex. 82; Ex. 101).

It was agreed that EIL would purchase commercial explosives and detonators from the shareholders in proportion to their respective stockholdings and that "safety fuse" was also to be purchased on a quota basis (Ex. 101). While it was provided that shareholders might make certain direct sales, at prices approved by EIL, such sales were to be charged against the quota of the party making the sale (Ex. 101, pp. 527–8). With the organization of EIL the South American Pooling Agreement was cancelled as of June 30, 1925 (Ex. 102). These arrangements with reference to South America were but part of a general understanding with DAG providing for abstention, adherence to quotas and collaboration in other markets (Ex. 78; Ex. 80; Ex. 85; Ex. 90).

It was at these meetings (April 22, 1925) that Irenée duPont stated that "it was essential that if we were coming together in South America, we should get together in Mexico also" (Ex. 93, p. 469). Time had brought about a change in duPont's views on Mexico from those of November 1924 (see, Ex. 75, p. 374). Hercules Powder Company and duPont were competitors of DAG in Mexico. A jointly-owned company was proposed to handle explosives in Mexico. DAG (Nobel-Hamburg) undertook to gradually diminish its exports and thereafter "to retire from the Mexican Market May 1, 1930, for a period of not less than 10 years" (Ex. 94, p. 374). Hercules was a party to the agreement as well as duPont.

It is to be noted that duPont advanced the claim that Costa Rica—"as also the other Central American markets—had always been and still were looked upon as districts which it would be in the best interests of the parties should be served by the American companies. The German representatives agreed that in dealing with enquiries for Costa Rica, Honduras, Guatemala, Panama and San Salvador, they would quote such prices as the duPont Company might dictate" (Ex. 85, p. 423).

At the close of the negotiations between ICI, duPont and DAG, ICI was able to note accurately: "We now have arrangements for practically all the remainder of the World—America and Mexico have been fixed up, South America is common territory, and mutually satisfactory arrangements have been made for China and Japan" (Ex. 95, p. 478).

After these long extended meetings and discussions for division of territories, one reads with wonder the record of a meeting held in Hamburg on September 6, 7, 8, 1925, that "Meantime it is understood that, while American law precludes the DuPont from coming to any abstention understanding, the agreement between the German Companies and Nobel should not only cover the exchange of patents and processes, but should also take the form of a trade abstention contract, in which would be plainly set out the markets in which the German Companies were entitled to trade" (Ex. 85, p. 424).

Three formal and separate agreements between ICI and DAG; duPont and DAG; and duPont and ICI were prepared; the agreements were not signed but were carried into effect (Ex. 92; Ex. 96). The agreement between ICI and DAG was outspokenly one of trade abstention, joined incidentally by patents and processes provisions. The agreement between duPont and DAG gave the outward appearance of legality to the arrangement for territorial division, but was part of the one pattern and plan for world division. DuPont had observed the form of the law in the writing, but had flouted it by collateral and oral understandings.

The duPont reluctance to enter into a formal trade abstention agreement was explained to DAG by ICI, as follows: "The existence of the Sherman Anti-Trust Laws makes it illegal and hence impossible for

the duPont Company to enter into a *clear* reservation agreement such as is possible to your group and mine, and for this reason it has been considered necessary to have three agreements. * * *" (Ex. 99, p. 517).

It mattered not that the formal documents were unsigned, for as the duPont London representative wrote on February 9, 1926 "So far as the spirit of the agreement goes, it is already in operation, and we should have no hesitation in going right ahead with the exchange of technical information or any offer of patents or processes which may arise" (Ex. 98, p. 515).

This understanding with ICI and DAG was continued by duPont until 1938. And, the understanding between ICI and DAG was respected and carried out by ICI as late as February, 1938 (Ex. 96, p. 498).

The competition from Coswig in Chile and Bolivia, as well as in other territories throughout the world, was eliminated by an agreement between Coswig and DAG made in 1927. Coswig agreed to limit its exports of explosives and detonators to Chile and Bolivia and to observe fixed prices. For this, as well as for a like undertaking with respect to the Dutch East Indies, and for complete withdrawal from the balance of South America and other territories, DAG undertook to pay Coswig annually £5000; one-half of this amount, ICI and duPont agreed was chargeable to Coswig's agreement to withdraw from EIL territory. ICI and duPont each undertook to annually reimburse DAG for their share of the Coswig payments.

EIL soon undertook to regulate competition from Atlas Powder Company in South America, excluding Chile and Bolivia. The last two countries had been provided for by arrangements entered into by CSAE. The South American trade of Hercules Powder Company was also given attention. Efforts had been made in 1926 to regulate competition between EIL and Atlas and Hercules (Ex. 1238, p. 4540). Some difficulty was met in arriving at an agreement with Atlas as they attempted to force from duPont "an agreement in Mexico as a part of their entering into a South American agreement" (Ex. 1239, p. 4541). Under the terms of

the understanding finally reached it was agreed that "the Atlas Powder Company will have the right to sell in the territory" (Ex. 1240, p. 4543) on the following quota basis:

*High Explosives*

| | |
|---|---|
| Explosives Industries Limited.. | 76.72% |
| Hercules Powder Company.... | 4.73% |
| Atlas Powder Company....... | 18.55% |
| | 100.00% |

(Ex. 1240, p. 4544; Ex. 1241, p. 4549)

*Blasting Powder*

| | |
|---|---|
| Explosives Industries Limited.. | 79.3% |
| Hercules Powder Company.... | 8.3% |
| Atlas Powder Company....... | 12.4% |
| | 100.00% |

(Ex. 1240, p. 4544; Ex. 1241, p. 4549)

This allocation, as to the sale of high explosives, was to be applied after the German and Norwegian quota of 478 tons had been made (Ex. 1242, p. 4551). It was contemplated then (February 11, 1930) that "this distribution should remain about the same during the next five years" (Ex. 1242, p. 4552), but these and like arrangements were renewed from time to time and continued until World War II (Ex. 1243; Ex. 1249).

Agreements were also made by EIL and CSAE in 1937 with two Belgian companies,—Poudreries Reunies de Belgique and Poudreries Royales de Wetteren-Coopal et Cie.—granting them definite restricted quotas for the sale of commercial explosives in South American markets (Exs. 1250–60).

Through the operations of EIL, duPont and ICI functioned and operated with the purpose and effect of eliminating competition between themselves and others in South American markets, thus carrying out in part the territorial allocations between duPont and ICI with respect to explosives in the understanding of 1929. The agreements made by and through the use of EIL were direct restraints upon the export trade of the United States.

DuPont sold its interest in EIL in June, 1938, to ICI (Ex. 715), but the Belgian and Scandinavian manufacturers and EIL

together with duPont continued to "work under a quota arrangement for South America as a whole" (Ex. 1184, p. 4337).

Concerning the withdrawal of duPont from EIL an ICI memorandum of May 29, 1939, reads: "In 1938, duPont, on the advice of their Legal Department, retired from their participation in Explosives Industries, Ltd., the joint Company formed by duPont, DAG, and ourselves, to sell explosives in South America excluding Chile and Bolivia. Both the DAG and we facilitated duPont's retrial as much as possible, dispensing with six months' notice, and duPont assured us that although they were not actively participating in EIL they had no wish to depart from the then existing allocation of trade. Their co-operation in this respect leaves something to be desired and we would, therefore, strongly urge the necessity for clear-cut arrangements on the commercial side if duPont should maintain that the alteration of the Patents and Processes agreement does not involve any change in their attitude to the 'unwritten' commercial agreement" (Ex. 634, p. 2356–7).

And, on October 13, 1939, ICI(NY) was reporting to the home office in London that Mr. Crane of duPont, "* * * claimed that since duPonts had withdrawn from EIL they had had to exercise considerable restraint in order to keep about the same proportion of the business in EIL territories which they had had when they were partners in EIL. He further claimed that, even so, their original percentage of 37½% had increased during the year to 45%" (Ex. 715, p. 2731).

The same report noted that the ICI (NY) representative had "already agreed with duPonts that ICI will not obtain quotations for explosives, which duPonts and/or CIL can supply, from Atlas or Hercules * * *" (Ex. 715, p. 2735).

It was also recorded that "DuPonts state quite plainly, that although they recognize in the explosives world that they will probably have to negotiate a split of markets with the DAG after the war, in the dye business they intend to capture and stick to all the trade they can possibly get, particularly in South America" (Ex. 715, p. 2736). DuPont was still prepared to split markets with DAG, after the war.

Mr. Crane of duPont had the same views with respect to ICI, and on October 25, 1939, he wrote a letter to Lord Melchett of ICI. The circumstances surrounding the writing and sending of this letter (Ex. 720) are most interesting. The letter was handed by Mr. Crane personally to Mr. Barnsley of ICI(NY) in New York and sent by him on to London, apparently by courier, with an accompanying letter (Ex. 721) in which Mr. Barnsley wrote that Mr. Crane wished him to explain "that this was the only letter which his Legal Dept. would allow him to write * * *" (Ex. 721, p. 2756). Mr. Crane agreed on behalf of duPont, in guarded language that:

"So far as our producing facilities permit and without sacrifice of our regular business, it is our desire to supply goods to your company in different lines of products which you may be in need of. No general formula of price for such supplies has yet been suggested, nor is it likely that there will be found one formula to apply to the various kinds of products. As these questions arise, our Foreign Relations Department will take them up with our different Industrial Departments and endeavor to effect equitable terms and adequate cooperation.

"We will naturally preserve a free hand and consult the best interests of the DuPont Company. We will undoubtedly take on for our own account much foreign business, some of which was hardly obtainable by us previously. That is inevitable, but our solicitation of such trade is not to be interpreted by you as an effort to take undue advantage of our temporary position as a supplier of some of your requirements. There are areas in which our activities are logical, there are goods which it is logical for us to supply. On the other hand, there are areas and products which could be effectively served by us only for temporary shortages of goods in this great emergency. In all of these matters we want to be guided by sound business considerations as well as by a fair and sympathetic attitude toward yourselves" (Ex. 720, pp. 2754–5).

Thus was stated in such terms and with as much candor as permitted by the duPont Legal Department, the duPont foreign policy during World War II with relation to the markets assigned ICI which ICI was unable to supply.

### D. Duperial Argentina

That the South American market presented great potentialities for further sales expansion and the introduction of new products became apparent. The sale, in 1932, of Chilean sulphur in Argentina by ICI at prices lower than those at which duPont's "new-acquired associates" Bartlett & Cia. and Borzone & Morengo, were selling Texas sulphur, led to a number of conferences between duPont and ICI on the subject. DuPont had acquired the Bartlett interests without knowing that ICI was engaged in selling Chilean sulphur in Argentina; duPont's "examination of the subject indicated that the activities of Bartlett plus Borzone & Morengo" could not "bring" them "into competition with ICI," therefore they did not discuss the matter with ICI beforehand (Ex. 935, p. 3545). ICI took an interest in a manufacturing company (Rivadavia) and informed duPont of it after it had done so.

"The desirability of close cooperation in all respects" (Ex. 935, p. 3545) was not long forgotten; the sales of Chilean sulphur were causing duPont's Argentine associates considerable difficulty. DuPont and ICI discussed the matter and "it was mutually agreed that it was desirable to reach some agreement to avoid unfriendly and ruinous competition" (Ex. 938). At first, it was left to the local Argentine representatives to negotiate; they talked of limitations on imports of sulphur to Argentina from the United States as well as from Chile and Italy, but without result. The suggestion was made "of the possibility of duPont and ICI joining forces in Argentina in much the same way as we have done in Canada" (Ex. 938, p. 3555).

At this time, 1932, duPont was extremely active in the Argentine. It owned E. I. duPont de Nemours y Cia. Argentina, S. A., which was a combination of the former C. G. Bartlett & Company and the carbon bisulphide business of Borzone & Morengo, both of Argentina; this company was the exclusive agent for the United States Sulphur Export Association and acted as agent for the various duPont departments and subsidiary companies. DuPont maintained an office in Buenos Aires for development of trade opportunities and owned the International Freighting Corporation, an American company with branches in Buenos Aires, which did a general shipping business. In addition, duPont had agents in the Argentine for Krebs Pigment & Color Corporation (owned 70% by duPont), for the duPont Rayon Company and for the duPont Fabrics and Finishes Department. All of this, as well as the promise of future development and expansion, duPont was willing to and did abandon by joining with ICI in the formation of a jointly-owned Argentine company.

That ICI was competing with duPont in Argentina is shown by ICI holdings in Argentina at the time. ICI owned about 90% of the stock of Cartucheria Orbea Argentina, S. A., manufacturers of sporting and metallic ammunition; 40% of S. A. Industrial y Commercial "Rivadavia," manufacturers of sulphate of copper and other acid products; 100% of Imperial Chemical Industries, S. A., Commercial e Industrial, Buenos Aires, a selling company for ICI products; and 100% of Barraca Amberense, S. A., a warehouse. This represented the contribution of ICI to maintain the "spirit of cooperation" in the Argentine (Ex. 943, p. 3579).

A clash of interests was avoided. In 1934, duPont and ICI established a jointly-owned company in Argentina known as Industrias Quimicas Argentinas "Duperial," S. A. Industrial y Commercial (Duperial-Argentina). DuPont and ICI have since owned the stock of this company in equal shares. It was made "the recognized vehicle for the expansion of duPont and ICI activities in Argentina" and "all of the services, technical, commercial, etc." of the two companies were placed at the disposal of the newly-created venture (Ex. 940, p. 3561).

Up to 1948, duPont and ICI controlled the policies and management of Duperial-Argentina through a Joint-Shareholders

Committee, composed of the manager of ICI(NY) and the director of the duPont Foreign Relations Committee (Ex. 940, p. 3560). The territory assigned to "Duperial-Argentina" embraced Argentina. Paraguay and Uruguay (Ex. 944, p. 3587). "Duperial-Uruguay" which was 100% owned by "Duperial-Argentina" was later formed.

"Duperial-Argentina" received from duPont and ICI "The right *for its own territory* to all patents, processes and information" within the chemical fields merged. So as to insure no interference with other divisions of territory which had been effected between duPont and ICI, it was agreed that "As a natural corollary to the grant of these exclusive rights it follows directly and as a matter of course that the Argentine Company must stay within *its own territory* and not spread out into other countries, either by laying down plants, exporting products or licensing under their processes" (Ex. 944, p. 3588).

But, ICI felt, and in this duPont acquiesced, that the new company with the combined technical research and business resources or duPont and ICI "could not fail to take a very prominent part in the industrial development of the Argentine and the unified effort would be so effective as to make its competitive power almost invulnerable" (Ex. 943, p. 3580).

The ban on Duperial-Argentina export was enforced, save in a limited number of cases where prior consent was obtained from duPont and ICI.

The purchase of all chemical products by Duperial-Argentina was confined to duPont and ICI. It was directed in December, 1935, that supplies should be drawn on a basis which would assure the continuance of the existing volume of trade of duPont and ICI at the time Duperial-Argentina was organized, with new business to be shared equally between them. The responsibility of dividing the business was placed with the Duperial Management, but it was agreed that, "However, in the event that the share of one principal is greater than that to which he is entitled, he will turn over 7½% of gross sales realizations on the excess to the other shareholder as representing manufacturing profit on this business" (Ex. 960, p. 3633).

DuPont and ICI fixed not only the prices at which they sold to Duperial-Argentina (Ex. 965) but also controlled the price at which Duperial-Argentina sold (Ex. 963).

DuPont and ICI undertook to endeavor to prevent other companies from exporting to Argentina in order to pre-empt that market for themselves through Duperial-Argentina. An Argentine competitor, it was learned, was endeavoring to make arrangements to represent the West India Oil Co., the Standard Oil Company of New Jersey marketing subsidiary, in the sale of solvents used for thinner and lacquer manufacture. DuPont and ICI took up the matter; the director of duPont Foreign Relations Department "put forward the suggestion that an approach be made to the Standard Oil Company to endeavor to secure for Duperial distribution of their products or some control of distribution or an agreed upon division of trade" (Ex. 1002, p. 3725). This was accomplished in 1935 and Standard Oil agreed to make Duperial-Argentina its exclusive agent for its solvents on a commission basis or to sell outright to it and to no one else in Argentina (Ex. 1003). This agreement of Standard Oil had not only the purpose, but the effect of eliminating competition between duPont, ICI and Standard Oil in the export of solvents from the United States to Argentina.

In 1934, Duperial-Argentina was acting as the sales agent for a European cartel exporting ammonia to Argentina. DuPont and ICI were exporting ammonia through Duperial-Argentina. Cia. Primitiva de Gas (Primitiva) an Argentine company, was also engaged in the local production of ammonia. DuPont and ICI were of the opinion that the strength of Primitiva's position indicated that company would be "eventual suppliers of the bulk of Anhydrous Ammonia consumed in the Argentine" (Ex. 1011, p. 3755). Competition from Primitiva had to be eliminated. An agreement was negotiated with Primitiva through Duperial-Argentina whereby the latter undertook to purchase the entire output of Primitiva for 10 years. As part

of the transaction the consent of the European cartel was obtained and duPont and ICI agreed to refrain from exporting ammonia to the Argentine. Even while the negotiations were being carried on, it was determined that it would be inadvisable for Duperial-Argentina "to push the product of the National Ammonia Company" ,(an American duPont concern) (Ex. 1012, p. 3758). The transaction resulted in a complete restraint on duPont's exports of ammonia to the Argentine.

At the time Duperial-Argentina was formed "Bunge & Born" was the largest commercial concern in Argentina. This firm was then investigating the advisability of entering the chemical industry, as a possible field for the employment of its ample capital resources. It was suggested that Bunge & Born be permitted to participate in the stock ownership of Duperial-Argentina; duPont successfully opposed this. The principal directing head of Bunge & Born was one Alfredo Hirsch, who was "recognized as being the richest man in the Argentine and broadly speaking the most influential individual" (Ex. 1015, p. 3769). Hirsch developed the company into a powerful competitor; Sir Harry McGowan in a memorandum to Lammot duPont of July 22, 1937, observed that Bunge & Born had built up a world-wide business that "they are good and useful friends, but extremely dangerous enemies" (Ex. 1015, p. 3770), and that they were "clearly in a position to make things very uncomfortable" for ICI and duPont in Argentina (Ex. 1015, p. 3771). With this background, when in 1935 duPont and ICI organized a subsidiary, Ducilo S.A. Productora de Rayon (Ducilo) to operate a rayon factory in Argentina, Bunge & Born began planning to erect a similar plant. Bunge & Born were offered and accepted a 15% stock participation in Ducilo. Certain Swiss interests and a French corporation were also given a stock interest in Ducilo; a formal agreement was signed by all parties in August, 1936 (Ex. 1039), and all agreed to refrain from the manufacture of rayon in Argentina until 1955. It was agreed by duPont and ICI that they were both obligated to vote the stock interest in

Ducilo to carry out the provisions of the Duperial contract they had made, and the restraints applied to duPont's exports of chemicals were applied with equal force to rayon (Ex. 1383, p. 11043). As a result, duPont refrained, except on rare occasions from exporting rayon from the United States to Argentina and Ducilo refrained from exporting rayon outside of Argentina, Paraguay and Uruguay. Thus, again, the imports and exports of the United States were directly restrained.

At a meeting of the executives of ICI and duPont held on October 20, 1937, at Wilmington, with both Sir Harry (then Lord) McGowan and Lammot duPont tak-ing part,

"It was agreed that the official policy of Duperial shall by no means exclude the policy of forming a partnership with Bunge & Born in our manufacturing enterprises in the Argentine.

"Meanwhile the policy of friendly cooperation and quota agreements is to be pursued. The policy of exchanging information wtih Bunge & Born as to future manufacturing programs is to be strictly adhered to" (Ex. 432, pp. 1815, 1816).

Bunge & Born at this time had in operation a plant for the manufacture of tartaric acid. Quotas were fixed by Duperial-Argentina with Bunge & Born, and the respective sales organizations collaborated "along sound lines" (Ex. 1046).

La Celulosa Argentina S.A. (La Celulosa) was competing in 1938 with Duperial-Argentina. Dupont and ICI began negotiations with La Celulosa to restrict the latter's activities. I. G. Farben was also then dealing with La Celulosa for a partnership arrangement. La Celulosa offered to sell Duperial-Argentina one-half of its chemical business. I. G. Farben and La Celulosa had also made counter-offers to each other. A meeting was held in London between representatives of ICI (acting for duPont as well as for itself) and representatives of I. G. Farben in April, 1938; the "friendly relations" between these negotiators and their purpose to avoid "needless competition" led to mutual acceptance of the "principle of trying to obtain a joint in-

vestment in Celulosa's chemical business * * * as the soundest policy; and the division of this investment was considered" (Ex. 1055, p. 3946). Agreement was finally reached by La Celulosa, Duperial-Argentina, I. G. Farben and Solvay et Cie., a Belgian concern, to eliminate competition in Argentina between duPont and ICI on one hand, and I. G. Farben on the other. A new corporation, Electroclor S.A. Argentina (Electroclor) was organized on December 3, 1938 to manufacture caustic soda and chlorine products in Argentina. It was agreed that the stock in Electroclor was to be issued—50% of La Celulosa, 33.4% to Duperial-Argentina, 11% to I. G. Farben, 5.5% to Solvay et Cie. (Ex. 1055, p. 3947). The stock was never issued to I. G. Farben and Solvay because of the outbreak of World War II in 1939. ICI refused to permit Duperial-Argentina to consummate the deal with I. G. Farben and Solvay. DuPont intervened as "neutral" and suggested that I. G. Farben renounce participation and receive back the funds it had subscribed with the assurance that Electroclor, as the Argentine company, would endeavor to furnish the local I. G. Farben Argentine office with a satisfactory proportion of chemicals for sale and with the further understanding that "when normalcy returns we will endeavor (to) secure restoration (of) their participation" (Ex. 1063, p. 3982). DuPont's position was later restated in a report of February 9, 1940 that, "the duPont Company informed I. G. that they intended to use their good offices after the war to have the I. G. participation restored" (Ex. 1391 p. 11100).

Before this, and in January, 1940, Electroclor agreed to give "Anilinas," an Argentine I. G. Farben subsidiary, one-third of the products of Electroclor for resale. This agreement was cancelled upon the insistence of the United States Government (Ex. 1078).

In the course of these dealings with I. G. Farben, duPont wrote on October 27, 1939, a letter which in part sets forth duPont's position in the Argentine, and which reads, "Your final suggestion of having duPont represent you on the Board and in the voting trust was not feasible, as ICI could not agree to have done indirectly what they could not do directly. Moreover, duPont's only interest in Argentina is through Duperial in which we are equal partners with I.C.I. We have no men of our own in that country to represent us nor could Duperial nor ICI agree to our attempting this role" (Ex. 1069, p. 3991).

Perhaps, this best sums up duPont's position in the Argentine; duPont's only interest there was through Duperial-Argentina; the territory had been divided with ICI as equal partners; duPont had no men in Argentina to represent it and to further its own separate interests in the development of trade and commerce.

### E. Duperial Brazil

Sir Harry McGowan and Lammot duPont, during a conference in London, in June, 1935, agreed "that steps should be initiated looking to the amalgamation of the interests of ICI and duPont in Brazil. Subsequently, each company (has) presented to the other considerable information with respect to its Brazilian business including recent balance sheet and income statements preparatory to inauguration of formal negotiations. * * *" (Ex. D–990, p. 7320).

The reasons which prompted the proposed merger in Brazil were stated to be "largely those which prompted the Argentine merger." Notice was taken of the fact that,

1. "Brazil is a large and relatively prosperous country, with great natural resources, and seemingly definitely committed to a program of industrial development."

2. "Both ICI and duPont were interested in sharing the development and growth of the Brazilian chemical industry through sales of goods manufactured both at home and locally in Brazil" (Ex. D–990, p. 7321).

DuPont and ICI each had commercial footholds in Brazil and each had prospects for substantial further development. The possibility of future competition between them and the desire to eliminate and avoid it, as in the Argentine, brought about the merger in Brazil.

It was agreed in May, 1936, that the merger be made effective financially as from October 1, 1936, that it be accomplished

through the medium of ICI-Brazil, Limited, by increasing its capital to acquire the net assets of duPont-do-Brazil and that this company be dissolved. This was carried out, and ICI-Brazil then changed its name to Industrias Chimicas Brasileiras "Duperial" S.A. (Duperial-Brazil) in 1937, and the stock was issued in equal shares to duPont and ICI.

Just as with Duperial-Argentina so it was with Duperial-Brazil; the "whole theory" of duPont and ICI was "that the Brazilian company shall be regarded as the vehicle of industrial effort for ICI and duPont in Brazil on certain definite lines of industry at present being merged, in respect of which the Brazilian company will receive the right for its own territory (namely, Brazil) to all patents, processes and information within that field which may be disposable by the partners" (Ex. 1079, p. 4041).

And, it was agreed that "as a natural corollary to the grant of these exclusive rights it follows directly and as a matter of course that the Brazilian company must stay within its own territory and not spread out into other countries, either by laying down plants, exporting products or licensing under their process" (Ex. 1079, p. 4042).

The operations of Duperial-Brazil were controlled by duPont and ICI, guided almost entirely by the pattern set for Duperial-Argentina.

Purchases by Duperial-Brazil were confined to duPont and ICI, and apportioned among the two by agreed formula (Ex. 1112). The shareholders' minutes of May, 1947 record that on dyestuffs "It has been arranged that when duPont and ICI are unable to supply Duperial's requirements, inquiries should be sent to ICI(NY) and only should they be unable to procure the necessary materials will Duperial be free to endeavor to purchase from outside sources" (Ex. 1151, p. 4215).

The prices at which products were sold by duPont and ICI to Duperial-Brazil were fixed by the Shareholders' Committee (Ex. 1132). They also fixed the minimum prices at which Duperial-Brazil sold its products (Ex. 1132; Ex. 1118; Ex. 1139).

Since the establishment of Duperial-Brazil, duPont and ICI have conducted all their exports to Brazil through Duperial-Brazil. The duPont policy with respect to this was stated in April, 1938, by the duPont Foreign Relations Department, as follows: " * * *, we have an obligation to ICI to consider Duperial-Brazil our exclusive agents in Brazil on products of our manufacture sold there" (Ex. 1091, p. 4061).

This policy was consistently followed by duPont's refusal to sell in Brazil in competition to Duperial-Brazil (Ex. 1094; Ex. 1109; Ex. 1096; Ex. 1102; Ex. 1105; Ex. 1107; Ex. 1109).

Duperial-Brazil, in 1938, entered into an agreement negotiated by duPont and ICI, with I. G. Farben and its Brazilian subsidiary, Allianza Commercial de Anilinas, to fix the price of dyestuffs exported by duPont, ICI and I. G. Farben to Brazil (Ex. 1116).

A local Brazilian dyestuff manufacturer, Zambotto, was in competition with Duperial-Brazil. In 1937, an agreement was entered into with Zambotto to eliminate this competition; Duperial-Brazil on its part undertook to furnish Zambotto intermediates and not to undersell him. DuPont and ICI separately agreed to support this arrangement "by refraining from quoting prices on the six Zambotto colors which would be lower than the prices at which Zambotto could make and sell the same colors" (Ex. 1128, p. 4149).

As between Duperial-Brazil, duPont and ICI it was agreed that

"The Zambotto business shall be dealt with by:

"1. The partners (that is, duPont and ICI) shall supply intermediates to the extent of half each in money value at factory cost plus freight, insurance, plus 10%, and, the purchase of intermediates from outsiders shall be discontinued unless expressly sanctioned. * * *

"2. * * * profit or loss on the Zambotto section * * * shall be divided 50/50 between the shareholders" (Ex. 1120, pp. 4124, 4125).

This Zambotto arrangement had the direct effect of limiting and restricting exports from the United States, not only by duPont, but by other American companies.

F. Nobel Chemical Finishes, Ltd.

DuPont, following World War I and during its energetic and efficient development of new chemical fields and products, became interested in paints, varnishes and finishes. Its research brought forth a new product found to be particularly adaptable for the spraying and painting of automobiles; it introduced this new product to the market under the trade-name "Duco." It has since become a product of almost universal use through the entire world. By June, 1925, H. G. Haskell, duPont vice-president, was able to report to his Finance and Executive Committee that "owing to the rapidly increasing sales of Duco exported to Great Britain and the good-will value of the name 'Duco'; British manufacturers have been considering ways and means of acquiring a share of this trade either by manufacturing a substitute or by making arrangements to become the agents for the distribution of 'Duco', or by acquiring the rights to manufacture and sell this product in Great Britain" (Ex. 131, p. 634).

But, before this, Sir Harry McGowan sensed the possibilities of Duco varnish and on October 1, 1924 cabled Irenée duPont: "If your company have made no arrangements for selling Duco varnish in this country would like you to consider this being done through one of Nobel affiliated companies" (Ex. D–1747, p. 9804).

To this, duPont was agreeable, for it was within the spirit of their agreement that this new product be embraced within the understanding between the two companies.

A year later, October, 1925, Sir Harry McGowan met at Wilmington with Irenée and Lammot duPont, and others from various companies, and it was then decided to form Nobel Chemical Finishes, Ltd. (NCF) for the exploitation of Duco in the British Empire, excepting Canada (Ex. 131). Later, Egypt was deemed by duPont to be included in the agreement and the duPont agency there was transferred to the new company (Ex. 134). Because of the proprietorship of the mark "Duco" for varnishes in another company, "Belco" was agreed upon as the mark for this new venture (Ex. 132, p. 636). This was done with some reluctance as, "Sir Harry expressed the opinion that another effort should be made to secure the word 'Duco' from Brown Bros. owing to the amount of goodwill attached to it as compared with the adopting of an entirely new name" (Ex. 132, p. 641).

This effort was made and proved unsuccessful, for "Belco" was the mark finally used.

Haskell, of duPont, felt that because of "the established and growing business in Great Britain" then enjoyed by duPont and because of other factors "a very substantial share of the profits would be due the duPont Company for relinquishing this export business" (Ex. 131, p. 634). That these claims were justified is shown by the fact that in crediting capital contributions, duPont was allowed in payment for this good will 150,000 shares in the proportion of 33 shares for every 16 subscribed and paid for by duPont in cash; the cash subscribed was therefore in the proportion of 51 by Nobel to 16 by duPont. Nobel received 51% of the voting stock and duPont, 49%; control of Nobel Chemical Finishes, Ltd. rested with Nobel. This conformed to the general scheme and plan of the understanding that Nobel should be the dominant factor in British territories, and to accomplish this duPont surrendered substantial rights in the export field.

DuPont undertook to send "such of their technical and expert advisers and their engineering staff to any of the company's works in the British Empire," as might be necessary, and to instruct employees of the new company "in the proper manner of manufacturing and applying Cellulose finish in accordance with the inventions" (Ex. D–1759, p. 9829). DuPont granted to NCF the sole and exclusive right to manufacture and sell "Duco" finishes in the British Empire excluding Canada and Newfoundland. NCF was restricted from exporting outside of these territories and duPont agreed to refrain from exporting to

the same territories, except as was necessary to supply NCF with material until the NCF plant was in full operation (Ex. D-1759, p. 9830; Ex. 132, p. 638).

It was agreed during the discussions leading up to the formation of NCF that "NCF should receive 5% on selling price of all materials shipped to our (NCF) markets by duPont from January 1, 1926 until such time as we (NCF) should take over the business from them with our (NCF) own manufacture" (Ex. 136). This 5% commission arrangement was changed after one year, and then, NCF still found itself unable to supply its assigned markets, and a new arrangement was made under which "all profit in excess of cost plus 25%" was paid by duPont to NCF. This applied to duPont's General Motor Export Business and to "all cases where it was found impossible for NCF to supply Duco to anyone in the Colonies, and shipment had to be made from Parlin" (duPont's plant); it also embraced sales made to certain New York merchants, who would not buy from NCF (Ex. 136, p. 651). DuPont, too, in 1927, surrendered and agreed that NCF should "take over the territories of Liberia, Angola and Siam" by paying duPont an amount computed on profits according to the same formula (Ex. 135, p. 648). Similar arrangements were applied to certain small markets of the British Empire which it was more economical for duPont to supply, and they were applied to paints and varnishes as well as to "Duco."

This was significantly called the "leased-territory" arrangement, a most appropriate designation. In 1946, two years after the complaint herein was filed, it was acknowledged by "the duPont legal people" that "the leased territory arrangement was one of the worst features of the case" (Ex. 564, p. 2126). That it was in violation of American law is beyond dispute; whether it merited this unique description in comparison with other aspects of duPont-ICI dealings is debatable. The clear purpose and effect of these arrangements was to eliminate competition between NCF and duPont and with other manufacturers of paints and varnishes.

DuPont, by 1926, had in Australia, a "large" and "attractive" business in "Fabrikoid," and artificial leather, and in "Pontop," a rubber cloth. A large impost was being considered by the Australian government; duPont felt its adoption quite probable and believed that they would likely lose the entire market within 3 years unless plans were immediately made to manufacture locally (Ex. D-1764, p. 9845). DuPont felt it advisable to associate itself with a local or British concern in the new plant.

The general manager of the duPont "Paint, Lacquer & Chemical Dept." cabled the duPont London representative on October 29, 1926, suggesting that the latter "advise McGowan we are considering possibility of Australian plant and ask him if Nobels desires minority participation" (Ex. D-1764, p. 9846).

Sir Harry McGowan, at that time, "was extremely busy with the formation of the new chemical trust" in England (which resulted in the organization of ICI) and furthermore, he had "been away from the office ill" (Ex. D-1764, p. 9846). But he was neither too busy nor too ill to give the matter his personal attention; he must have regarded the proposal as important, for he wrote Lammot duPont a personal letter on November 8, 1926, suggesting that Nobel "should control any jointly-owned Australian company in artificial leather." Lammot duPont replied and agreed to a 51-49% stock division with Nobel holding the majority. He noted in his letter that Nobel "do no rubber-cloth business in Australia at all, whereas, roughly, half of our coated fabric sales in Australia are rubber and we feel that this proportion is not likely to decrease. In artificial leather, as you state in your letter, our sales predominate over those of your allied companies: in fact we think it is clear that we considerably predominate in the Australian market. This dominating position is apparently not due to any low price activities on our part, nor is it due to any patent situation or any outside connections. It seems that it must be due to the quality and reputation of our goods" (Ex. 153, p. 716).

Mr. duPont added, " * * * there is nothing more natural for us to do in the

present situation than to make a deal with the waterproofing company of the Granville Woolen Mills, whereby we furnish the know-how and technical ability in return for an interest in their proposed venture· These people seem to have the money and we know have not the experience· We have not made any such proposition to these people and do not intend to, preferring to deal with Nobels, with whom we have had such varied and pleasant relations over. a long period of years" (p. 717).

Nevertheless, duPont was agreeable to surrendering its "dominating position" for a minority interest in the new company, and to bring new products within the scope of the territorial understandings with Nobel, even though the priority sales position of those duPont products was not "due to any patent situation." More than suspicion exists that, perhaps, Mr. duPont was motivated by the desire to see the "varied and pleasant relations" continue with the "new chemical trust," Sir Harry McGowan was then forming in England.

A jointly-owned company known as Nobel Chemical Finishes, Ltd. (Australasia) was formed in 1927 (the name was later changed to Leathercloth Proprietary, Ltd. (LPL)), to manufacture and sell fabrikoid, rubber cloth and related articles in Australia. ICI and duPont shareholdings in this company were in the proportion of 51-49% respectively (Ex. 157; Ex. D-1769).

Later, in 1929, ICI changed LPL from a "public" company to a "private" company. It seems that in Australia a "private" company "enjoys certain advantages in the way of avoiding necessity for public reports" (Ex. 164, p· 750) ; but it appears that it was not this factor which prompted the change· The change to a proprietary company brought with it a possible restrictive provision regarding transfer of shares. The matter was discussed by duPont executives (Ex. 164; Ex. 165) in memoranda containing these observations: "In other words, we are, by joining with ICI in this enterprise, foregoing the Australian market forever. Assuming that the general principle of British Empire for ICI, North America for duPont and the rest of the

world open is believed to be a good thing for the company as a whole, then I feel that this is all right as Australia is of course one of the most important parts of the British Empire for the future and presumably the English should be in the best position to develop it for the long pull" (Ex· 164, p. 752).

It was also noted that duPont was "ICI's partner not only in this venture but in a general way" (Ex. 165, p· 753), and that "it might be well to point out to our ICI friends that as long as the present general Agreement is in effect Australia is ICI's territory so that even if we found it necessary to sell our shares for financial reasons, we would not be at liberty to have a free hand in the Australian market" (Ex. 165, pp. 755, 756)·

DuPont and ICI agreed not to engage directly or indirectly in the manufacture or sale of coated fabrics in Australia except through LPL until 10 years after either disposed of its shares in LPL (Ex. 166; Ex· D-1775). In addition, duPont agreed to withdraw from the sale of rubber cloth in England, as it seemed "to be the only way out of a very awkward situation." To duPont, it was "unlikely that we (duPont) could work satisfactorily with Nobels as partners in Fabrikoid in Australia and perhaps in a prospective combination in France if we (duPont) were competing with them (ICI) in their own market" (Ex. 154, p. 720). In December, 1929, it was recognized by duPont that "the duPont-ICI agreement precludes our expansion in other fields" (Ex. 167, p· 764)·

The general policy of duPont with regard to Australia was established beyond doubt in March, 1927, when Lammot duPont overruled the decision of a subordinate and directed that duPont sell to ICI duPont's Australian Ammonia Company. Mr. duPont then recorded in a cable to Sir Harry McGowan that the "sale of our Australian interests seem consistent with our long-established policy" (Ex· 168, p. 765)· It was but another indication of the general policy of ICI and duPont not a compete with the other.

Even after the 1929 Patents and Processes Agreement, duPont continued in stock

ownership in NCF as well as in LPL; as a stockholder, duPont received profits from the sale of paints, varnishes and finishes within the British Empire. It was recognized that duPont's continued part ownership did not conform to the territorial allocation agreed upon in the Understanding of 1929 (Ex. 543, pp. 2036–2037; Ex. 546, pp. 2046–2047; Ex. 548, p. 2055; Ex. 1415). It took several years to remedy this, but it was accomplished and in December, 1935, ICI paid duPont $5,750,000.00 for the du-Pont holdings in both NCF and LPL. At the time of the purchase, it was understood that "The acquisition of duPont's interests not to affect existing rights and obligations of the several companies, so that duPonts will continue to pay Nobel Chemical Finishes, Ltd. in respect of sales in Empire markets of paints and lacquers made by du-Pont, and Nobel Chemical Finishes will pay DuPonts in respect of sales which they make in DuPont's markets; also all companies, including Leathercloth Proprietary, Ltd. will continue to have full exchange of technical information free of charge as hitherto, and DuPonts will be excluded from manufacture in or export to all Empire markets except by consent" (Ex. 555, p. 2092). and so the sale was consummated and the territorial allocations preserved intact.

VII. Remington Arms Company, Inc.

It is alleged in the complaint that Remington joined in the understanding between duPont and ICI to restrain trade in chemical products, sporting arms and ammunition in 1933 upon the acquisition of control of Remington by duPont. It is further contended by the Government that thereafter Remington cooperated with duPont and ICI to eliminate competition between Remington and ICI, and acted jointly with duPont and ICI in furtherance of the agreement which had long existed between them.

The complaint charges that by this action Remington's exports of sporting arms and ammunition were curtailed. It does not allege that these acts were done with either the purpose or the effect of restraining exports of other United States manufacturers or imports of foreign manufacturers into the United States. But the complaint does charge that competition between ICI and Remington, and between various foreign companies and ICI and Remington was eliminated in certain markets of the world (Paragraph 194, complaint).

During the trial, the Government stated its position to be that the acquisition by du-Pont of its interest in Remington was "innocent," in that "it was not part of the preconceived conspiracy" between duPont and ICI (R. 1257). The theory of the Government's case with respect to Remington is that "it was after a majority interest in Remington was acquired by duPont that the agreement was made between ICI and duPont to extend the existing conspiracy and bring in Remington within its scope" (R. 1258–59).

"The duPont Company acquired control of Remington on June 2, 1933. The interest purchased consisted of 867,000 shares of Remington common stock (51.13% of the common shares then outstanding). * * Control empowered the duPont company 'to effect internal reorganization' and duPont management was forthwith installed." At the same time, "duPont acquired a majority (89.4%) of the Remington 7% preferred shares" (Ex. D–1810, p. 9964). By March, 1937, duPont holdings had increased to 60.17% of the common stock and to 98.6% of the preferred stock. It was then yielding duPont about 10% on the capital invested, and held promise of a larger return. It was a profitable investment (Ex. D–1810, p. 9965).

Remington had long been engaged in the manufacture of sporting arms and ammunition. It had by 1933 established an international good-will and reputation. Du-Pont had not manufactured either sporting arms or ammunition, but it was a major producer of "sporting powders" used in the making of sporting ammunition. ICI had been manufacturing sporting ammunition and had been exporting this product to world markets.

Prior to 1933, duPont and ICI had brought "sporting powders" within their understanding of cooperation. They had exchanged patent rights and licenses re-

lating to sporting powders and ammunition outside existing patents and processes agreements (Ex. 290, p. 1313; Ex. 394, p. 1687; Ex. 579, p. 2160; Ex. 842, pp. 3134, 3142). DuPont had protected ICI from the competition of American cartridge companies by withdrawing discounts and rebates on powder sold to them for export sale (Ex. 60, pp. 304–5). In February, 1928, duPont recorded that, "The American loading companies, fighting among themselves, export below the world price, disturbing Nobels' market. We have done all in our power to prevent this by cutting our rebates on powder used for export" (Ex. 184, p. 844).

Remington was a loading company and was using duPont's powders in its loading process. There was, too, the tacit understanding between duPont and ICI that the United States market was to be under the jurisdiction of duPont and not ICI, even though duPont was not then engaged in the manufacture of sporting ammunition (Exs. 780–787, 851). In 1928, at a meeting held by duPont executives, it was determined that duPont would oppose any proposal from ICI that it be permitted to buy one of the American loading companies. It was then noted that, " * * * it would be highly undesirable for Nobels to take this step unless they would continue to use duPont powder. Also, the other loading companies might look on Nobels as partners of duPont which would be detrimental to our interests as suppliers of powder. Summing up, it is against our interests for Nobels to enter the ammunition industry in this country" (Ex. 185, p. 854).

It was against this background that in May, 1931, Remington approached duPont "seeking the support of duPont in a plan to acquire" the assets of Winchester Repeating Arms Company (Ex. D–1809, p. 9958). This deal was not carried out and Winchester was later acquired by Western Cartridge Company "one of the five producers of ammunition in this country, and perhaps the most aggressive" (Ex. D–1809, pp. 9959, 9968). It was the Western Cartridge Company which duPont felt ICI might purchase "in clearing up the existing cut-throat situation" which confronted

ICI in the export markets (Ex. 185, p. 854).

"Under duPont management Remington broadened the scope of its activities"; it acquired in 1933 the entire business of Chamberlin Cartridge and Target Company, manufacturers of targets and traps; and in 1934, the assets and business of Peters Cartridge Company, as well as those of Charles Parker Company, relating to the manufacture and sale of Parker shotguns (Ex. D–1810, p. 9965).

Western, when it purchased Winchester, took over the latter's operating contract with the U. S. Cartridge Company, and subsequently acquired this company. This left, as important sporting ammunition manufacturers, besides Western and Remington, only the Federal Cartridge Corporation, a manufacturer of private brand ammunition, for American mail-order houses (Ex. D–1810, p. 9968).

Western "could, and did, sell ammunition at prices which embarrassed their competitors"; they "were constantly manufacturing and utilizing larger quantities of their own shotgun powder, resulting in a proportionate reduction in their purchases of powder from the duPont company." "For some years, Western had been the first to declare new prices; the other ammunition firms were apparently content to follow their leadership" (Ex. D–1810, p. 9968). Western was offering duPont keen competition in the American home market. But, by September 3, 1937,—four years after duPont purchased into Remington,—the duPont Development Department was able to report to its Executive Committee that, "Up until the last year or two, prices in the ammunition industry were in a chaotic condition; cut-throat competition, concealed rebates and adjustments and other undesirable conditions were the order of the day. The present Remington management has abolished many of these practices, thereby promoting better accord within the industry" (Ex. D–1810, p. 9979).

How this "better accord" was brought about, the report does not narrate, but it does note that it was done and that "this accomplishment has had an outstanding influence on ammunition profits" (Ex. D–1810, p. 9979).

From the time, in 1933, that duPont secured its majority interest in Remington, duPont consistently nominated a majority of the Remington Board of Directors. This resulted in continuous joint management and interlocking directorates between du-Pont and Remington (Ex. D–2181, p. 11320). The negotiator for duPont in the patents & processes agreements, Dr. Fin Sparre, was a Remington director from June 2, 1933 to October 7, 1944, and there were other duPont representatives on the Remington Board of Directors. The record is clear that duPont and Remington were managed as one and the same enterprise; Remington was used to serve and accomplish duPont's objectives.

DuPont consistently represented Remington in its negotiations with third parties; thus, in 1933, Dr. Sparre and his fellow du-Pont employees represented Remington in negotiations with ICI; some of these same duPont negotiators represented Remington in 1934, in its dealings with Orbea, which were incidental to the formation of Du-perial-Argentina; duPont agents represented Remington in its discussions with ICI and CBC in Brazil; and duPont officials appeared for Remington in the so-called "evaluation" discussions of 1946 had with ICI.

August 15, 1933, less than three months after duPont acquired control of Remington, found Dr. Sparre at work beginning discussions to negotiate "a patents and processes agreement" with ICI on Remington's behalf. Remington's president, C. K. Davis, had on August 4, 1933 been authorized to negotiate with ICI and CIL for the exchange of patents and processes information (Ex. D–2166). Mr. Davis in turn, delegated this authority to Dr. Sparre (Ex. 1267). Why this was done was not explained by Mr. Davis; Remington did not call its own president as a witness.

Dr. Sparre felt "that the situation was somewhat complicated by Remington's existing business in the British Empire," but he was assured that, "the relations between ICI and Remington had been very pleasant and that the only change which ICI would have to make in coming to a formal agreement would be to cut off relations with Winchester" and, that it was not felt that "ICI could profitably take over Remington's business in the British Empire and that it would be better for Remington (to) continue its activities" (Ex. 1267, p. 4664).

"The hope was expressed that ICI-Remington agreement might be extended to include DAG along the lines of the duPont-ICI Explosives Patents and Processes Agreement." Canadian territory was also discussed and Dr. Sparre suggested, for Remington, that the contemplated agreement with CIL "should make Canada exclusive territory for CIL but that all CIL information outside of Canada should go to ICI and Remington exclusively along the line of the ICI-Remington agreement." South American business was also discussed. The duPont legal department was set to draft the necessary papers (Ex. 1267). Dr. Sparre knew that to have "a proper basis for a suitable patents and processes agreement," the export position of Remington and ICI in various overseas markets would have to be considered and he directed the duPont men at Remington's plant to bring records of Remington's export sales to the next meeting (Ex. 1268, p. 4668).

At the meeting which followed on September 27, 1933, between Dr. Sparre and other duPont officials representing Remington, and ICI, little time was devoted to the proposed license agreement as such. The principal discussions centered around "the position of Remington vis-a-vis CIL" in the export of ammunition, the "exporting rights" of CIL to Central and South America, "several markets in which ICI prices were lower than Remington," and the Remington English factory (Ex. 1269).

In the month of April, 1934, F. W. Pickard, a duPont vice-president, and also a director of Remington, wrote: "We are mutually agreeable to the idea of broad cooperation between ICI and Remington, and it is understood that we will arrange to have the world situation carefully examined when mutually convenient, perhaps sometime in the latter part of this year, with the idea of reaching conclusions as to the best method of cooperation in other countries where both ICI and Remington

are interested, military business excepted" (Ex. 1271, p. 4676).

This letter, when shown to Sir Harry McGowan, brought forth from him agreement in principle that, "now that the Remington Company has become a duPont controlled concern, it is eminently desirable that there should be broad-scale understanding with that Company" (Ex. 1272, p. 4678).

It also produced from the ICI correspondent the expression of his judgment that, " * * * the conclusion of the Patents and Processes Agreement with Remington now before our respective executives makes it very desirable that the Companies should get together and review the whole world situation with the object of broader cooperation" (Ex. 1272, pp. 4679, 4680).

The cooperation between Remington and ICI on a world-wide basis brought forth some objection from the Remington minority stockholders. The objection was not, however, to the cooperation but that Remington was getting the "short end" of the dealings with ICI.

Mr. M. Hartley Dodge and members of his family were the principal minority stockholders of Remington, owning approximately 20% of its outstanding capital stock after the duPont purchase. When duPont acquired its interest, Remington's certificate of incorporation was amended to provide for cumulative voting for directors (Ex. D-2262), which enabled the Dodge interests to elect minority directors (Ex. D-2181). These minority stockholders continued to be active in the affairs of the corporation. No protest is recorded from them, however, as to the division of world markets with ICI, only that, "they felt that in equity ICI ought to accept as a general proposition for discussion, that the Remington Company were entitled to expect a continuance of the status quo ante in foreign markets" (Ex. 1278, pp. 4718–19).

During the Remington-ICI talks in April, 1934 concerning South America, ICI advanced the suggestion for the sale of Remington's "brand and business in the Argentine, Uruguay, and Paraguay to Orbea or to the new corporation to be formed under ICI-DuPont ownership." Remington did not accept the proposal but did indicate their "desire to cooperate with ICI not only (with) respect to the Argentine territory, but on a broad scale" (Ex. 1271, p. 4675). It was reported to ICI that the opposition to this proposal sprang from the minority Remington interests and Mr. Dodge (Ex. 1273, p. 4682). A reading of the record leaves the impression that this was not entirely so,—that duPont interests covertly supported the objection even though paternity was disavowed, and this, with the purpose of achieving a better bargain with ICI as well as to preserve in some measure the Remington trademark in the Argentine. The objective of both duPont and ICI was to eliminate competition between Orbea and Remington, and to this Remington had no objection, provided only that any arrangements made would "definitely preserve the Remington brand in those countries and yield a proper return to the Remington Arms Company" (Ex. 1271, p. 4676).

Finally, in June, 1935, J. K. Jenney, the Assistant Director of duPont Foreign Relations Department, was able to report favorably to Monaghan of Remington that although the local manager of Orbea, Salmon, had "stated unequivocally that he considered the deal a bad one for Orbea," White of ICI(NY) representing ICI, had stated, however, "that it was the considered opinion of the Shareholders Committee that the deal should be made for family reasons and also that ICI, while considering the deal in many ways unfair to Orbea, had instructed its representative on the Shareholders Committee, namely, Mr. White, to reach an agreement on broad lines irrespective of the fairness of some of the provisions" (Ex. 1303, p. 4841.)

With discussions still pending and the Remington-ICI "Patents and Processes Agreement" still unsigned, ICI, on its part, was not unwilling to give a little more with respect to Argentina than it felt it should. ICI treated this negotiation simply as a part of the overall, worldwide division of territory then in progress between it and Remington. And so the pact was made; only on better terms for Remington than were first proposed by ICI. Monaghan was then able, in June, 1935, to write Mr. Dodge that, "through pressure

from duPont and ICI, the Orbea Company has been forced to accept the contract substantially as originally written * * *," that "throughout, the splendid attitude exhibited by the ICI people has been very gratifying," and that "the agreement now presented should be accepted particularly because of the good faith that has so far been demonstrated by the ICI people" (Ex. D–1970, pp. 10431–32–33). DuPont no longer found it "difficult to persuade the minority interest in Remington, that they should relinquish the Argentine market" (Ex. D–1974, p. 10444).

The agreement between Remington and Orbea was signed in December, 1935 (Ex. 1304). It provided that Orbea should have the exclusive right to manufacture and sell Remington center fire ammunition in Argentina; that Remington would not sell such ammunition in Argentina except through Orbea, and that Orbea was to be Remington's sole agent for the sale of rim fire ammunition and firearms in Argentina. It was also agreed that Orbea would not export center fire ammunition of the Remington type from Argentina and Remington was granted exclusive rights to patents, processes and improvements developed by Orbea. Orbea also undertook to maintain in the Remington trademark and goodwill and agreed that at least 25% of its annual sale of center fire ammunition should consist of the Remington type. That Orbea was not then qualified to manufacture products up to the Remington standard was recognized by Remington's undertaking to furnish Orbea all necessary technical information as to the manufacture of Remington center fire ammunition. Orbea further agreed to pay Remington 10,000 pesos annually in addition to one-third of the net profits earned by it on the sale of Remington center fire ammunition, with a guaranteed minimum of 10,000 pesos. Finally, Orbea agreed to purchase from Remington at least 50% of its total requirements of rim fire ammunition and firearms for sale in the Argentine (Ex. 1304).

In application, this last provision was interpreted as requiring Orbea to purchase 50% of its rim fire ammunition requirements from Remington and 50% from ICI.

Thus, it was reported on February 9, 1938 concerning Orbea sales of calibre .22 for 1937 that:

"with regard to sales of .22's, in accordance with the agreement with Remington Arms Company, at least 50% of all the sales made by Duperial in this calibre must be Remington brand.

"From the figures given below, you will see that the distribution has turned out quite equitably:
ICI ................. 2,775,900 cartridges
Remington .......... 2,887,500 "

"The figure shown under ICI for sales of .22's represents sales made by us, since we are the only importers and distributors of this brand.

"Sales of Remington brand represent quantities invoiced by Remington Arms Co. to their importing clients down here, from January to December, 1937" (Ex. D–1986, p. 10465).

The agreement by Remington to abstain from selling in Argentina except through Orbea and the arrangement to divide rim fire sales between Remington and ICI was designed to and its purpose was to effect directly a restraint upon Remington's export trade to Argentina. Competition between Remington, ICI and Orbea in the Argentine market was eliminated.

It was while ICI was exhibiting the "very gratifying * * * splendid attitude" in June, 1935, in connection with the Orbea discussions, that the so-called "Patents and Processes Agreement" negotiations between Remington and ICI were approaching culmination. The agreement between them was signed on August 20, 1935 (Ex. 1276); by its terms it was to continue in effect until July 1, 1939 (Ex. 1276, p. 4696). A further agreement was signed on June 30, 1939, which provided it was to continue indefinitely with the right of cancellation granted to either party upon six-months' notice any time after December 30, 1948, or in the event of war being proclaimed by the government of either party, at any time, by either, on written notice (Ex. 1277, p. 4711).

Nothing is more illustrative of the manner in which the affairs of Remington were

completely dominated and directed by du-Pont with Remington consent than the proceedings had in conjunction with the Remington-ICI Patents & Processes Agreement, dated August 20, 1935 (Ex. 1276). This was negotiated by Dr. Sparre of du-Pont on behalf of Remington; it was "approved by the Legal, Development and Foreign Relations departments" of duPont, and was then acted upon by the Remington Board "at a meeting held on June 7th subject to approval of the Executive and Finance Committees of the duPont Company"; the duPont Executive Committee noted its approval on June 12, 1935 "subject to final approval of the Finance Committee" of duPont, and from the duPont Finance Committee it received its final imprimatur (Ex. 1275, p. 4686).

A fairly complete picture of the Remington-ICI situation as of the fall of 1935 is revealed by Exhibit 1278 (pp. 4716–21), which is a letter of report sent from ICI (NY) to the London ICI office on October 11, 1935. It followed a meeting of Remington, ICI and duPont representatives at which the "Remington-ICI controversy" was discussed. There were present, C. K. Davis, Remington president; Monaghan, Remington Export Manager; Swint, of duPont; and G. W. White, of ICI(NY). White reported to the ICI London office that, "It has been fairly common knowledge that there was something unsatisfactory to the Remington officials in their relationship with ICI" (Ex. 1278, p. 4716), and that he had "for some long time past tried to put my (his) finger upon the cause." The meeting aired the Remington grievances. He noted that "the Remington people regarded themselves as injured parties," and that, "They felt that their Company's foreign business had suffered as a consequence of the foreign policy imposed upon them by the duPont Company as part of the latter's arrangements with ICI. The evidence they produced in support of this boiled down to the ICI move in Argentina and Brazil, which Remington regarded as an attack upon their business, in both of which cases they were unable to take defensive measures; and to the absence of any effort by ICI to discuss world affairs with Reming-

ton in response to the several requests made by the latter and in spite of the recent promise of ICI to send officials over here for that purpose" (Ex. 1278, p. 4717).

Here then was an expression reported as emanating from Remington's own president as to the cause of the unsatisfactory relations with ICI. The knowledge that he possessed as president was knowledge of Remington. Notwithstanding such knowledge, he had not been deterred from executing a so-called Patents and Processes Agreement only a few months before—on August 20, 1935 (Ex. 1276). Mr. Davis and the Remington Board of Directors had made Remington not only a willing victim, but a consenting accomplice, to the foreign policy of duPont and ICI. Mr. Davis' discourse about being imposed upon by du-Pont was not the protest of innocence outraged.

As to the Remington lament over the export situation, ICI tritely noted, "There seems little point in Remington's statement that since the duPont merger their efforts in the export field have been hampered. This read(s) like a criticism of their own organization" (Ex. 1279, pp. 4727–8).

By the agreement of August 20, 1935 (Ex. 1277) ICI agreed to grant to Remington, upon request, "the non-exclusive right and license to practice any and all patented and secret inventions now or during the term of the agreement owned or controlled by ICI relating to ammunition or components thereof (exclusive of military ammunition and non-ferrous metals as aforesaid), and to make, use and sell any and all products embodying such inventions, throughout the world." It was also agreed "that ICI will not grant to others, during the term of this agreement, similar rights within the countries of North America and Central America (exclusive of Canada, Newfoundland and British possessions, but otherwise inclusive of the West Indies) or within present and future colonies and possessions of the United States of America." The agreement contained similar grants back to ICI from Remington "within countries of the British Empire (inclusive of Egypt but exclusive of Canada and Newfoundland) (Ex. 1276, pp. 4689–90). Significant, too,

is the provision dealing with "Non-Exclusive licenses to other parties" (Ex. 1276, p. 4692), by which it was agreed that ICI and Remington should notify each other before issuing licenses to third parties for non-assigned territories. The agreement, drawn by duPont's legal department, when read in the light of the contemporaneous writings, appears but a crude device which it was hoped might conceal and cover a division of markets and sales territories.

It was also provided in both the 1935 and the renewal 1939 agreements that the "Licenses granted as aforesaid shall be subject to adequate and justifiable compensation to be agreed upon by separate negotiations, but it is understood that such compensation will be determined under broad principles giving recognition to the mutual benefits secured or to be secured hereunder, without requiring detailed accounting or an involved system of compensation" (Ex. 1276 p. 4691; Ex. 1277, p. 4705).

Indeed, "broad principles" were applied in these evaluations; neither Remington nor ICI made any payment whatsoever to the other, and, on this subject, Remington wrote to ICI on January 21, 1937: "It is our feeling that the practice between Remington and ICI with respect to royalties for the use of each other's inventions should conform as closely as practicable to the practice between duPont and ICI" (Ex. 1282, p. 4749).

To this, ICI replied on March 5, 1937: "* * * we are in full agreement with your suggestions that the basis of payments should be similar to that adopted in the ICI/duPont agreement," and, it was suggested by ICI that quinquennial settlements be had, based on one year's profits arising out of the use of the patent. The letter continued, "as each case has to be examined on its merits, and there is a possibility that inventions exchanged between us will be of substantially equal value, we feel that it will not be necessary to supplement the present ICI/Remington Agreement other than by this exchange of letters confirming the arrangement" (Ex. 1283, p. 4752).

When in April, 1946 ICI and Remington finally did consider "evaluation" of infor-mation, patents and processes exchanged from 1935 to 1944, ICI found that "there are (were) no offers to or from Remington of any importance to evaluate" (Ex. 1285, p. 4760). It was agreed that since "both companies have benefited from the agreement, no payment will be made in respect of this evaluation period" (Ex. 1288, p. 4800).

When the Remington-ICI agreement of 1935 was concluded, special provision was made for the territories of Canada and Newfoundland. These markets were made the topic of separate discussions and negotiations between Remington and CIL. In 1933, they "had agreed to a free interchange of information between Remington and CIL pending the conclusion of a formal agreement" (Ex. 1267, p. 4665). Dr. Sparre, at the time (as we have already noted) suggested that the formal agreement "should make Canada exclusive territory for CIL but that all CIL information outside of Canada should go to ICI and Remington exclusively along the line of the ICI-Remington agreement." It was pointed out that CIL had been "allowed" by ICI "to go into South America as compensation for CIL Australian business which they built up during the war," and that "CIL and ICI have an ammunition agreement" (Ex. 1267, p. 4665). CIL's export business came up again for consideration at a meeting held on September 29, 1933, then, "The duPont officials outlined the position of Remington vis-a-vis CIL with a view to determining whether this position could be covered by the present form of Tri-Party agreement, in which case they considered that CIL should cease to export ammunition; or whether a separate agreement between CIL and Remington was necessary, as it would be if CIL continue to export" (Ex. 1269, p. 4669).

These meetings were not the first had between duPont, ICI and CIL at which the sporting ammunition output of American manufacturers was considered. As early as October, 1925, at a meeting held in Wilmington, all three were represented and the minutes show that with respect to sporting ammunition, "The effect on world prices of the price-cutting between the

U. S. manufacturers was discussed. Sir Harry asked duPonts their opinion on the wisdom of an informal conversation with the heads of these companies. It was thought that such a plan was sound and Mr. Felix duPont undertook to make the necessary arrangements."

There is appended a note that "subsequently Sir Harry met the American ammunition manufacturers at luncheon on 19th October" (Ex. 90, p. 446). It does not appear who among the American manufacturers gathered to dine with Sir Harry and Felix duPont, but it is reasonable to suppose that Remington was among them, for Remington was at the time a large consumer of duPont powders.

By September, 1937, a draft of the proposed ICI-Remington-CIL agreement satisfactory to both duPont and ICI had been prepared. Mr. Dodge of the minority stockholders interest opposed its execution and stated that he would "like to see this proposed agreement shelved for the time being." This suggestion was conveyed to C. K. Davis, the president of Remington, with instructions from duPont that at the next meeting of Remington directors it be tabled indefinitely (Ex. 1294, p. 4816). This was done. The details of Mr. Dodge's objections to the signing of the formal agreement are not fully revealed; they centered upon matters entirely commercial (Ex. 1280, p. 4732) and not upon the legality of the proposed agreement (Ex. D–1953; Ex. D–1954). The Remington patent attorney did, however, record that the agreement "was not approved, due to objection by the minority Directors, particularly Mr. Dodge, who objected to the broad proposition of free licenses to CIL under any and all future Remington patents" (Ex. D–2173, p. 11309). In fact, the failure to sign the document did not effect a change in the policy of the duPont management of Remington and the views of the duPont majority continued to control the acts of Remington. As Mr. Brown, writing for the controlling duPont interests, noted in his letter to C. K. Davis, on September 23, 1937: "While it would certainly be desirable to have this agreement executed at this time, it is true that during the more

than four years of duPont management of Remington, no question has come up between Remington and CIL that would have been solved by the agreement, nor has anything been lost to any of the three parties because there was no such agreement. Of course, this does not mean that we may not run into some embarrassing situation that would be avoided if the agreement were in effect. However, to force through the Board at this time a measure that Dodge quite strongly opposes would certainly not be in the interest of harmony, and for that reason appears to me unwise. We have the embarrassment that the proposed agreement has been approved by the other two parties, but I believe we can explain the situation to them so that Remington's relationships will not be disturbed" (Ex. 1294, pp. 4816–17).

But, before this, by letter from Remington to CIL dated October 7, 1935, it had been agreed that each would advise the other of developments in the sporting ammunition field and exchange patent licenses upon request (Ex. D–1951) ; this arrangement was confirmed later by another letter on October 3, 1944 (Ex. 1295) and continued until cancelled on June 28, 1948 (Ex. D–1958). ICI was content to continue without a formal agreement; this was satisfactory to it because the "spirit of cooperation" prevailed in those territories in which ICI was concerned.

The Brazilian market also received the attention of the duPont-Remington and ICI negotiators. Brazil had "for a number of years represented Remington's most important foreign market" (Ex. 1309, p. 4860). DuPont undertook "to loan to Remington the amount required for the initial investment in the Matarazzo property (Fabrica Nacional Dos Cartouchos E Municiones) at 1½% interest" (Ex. 1310, p. 4864). The transaction was closed in 1936 and ICI and Remington jointly purchased the business of one of the foremost Brazilian producers of ammunition. A new company was organized—Compania Brasileira de Cartuchos (CBC) with the stock equally divided between ICI and Remington. It has so remained. As with the Duperials, so with CBC, control of the policies and manage-

ment was vested in a joint stockholders committee composed of representatives of ICI and duPont (Exs. 1306–1312).

It had been agreed by ICI at a meeting with Remington and duPont officials held on December 2, 1935, that, " * * * the Remington Company would be compensated by the new company on an equitable basis for trade which Remington might give up in Brazil in faonor of the new joint enterprise which would probably manufacture under Remington processes" (Ex. 1280, p. 4733).

This meeting "was in the nature of a private luncheon to which representatives of the Remington minority interests were invited to meet" with H. J. Mitchell of ICI; Mr. M. Hartley Dodge was numbered among those present (Ex. 1280, p. 4732).

It was agreed that Remington would "conduct its sporting ammunition business in Brazil through CBC, and that pending manufacture of such products on a commercial scale by the latter, Remington will sell the requirements of CBC at such special prices or upon such basis as shall be mutually agreed by the Shareholders Committee of CBC." For this, Remington was paid $125,000 (Ex. 1314, p. 4877).

Remington and ICI further agreed that profit on the sale of Remington ammunition in Brazil should be divided equally between Remington and ICI (Ex. 1323). They also agreed that CBC would manufacture sporting ammunition for the Brazilian market with the profits to be equally divided between them.

Due to faulty manufacture and to the powder used, the CBC ammunition was inferior to the standard United States products. CBC has therefore never manufactured ammunition under the Remington mark, and Remington has continued to export to Brazil (Ex. D–2024, p. 10541). It was sought to remedy this situation, even as late as May 1946 (Ex. D–2100, p. 10768). In the meanwhile, the procedure was for Remington to sell its products to CBC and to divide equally with ICI the difference between the factory cost of such products and the price to CBC. This was accomplished by direct payment by Remington to ICI and not through CBC (Ex.

1323). The agreement by Remington to abstain from exporting to Brazil was a restraint upon American exports and its purpose was to eliminate competition between duPont, Remington and ICI in exports of ammunition to Brazil.

By exchange of letters in the fall of 1937 (Ex. 1317; Ex. 1318), Remington and ICI entered into a patents and processes agreement with CBC by which they each agreed to license CBC under their patents for the sale of sporting ammunition only in Brazil. CBC agreed to license Remington and ICI under its patents throughout the world, excepting Brazil. This had the effect of confining CBC to the Brazilian market, so that it could not enter the United States market. It also prevented Remington and ICI from exporting to Brazil ammunition embodying CBC patents.

It was by design that Remington entered into this joint Brazilian venture with ICI. It was to carry out and continue the division of world markets which had long existed between duPont and ICI. Remington had made itself a part of the conspiracy, and the creation of CBC was but one step in carrying it into effect in Brazil.

## VIII. The Individual Defendants

Five individuals were made defendants in the complaint; three have been served with process and have appeared—Lammot duPont, Walter S. Carpenter, Jr. and Charles K. Davis. Lammot duPont began his association with duPont in 1902; he was its president from 1926 to 1940; Chairman of the Board of Directors from 1940 to 1948; he is now a director. Walter S. Carpenter, Jr. has been long employed by duPont; as Vice President from 1919 to 1940; as President from 1940 to 1948; as director from 1919 to date and Chairman of the Board from 1948 to date. Charles K. Davis has been President and General Manager of Remington since 1933.

No proof has been presented as to the extent of the stockholdings of any of these individuals in the corporate defendants. No charge is made of monopoly, or of unscrupulous practices in dealings with competitors. These individuals com-

mitted no acts of personal wrong calling for censure or condemnation. They were officers, agents and employees of corporate defendants, and acted only for and on behalf of those corporations pursuant to and under the authority of their corporate Board of Directors. Their acts were not calculated to bring them direct personal gain; any profit which they might have received came through stock ownership (and of this we have no proof). There seems at this stage of the proceedings no warrant or basis for a personal injunction against them, cf. Hartford-Empire Co. v. United States, 323 U.S. 386, 428, 65 S.Ct. 373, 89 L.Ed. 322, and for this reason the individual defendants ask for dismissal of the bill as to them.

But we have not by the terms of our pre-trial order yet arrived at the point where we are formulating the terms of a decree; that is the next step to be taken in these proceedings. We are now concerned only with findings of facts established by the trial evidence and with conclusions of law to be drawn from those facts. We find that each of these individual defendants by his acts did assist in the formulation and execution of policies here found to be unlawful. The complaint as against the individuals will not be dismissed and we leave for later decision whether relief against them will be necessary.

### IX. Present Status of Relationship between duPont and ICI

Prior to the trial of this suit, conferences were had with the Department of Justice, looking toward a consent decree. Of course, we took no part in these discussions, and, in fact, were entirely ignorant of these dealings, until they were revealed by the defendants by the introduction of documents in evidence. No weight whatsoever has been given to these negotiations; they have been entirely disregarded.

It does appear, however, that when these discussions were terminated a commission was sent by duPont to London, there to confer with ICI. C. H. Greenewalt, duPont's president, headed the duPont lega-

tion. Lord McGowan, Chairman of the ICI board, and other directors and officers of ICI represented their company. This London conference which lasted from May 14 to 21, 1948, was made the subject of a report from Mr. Greenewalt to the duPont Executive Committee, dated June 4, 1948 (Ex. D–933). The conference, as reported in the rather brief memorandum which dealt with negotiations lasting a full week, concerned "the cancellation of the Patents and Processes Agreement of 1939 and of the agreements with CIL and the South American companies to which duPont and ICI are signatories" (Ex. D–933, p. 7078). This short report leads one to infer that more was decided than is recorded, and that oral reports were made of matters not contained in the written report.

It was set forth, in writing, however, that arrangements between the duPont agents and the ICI directors were made: (1) "that the 1939 Patents and Processes Agreement be cancelled in its entirety as of June 30, 1948"; that because of the "premature cancellation" of the contract, duPont would pay and "ICI would accept whatever sum duPont should determine to be just and equitable" (Ex. D–933, p. 7079) and (2) "that duPont and ICI would each consent to an immediate cancellation of the tripartite Patents and Processes Agreement of 1936 with CIL"; that "duPont would enter into a bilateral agreement with CIL to replace the cancelled tripartite agreement" (Ex. D–933, p. 7079).

The possibility of the entry of a decree in this suit directing divestiture of the interests of duPont and ICI in the jointly-owned companies was considered. If the occasion should arise, ICI expressed itself as "prepared to work out a plan with duPont looking toward the segregation of assets owned by the Canadian and South American companies. This plan would be simply a statement of the recommendations to be made to the court in case it orders dissolution of the joint companies. * * *" (Ex. D–933, p. 7081). DuPont is recorded in the report, as "willing, while the matter is in litigation, to give to CIL the benefit of its full technical support so as to permit its continued growth and

expansion" (Ex. D–933, p. 7080), and the same duPont attitude is reported with respect to the Duperials and CSAE.

The agreement "that duPont and ICI would each consent to an immediate cancellation of the Tripartite Patents and Processes Agreement of 1936 with CIL" (Ex. 868) was carried out by both duPont (Ex. D–730) and ICI (Ex. D–743), and new separate bilateral agreements were made with CIL. By the new agreement duPont granted CIL a license under a long list of duPont-held Canadian patents, subject only to prior commitments to third parties and the rights of duPont itself to operate under these patents; this grant to CIL was exclusive (Ex. D–730). DuPont undertook "upon receipt of request in writing from CIL" to grant to CIL a non-exclusive license under any Canadian or Newfoundland patent owned by duPont relating to the listed products (Ex. D–730, p. 6559). DuPont further granted "to CIL a non-exclusive license to sell under all United States patents now or hereafter owned by duPont claiming the product so sold, that correspond in subject matter to any Canadian patent licensed to CIL" (Ex. D–730, p. 6559). DuPont also agreed, subject to any prior commitment, to make "available to CIL such of duPont's technical information, as CIL may request, concerning the manufacture or use of the products," as scheduled, or as the schedule might be amended by the addition of new products (Ex. 730, p. 6560).

By June 17, 1948, duPont and ICI had arrived at the terms of a proposed letter agreement cancelling the "so-called Duperial Argentina and Brazil 'merger agreements' of 1934 and 1936 respectively and the 1920 agreement between duPont and Explosives Trades Limited (ICI) providing for the formation of CSAE" (Ex. D–934). The "principal results" of this letter are purported to be outlined by duPont in Ex. D–934, p. 7083. The "results" support the factual conclusions we have already reached concerning the operations of the "Duperials" and of CSAE. But above these "results", there still survives the fact of joint ownership and joint management of these companies by duPont and ICI.

The stockholdings remain undisturbed, and although ostensibly the letter "abolishes the present ICI-duPont Shareholders Committee for management of these companies and revokes all actions of the committees," it simultaneously "reestablishes them as Advisory Committees to which the management will look for advice on specified subjects related to organization, personnel and the financial affairs of the companies" (Ex. D–934, p. 7082). This is a most comprehensive and all-embracing reservation of control, especially when considered in the light of the entire stock ownership by the principals of the "Advisory Committees." The old, established regimen was continued; but, with new titles.

It is amusing to note that on June 24, 1948, Wendell R. Swint, Foreign Relations Department Director for duPont, sent identical letters to the "Duperial" subsidiaries advising that "We expect to negotiate with you on a bilateral basis; i.e., between duPont and Duperial, new agreements relating to patents and technical information and new selling arrangements" (Ex. D–937, p. 7095; D–938, p. 7097).

It was on the same day, June 24, 1948, that Swint had been designated as the duPont member of the new "Advisory Committee" (Ex. D–939). The letters of June 24, 1948, were followed by identical letters from duPont to the Duperials on November 24, 1948 reading in part: "We have now prepared an agreement, copy of which is enclosed, which we suggest, that you study and advise us as soon as feasible whether the Duperial management has any objections to the agreement as submitted" (Ex. D–940, p. 7100; D–941, p. 7102).

Just what happened to the planned negotiations is not revealed; whether any were in fact had, is, in view of the wording of these letters most unlikely; the entire correspondence concerning these new bilateral agreements appears as self-serving writings lacking in sincerity. The bilateral agreements were the result of negotiations between duPont and ICI in which the jointly owned companies did not participate as separate entities. (See Ex. D–933, p. 7080.)

But these talks concerning modification of existing duPont-ICI agreements did not

begin with the London conference of May, 1948. In August, 1946, duPont advised ICI that they wished "to discuss with ICI the possible revision of the ICI-duPont nylon agreement in the light of the pending anti-trust suit" (Ex. 705, p. 2674). When Mr. Swint of duPont consulted on this subject with ICI in October, 1946, ICI recorded that he "stressed the urgency of ICI reaching a decision, because * * * it was desired to formalize a new agreement before negotiations were commenced with the Department of Justice" (Ex. 706, pp. 2677, 2678).

It was duPont's purpose that certain patents in the nylon field, but applicable to use in the non-nylon field, be assigned to ICI, which would render small the "risk of the assigned patents being brought within the jurisdiction of the Department of Justice" (Ex. 708, p. 2699). And to this ICI had no objection noting that, "It can be expected, after the anti-trust settlement, any exchange between the parties on nylon matters need be treated no differently or not very differently from whatever form of exchange subsists on other topics" (Ex. 708, p. 2703).

ICI recognized too the possibility that the assignment of patents to ICI by duPont "will materially reduce the risk of any loss of rights under any anti-trust settlement" (Ex. 708, p. 2705). The old spirit of co-operation still continued between duPont and ICI.

It is significant that shortly following the London conference of May, 1948 between the representatives of duPont and ICI (Ex. D-933), Remington and ICI, on June 25, 1948 (Ex. D-2117), each terminated their patents and processes agreement with CBC, which was evidenced by the exchange of letters in October-November, 1937 (Ex. 1317; Ex. 1318). Although the agreements were terminated shortly after the promulgation by the Brazilian government of new regulations covering Brazilian imports and exports, the cancellation was accomplished as the result of concerted Remington-ICI action, both agreeing that, "Such termination shall be without prejudice to the continued use by either party of technical information which may have

been exchanged in accordance with the terms of the agreement" (of 1937) (Ex. D-2118, p. 10842; Ex. D-2120, p. 10848).

Evidence has also been presented tending to sustain the contention of ICI that it had entered the United States markets in active competition with duPont. It has been shown that during 1949, negotiations were begun by ICI for the acquisition of a controlling interest in Arnold, Hoffman & Company, Inc. of Providence, Rhode Island, a corporation engaged in the manufacture of dyestuffs and other chemicals. "The negotiations were successfully concluded in the spring of 1950," and it was stated by ICI in its annual report for 1949 that "as a result of this new venture the Company will have an attractive medium both for the manufacture in the United States of products in which the Company has special advantages and also for the sale in that country of products manufactured in Great Britain" (Ex. D-2234, p. 14). This entrance of ICI into United States trade represents a radical departure from the policy, theretofore followed, of reserving the United States' market for duPont.

DuPont had long ago successfully objected to ICI's acquiring an interest in the Western Cartridge Company (Ex. 185, p. 854), and, in 1924, when ICI negotiated through a subsidiary—Scottish Dyes, Ltd. —an agreement with the American concern, Newport Chemical Company, for exchange of technical information on certain dyestuffs, duPont expressed its objection because of the possibility that if duPont gave information on these dyestuffs to ICI, it might through Scottish Dyes, Ltd. be passed on to Newport. This, duPont, at the time, feared would permit Newport to compete with it on the basis of duPont's own technical information (Ex. 184, p. 845; Ex. 206, p. 937; Ex. 210, p. 963; Ex. 212, p. 986). It was treated by duPont as a serious objection; it was solved by duPont's acquiring Newport (Ex. 184, p. 845; Ex. 206, p. 937).

This duPont purpose of restricting ICI in the United States, it was urged, was to protect itself from the competitive use of its own technical know-how by ICI and

others with whom ICI might be affiliated. While this restriction was temporarily lifted as a war measure in 1939 (Ex. 720), it otherwise continued until the making of the duPont-ICI Agreement on June 30, 1948 (Ex. D–624; Ex. D–1271; Exs. 1 and 2 of the complaint). This last agreement provides in Article IV (Ex. D–624, p. 6010) that: "Each party hereby grants to the other the unrestricted, non-exclusive, territorially-unlimited right to use and employ in its own manufacturing and selling operations all technical information heretofore conveyed to it under either of said Patents and Processes Agreements. Furthermore, each party may disclose any technical information so conveyed to it after five (5) years from the receipt thereof or at such earlier time as it becomes published or otherwise available to the public; and at any time in disposing of its own technical information which it is free to disclose, either party may include any technical information received from the other party which is inseparably intermingled therewith" (Ex. D–624, pp. 6010, 6011).

Just what has become of duPont's desire which continued through the years, to protect itself from the use of its own technology by its competitors? The suddenness of the complete abandonment of an aim, which defendants claim was at the basis of their entire patents and processes policy does cause hesitation in accepting it as a matter of faith, and puts in doubt the planned permanence of this new policy. So, also, with reference to ICI's investment in the American company, Arnold Hoffman & Company, Inc. We conclude that these changes had best be ensured by decree.

It appears, too, that since 1948, duPont has established foreign sales agencies and has made attempts to enter foreign markets in territories which long had been regulated by the duPont understandings with ICI. How long sustained these recent endeavours will be, only the future will reveal. They do, however, afford basis for the hope that these steps to increase foreign trade will continue and that the abandonment of these markets to ICI is no longer the policy of duPont. This hope will be strengthened by appropriate provisions in a decree.

These recent agreements and activities tend to indicate a recognition, at least on the part of duPont, that the relationship between duPont and ICI might be held to be in violation of the law: what they also demonstrate, however, is the continuance of the close relationship which has existed between them for more than five decades. They sustain the contention of the Government that the issues are not moot and that there is proof beyond more than reasonable doubt to hold that left unregulated by judicial decree, the old understandings between duPont and ICI survive, only to be put into operation at a more propitious and opportune time. This view is not intended as criticism of counsel who have appeared for the defendants. Certainly, their advice and guidance on these new arrangements betoken nothing but a desire to attempt to guide their clients to a policy which conforms to and is in accord with our national policy, which their clients have long disregarded. While these recent modifications might well serve to "eliminate business uncertainties, which were inevitable" (Tr. 1758), they do not remove the need for judicial regulation of the future acts of the defendants by decree.

The bona fide character of the cancellation of these old agreements has not yet been subjected to the test of passing years. They may be the precursor of new policies and of a new relationship between duPont and ICI. This change may have been wrought by a sincere desire on the part of duPont to now conform its international business and dealings to the declared policy of the United States, which has afforded it protection and whose laws have permitted and encouraged its great growth and prosperity. The condition of international political and economic affairs may have contributed to the adoption of these new policies by duPont and ICI. If this be so, a readjustment of world conditions may induce a revival of old understandings and that without sanction of the laws of the United States. To guard against this, a decree should be entered; we can not say "that there is no reasonable expectation

that the wrong will be repeated." United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 448.

The Government has charged in this suit that the defendants entered into a conspiracy to divide among themselves the territories of the world, and that the agreements considered herein—principally, the Patents and Processes Agreements and the Joint Company Arrangements—were but parts of that conspiracy, devices intended to carry out its purposes.

We have found that the various patents and processes agreements were made in furtherance of the conspiracy alleged. These agreements, irrespective of their *per se* legality, were instruments designed and intended to accomplish the world-wide allocation of markets; their object was to achieve an unlawful purpose—an illegal restraint of trade prohibited by Section 1 of the Sherman Act. The agreements are unlawful because they provided a means for the accomplishment of this purpose and objective. We have also found that these agreements did, in operation, result in restraints of United States trade.

■ We have found that the jointly-owned companies were means designed and used by duPont and ICI to avoid and prevent competition between themselves and with others in the non-exclusive territories. They were a means used for the accomplishment of the basic understanding for the division of world-wide territories. We have found that not only were they intended to affect the export and import trade of the United States but that the limitations placed on duPont and other American companies on the exports to these jointly-owned companies and the restrictions placed on these companies with respect to sales and exports by them to the United States did achieve the purpose and end for which they were organized. Cf. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 443–444. The operations of these jointly-owned companies were in violation of the law. United States v. National Lead Co., D.C.S.D.N.Y. 1945, 63 F.Supp. 513, 524. "Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.'" Timken Roller Bearing Co. v. United States, 1950, 341 U.S. 593, 598, 71 S.Ct. 971, 974.

After an exhaustive examination of the voluminous evidence presented in this case, we conclude that the Government has proved its case: the defendants had entered into a conspiracy to divide markets, and the agreements considered in this opinion were instruments of that conspiracy.

■ In the face of this finding, the law is crystal clear: a conspiracy to divide territories, which affects American commerce, violates the Sherman Act. United States v. Timken Roller Bearing Co., D.C., 83 F.Supp. 284, affirmed 341 U.S. 593, 71 S.Ct. 971; United States v. National Lead Co., D.C., 63 F.Supp. 513, affirmed 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; United States v. General Electric Co., D.C., 80 F. Supp. 989. So settled is the law on this that in the National Lead case, supra, Judge Rifkind wrote: "No citation of authority is any longer necessary to support the proposition that a combination of competitors, which by agreement divides the world into exclusive trade areas, and suppresses all competition among the members of the combination, offends the Sherman Act." 63 F.Supp., at page 523.

■ Nor are the operations of the defendants in any way immunized under the Sherman Act by the failure of the Government to allege or attempt to prove the domination by the defendants of the industries involved. With respect to price fixing, the Supreme Court has written that such a showing is unnecessary. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, footnote 59, commencing at 224, 60 S.Ct. 811, 845, 84 L.Ed. 1129. Justice Douglas there wrote: "It is the 'contract, combination * * * or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other. * * * In view of these con-

siderations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity."

■■■ Territorial division is "in restraint of trade or commerce," no less than price fixing. It involves "the denial to commerce of the supposed protection of competition." United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 428. There is no intimation in any decision that elimination of competition is to be given a more favorable judicial consideration when achieved by the route of territorial division rather than by way of price fixing, or that proof of industry domination is required in one case though not required in the other.

■■■ Similarly do we deem irrelevant any inquiry into whether the arrangements between the parties actually injured the public interest, or whether the public benefited thereby. A like contention was decisively repudiated by the Supreme Court in the Timken decision, supra: "We also reject the suggestion that the Sherman Act should not be enforced in this case because what appellant has done is reasonable in view of current foreign trade conditions. * * * This position ignores the fact that the provisions in the Sherman Act against restraints of foreign trade are based on the assumption, and reflect the policy, that export and import trade in commodities is both possible and desirable. Those provisions of the Act are wholly inconsistent with appellant's argument that American business must be left free to participate in international cartels, that free foreign commerce in goods must be sacrificed in order to foster export of American dollars for investment in foreign factories which sell abroad. Acceptance of appellant's view would make the Sherman Act a dead letter in so far as it prohibits contracts and conspiracies in restraint of foreign trade". 341 U.S. at page 599, 71 S.Ct. at page 975.

In view of our determination that the various agreements considered were part of an over-all conspiracy to divide world territories, it becomes unnecessary to consider the *per se* validity of the individual agreements. It should be noted, however, that the Government has vigorously argued, primarily by analogy to United States v. Line Materials Co., 1948, 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701, that the Patents and Processes Agreements were illegal on their face. Our factual findings also dispose of the defendants' contention that the arrangements involving joint companies do not fall within the jurisdiction of the Sherman Act. The language of the National Lead case is particularly appropriate:

"It has been alleged and proved that a conspiracy was entered into, in the United States, to restrain and control the commerce of the world, including the foreign commerce of the United States. The several agreements relating to manufacture and trade within the European markets are but some of the links in the chain which was designed to enthral the entire commerce * * *. The object of the government's attack is a conspiracy in the United States affecting American commerce, by acts done in the United States as well as abroad." 63 F.Supp. at pages 524–525.

Even if the arrangements involving joint companies abroad were considered independently of the other agreements, the decision of the Supreme Court in the Timken case would strongly indicate that they fall within the jurisdiction of the Sherman Act and are violative of its provisions.

We have applied the law as we see it to these findings made, and we have arrived at the following.

## X. Conclusions of Law

1. This court has jurisdiction over the defendants duPont, ICI, ICI(NY), Remington, Lammot duPont, Walter S. Carpenter, Jr., and Charles K. Davis.

2. Beginning some time prior to 1920 and thereafter up to the filing of the complaint in this case, duPont and ICI, and from time to time during that period, Lammot duPont, Walter S. Carpenter, Jr., and Harry Duncan McGowan (known as Sir Harry McGowan and as Lord McGowan), Henry Mond (known as Lord Melchett),

CIL, EIL, CSAE, Duperial-Argentina, Duperial-Brazil, Bunge & Born, DAG, and I. G. Farben, and beginning with the year 1933, Remington and Charles K. Davis, were engaged in a combination and conspiracy in restraint of trade and commerce in chemical products, sporting arms and ammunition, among the several states of the United States and with foreign nations, and were parties to contracts, agreements, arrangements, and understandings in restraint of such trade and commerce, all in violation of section 1 of the Sherman Act.

3. Plaintiff is entitled to relief by appropriate decree of this Court.

Proposed decrees may be filed within thirty days from the date of the filing of this opinion and thereafter all will be heard on due notice.